Richard B. Fox, J.D., M.D.
State Bar Number 283447
1875 S. Bascom Avenue, Ste. 2400
Campbell, CA 95008
Tel: 408-402-2452
Fax: 669-221-6281
drfox@drfoxlawoffice.com
Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

Free Now Foundation, Brave And Free Santa Cruz, D.Q., by his Next Friend, Alix Mayer, A.R., by his Next Friend, Alix Mayer, T.E., by his Next Friend, Kathleen Lynch, and N.D., by his Next Friend, Kathleen Lynch;

                Plaintiffs

vs.

Erica Pan In Her Official Capacity As Director Of The California Department Of Public Health;

                Defendant

CASE NO. 2:24-cv-03523-DJC-SCR

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**DEMAND FOR JURY TRIAL**

**FIRST CAUSE OF ACTION:** Infringement Of The Fundamental Substantive Due Process Right Of Plaintiffs, And All Other Innocent California Minor Children, To Be Free From Mandated, Potentially Lethal, Injections That Can Cause Death Or Serious Permanent Illnesses, Such As Autism And Sudden Infant Death Syndrome, U.S. Constitution, Fourteenth Amendment, 42 U.S.C. § 1983
**SECOND CAUSE OF ACTION:** Infringement Of The Fundamental Substantive Due Process Right Of Plaintiffs, And All Other California Minor Children, To Be Free From Mandated Medical Injections Where The Injections Have Not Been Shown To Serve A Public Health Purpose By Preventing The Transmission Of Infection, U.S. Constitution, Fourteenth Amendment, 42 U.S.C. § 1983
**THIRD CAUSE OF ACTION:** Infringement Of The Fundamental Substantive Due Process Right Of Plaintiff Children, And All Other California Minor Children, To Attend School, U.S. Constitution, Fourteenth Amendment, 42 U.S.C. § 1983
**FOURTH CAUSE OF ACTION:** Unconstitutional Conditioning Of The Rights Of Plaintiffs, And All Other California Minor Children, To Their California Benefit Of A Free Public Education On Condition That Plaintiffs Give Up Their Fundamental Right To Be Free Of Mandated Injections, 42 U.S.C. § 1983
**FIFTH CAUSE OF ACTION:** Failure To Afford Strict Scrutiny Procedural Due Process To Plaintiffs, And All Other California Minor Children, Who Wish To Exercise Their Fundamental Substantive Due Process Right To Be Free Of California's Mandated Injections Required For School Attendance, 42 U.S.C. § 1983

This Second Amended Complaint is filed this date pursuant to the Court's order of May 30, 2025. ECF #38.

**TABLE OF CONTENTS**

1.     INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    1.1    *Jacobson v. Massachusetts* Is Not Authority For California's Vaccine Mandates For

           School Children Because Government Data Show That Those Vaccines Are Not

           Safe And, Instead, Cause Widespread Injury And Death . . . . . . . . . . . . . . . . . . 8

    1.2    *Jacobson v. Massachusetts* Is Not Authority For California's Vaccine Mandates For

           School Children Because Those Vaccines Do Not Prevent Transmission Of The

           Relevant Infections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

2.     JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    2.1    Subject Matter Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    2.2    Personal Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    2.3    Venue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

3.     THE PLAINTIFFS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    3.1    Plaintiff Free Now Foundation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    3.2    Minor Child D.Q. And His Next Friend, Alix Mayer. . . . . . . . . . . . . . . . . . . 19

    3.3    Minor Child A.R.. And His Next Friend, Alix Mayer . . . . . . . . . . . . . . . . . . 20

    3.4    Minor Child T.E. And His Next Friend, Kathleen Lynch    . . . . . . . . . . . . . . 20

    3.5    Minor Child N.D. And His Next Friend, Kathleen Lynch    . . . . . . . . . . . . . . 21

    3.6    Plaintiff Free Now Foundation Has Associational Standing In This Case . . . . . . . 22

    3.7    Plaintiff Brave And Free Santa Cruz Has Associational Status In This Case . . . . 23

4.     DEFENDANT, ERICA PAN, IN HER OFFICIAL CAPACITY AS DIRECTOR OF THE

      CALIFORNIA DEPARTMENT OF PUBLIC HEALTH. . . . . . . . . . . . . . . . . . . 24

5.     STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    5.1    California's Mandated Immunizations Under Health And Safety Code Section 120335

           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

5.2   Congress Finds That California's Mandated Immunizations Cause Permanent,
      Compensable, Injury Under The National Childhood Vaccine Injury Act (NCVIA)
      Of 1986 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

5.3   Most Injuries And Deaths Due To California's Mandated Immunizations Are Not
      Compensable Under The NCVIA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

5.4   California's Mandated Immunizations Have Many Unavoidable Adverse Effects,
      Including Neuro-Developmental Delay And Learning Disability . . . . . . . . . . . . 31

      5.4.1   The Many Immunizations Required To Attend School In California. . . . . 31

      5.4.2   Neither California Nor The CDC Have Repor ted Studies Comparing The
              Adverse Events In Vaccinated Children Versus Those In Unvaccinated
              Children ("VU Studies", Similar To Placebo-Controlled Studies) To Prove
              The Safety And Effectiveness Of Their Vaccines . . . . . . . . . . . . . . . . . . . 33

      5.4.3   Unofficial Studies Show That The Immunizations Mandated Under Health
              and Safety Code Section 120335 Cause Serious, Irreparable, Injury And Death
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

              5.4.3.1 Comparison Of Autism Rates Between Vaccinated And
                      Unvaccinated Children ("VU Studies") Show That Mandated
                      Immunizations Are The Likely Cause Of Many Cases Of Childhood
                      Autism, Especially Among African-American Boys . . . . . . . . . . 33

                      5.4.3.1.1   Vaccinated Florida Children On Medicaid Have Far
                                  Higher Rates of Neuro-developmental Delay,
                                  Including Autism, Than Those Who Are
                                  Unvaccinated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

                      5.4.3.1.2   Two VU Studies Found Lower Than Expected Rates
                                  Of Autism In The Amish Community That Has Low
                                  Rates Of Vaccination . . . . . . . . . . . . . . . . . . . . . . . 34

                      5.4.3.1.3   Autism And Other Neurodevelopmental Disorders
                                  Are Four Times More Common Among Vaccinated
                                  Homeschooled Children Than Among Those
                                  Homeschooled That Are Unvaccinated, And Even

More Common Among Non-White Boys . . . . . . . . [35](#35)

5.4.3.1.4     According To The CDC's Vaccine Adverse Event Reporting System (VAERS), The Most Common Age For The Onset Of Autism Spectrum Disorder Is Age One To Three Years And It Most Commonly Strikes On The Very Same Day As A Vaccination. . . . . . . [39](#39)

5.4.3.1.5     Autism Is More Common Among Ethiopian And Somali Children Born In Western Countries Than Among Those Born In Their Native Countries. . . . [44](#44)

5.4.3.1.6     U.S. Pediatric Doctors With Substantial Numbers Of Unvaccinated Children In Their Practices Find That Autism And Neurodevelopmental Delay Rates Are Much Higher Among The Vaccinated Than Among The Unvaccinated . . . . . . . . . . . . . . . . . . . . . . . . . [45](#45)

5.4.3.1.7     If Childhood Vaccines Don't Cause Autism, How Do You Explain The McDowell Infant Triplets All Becoming Autistic On The Very Same Day Within A Few Hours Of Their CDC-Recommended Vaccinations? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [49](#49)

5.4.3.1.8     California, Where Childhood Immunizations Are Strictly Enforced, Has A Child Autism Rate 64% Higher Than The National Average . . . . . . . . . . . [50](#50)

5.4.3.2 Infant Immunizations Are The Likely Cause Of A Substantial Number Of Sudden Unexpected Infant Deaths (SUID)(Crib Deaths) [51](#51)

5.4.3.2.1     A Veteran Police Investigator Has Reported That 50% Of The More Than 250 SUID Cases She Has Investigated Occurred Within 48 Hours Of The Infant's Immunization And 70% Within One Week [51](#51)

5.4.3.2.2     VAERS Data From The CDC Also Show Increased Frequency Of Sudden Unexplained Infant Death

(SUID) Immediately Following Infant Immunizations 54

        5.4.3.2.3    The Rate Of Sudden Unexpected Infant Death For African-American Infants Is Twice That Of Non-Hispanic White And Hispanic Infants . . . . . . . . . . 56

        5.4.3.2.4    The Studies Cited By The CDC To Show That Infant Immunizations Do Not Cause SUID Did Not Examine The Interval Between Immunization And Death . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

        5.4.3.2.5    Neurotoxic Aluminum Adjuvant Overload May Also Contribute To Sudden Unexpected Infant Death (SUID) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

      5.4.3.3 Increased Rates Of Asthma, Type 1 Diabetes, Inflammatory Bowel Disease, Rheumatoid Arthritis, and Thyroid Inflammation Are Reported In Vaccinated Children Versus Those Unvaccinated . . . 65

      5.4.3.4 Parents Share Their Tragic Stories Of Vaccination Injuries. . . . . . 69

        5.4.3.4.1    The One Year-Old Daughter Of Shanticia Nelson And Dayon Carter Died Suddenly Just A Few Hours After Her Routine Immunizations. . . . . . . . . . . . . 69

        5.4.3.4.2    Other Parents Share Their Tragic Stories Of Vaccination Injuries . . . . . . . . . . . . . . . . . . . . . . . 70

    5.4.4   Childhood Immunizations Required By California Health And Safety Code Section 120335 Are Not Clearly Necessary To Prevent Serious Infection In Children. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

      5.4.4.1 No Overall Net Benefit Of Measles Immunization Has Been Shown By VU Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

      5.4.4.2 No Overall Net Benefit Of Polio Immunization Has Been Shown By VU Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

  5.5   The California Department Of Public Health, Working With The Medical And Osteopathic Medical Boards Of California Have Made Medical Exemptions Very Difficult For Parents To Obtain For Their Children In Derogation Of Their Due

Process Rights Under A Strict Scrutiny Standard Of Review . . . . . . . . . . . . . . . 77

6.      CALIFORNIA'S IMMUNIZATION STATUTES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

7.      CAUSES OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

        7.1     FIRST CAUSE OF ACTION: Infringement Of The Fundamental Substantive Due
                Process Right Of Plaintiffs, And All Other Innocent California Minor Children, To
                Be Free From Mandated, Potentially Lethal, Injections That Can Cause Death Or
                Serious Permanent Illnesses, Such As Autism And Sudden Infant Death Syndrome,
                U.S. Constitution, Fourteenth Amendment, 42 U.S.C. § 1983 . . . . . . . . . . . . . . 84

        7.2     SECOND CAUSE OF ACTION: Infringement Of The Fundamental Substantive
                Due Process Right Of Plaintiffs, And All Other California Minor Children, To Be
                Free From Mandated Medical Injections Where The Injections Have Not Been
                Shown To Serve A Public Health Purpose By Preventing The Transmission Of
                Infection, U.S. Constitution, Fourteenth Amendment, 42 U.S.C. § 1983 . . . . . . . 85

        7.3     THIRD CAUSE OF ACTION: Infringement Of The Fundamental Substantive Due
                Process Right Of Plaintiff Children, And All Other California Minor Children, To
                Attend School, U.S. Constitution, Fourteenth Amendment, 42 U.S.C. § 1983 . . . 86

        7.4     FOURTH CAUSE OF ACTION: Unconstitutional Conditioning Of The Rights Of
                Plaintiffs, And All Other California Minor Children, To Their California Benefit Of
                A Free Public Education On Condition That Plaintiffs Give Up Their Fundamental
                Right To Be Free Of Mandated Injections, 42 U.S.C. § 1983 . . . . . . . . . . . . . . . 87

        7.5     FIFTH CAUSE OF ACTION: Failure To Afford Strict Scrutiny Procedural Due
                Process To Plaintiffs, And All Other California Minor Children, Who Wish To
                Exercise Their Fundamental Substantive Due Process Right To Be Free Of
                California's Mandated Injections Required For School Attendance, 42 U.S.C. §
                1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

8.      IRREPARABLE INJURY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

9.     PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

COME NOW Plaintiffs Free Now Foundation, Brave and Free Santa Cruz, minor children D.Q., A.R., T.E., and N.D., by their attorney, and hereby allege against the Defendants as follows:

**1.  INTRODUCTION**

1.  This Second Amended Complaint seeks to permanently enjoin the Director of the California Department of Public Health (CDPH) from enforcing, as to: (a) the named plaintiffs and (b) all other California children, the immunizations mandated under California Health and Safety Code Section 120335(b) for children attending schools, both public and private, pre-schools, and day care centers because:

(a)  the U.S. Congress found, when it passed the National Childhood Vaccine Injury Act (NCVIA), that those vaccines often cause permanent injury and death such that mandating those vaccines infringes upon the child's fundamental right to be free of physical harm inflicted by the government and the parents' fundamental right to determine the child's medical care, and

(b)  the President has directed Department of Health and Human Services Secretary Kennedy to investigate the cause(s) of the childhood autism epidemic, including whether childhood immunizations are such a cause, and eliminate them, and

(c)  childhood vaccines have not been shown to prevent transmission of their respective infections and thus cannot be mandated under the public health rationale of *Jacobson v. Massachusetts*, and

(d)  California's immunization statute does not allow the child to opt-out of those requirements by paying a reasonable fine, in contrast to the Massachusetts statute upheld in *Jacobson v. Massachusetts*.

2.  Heretofore, the courts have deferred to laws mandating these deadly vaccines under the Supreme Court's 1905 decision in *Jacobson v. Massachusetts* permitting Massachusetts to require smallpox vaccinations for adults under its police powers on the basis that those vaccinations were  known: (a) **to be safe**, and (b) **to prevent the transmission of the infection to the public.** As explained below, Jacobson does not apply to California's vaccine mandates because those vaccines: (a) are not safe, )b) have not been shown to prevent the transmission of the relevant infections to the public, and (c) do not allow the child to opt-out of the immunization requirements

by paying a reasonable fine.

**1.1** ***Jacobson v. Massachusetts* Is Not Authority For California's Vaccine Mandates For School Children Because Government Data Show That Those Vaccines Are Not Safe And, Instead, Cause Widespread Injury And Death**

3.     The two most common serious vaccine injuries are autism and Sudden Unexpected Infant Death (SUID).

4.     The U.S. Centers for Disease Control (CDC) reports that autism now strikes one in thirty-one U.S. children, with vaccine-mandating California leading the nation with a rate of one in twenty. For California boys, the rate is one in twelve.

5.     Most are regressive autism cases in which a previously normally developing child suddenly becomes autistic within hours or a few days of an immunization.

6.     With California having a population of about 8,680,000 children, as many as 400,000 of them may be autistic, with many more autistic adults.

7.     The CDC reports that nearly 40% have IQ's less than or equal to 70 and are considered intellectually disabled. They need life-long custodial care, with most of that burden falling on the parents, especially mothers.

8.     Those of school age require expensive special education services. California has about 850,000 students in special education classes. About 170,000 (20%) are autistic.

9.     California receives almost $15 billion in federal funds for special education. Twenty percent of that would be $3 billion per year.

10.     In a recent meeting of President Trump's Cabinet, U.S. Department of Health and Human Services Secretary Kennedy announced that the nation's autism rate has increased from one in ten thousand, when he was a child, to now one in thirty-one:

DHHS Secretary Kennedy to President Trump: We're trying to refocus the press to get them to pay attention to the chronic disease epidemic as you've asked us to. We have now thirty eight percent of American youth are prediabetic. This was unknown thirty years ago. Every child that becomes diabetic, there should be a headline about them. We have a hundred million adults who are prediabetic or diabetic. And, and we have as you, we have now the autism rates have gone from now most recent numbers we think are gonna be about one in thirty one. One in twelve, so they're going up again from one in ten thousand when I was a kid. And we are going at your direction. We are gonna know by September. We've launched a massive, testing and research effort that's gonna involve hundreds of scientists from around the world. By September, we will know what has caused the autism epidemic, and we'll be we'll be able to eliminate those exposures.

President Trump: Think of that. So it was one in ten thousand children had autism, and now it's one in thirty one. Not thirty one thousand, thirty one. That is a that's a horrible statistic, isn't it? And there's gotta be something artificial out there that's doing this. So you think you're gonna have a pretty good idea?

Secretary Kennedy: We will know by September.

President Trump: There there will be no bigger news conference than that. So that's that's it. If you can come up with that answer where you stop taking something, you stop eating something, or maybe it's a shot, but something's causing it. It can't be it can't be, from 10,000 to can you imagine that, Marco? That's a big that's a big number. Thank you very much. You're doing great. Thank you, Bobby.[1]

11.    Quite clearly, this effort to identify and **eliminate** the causes of autism is a very high priority for the Trump administration, up to and including the President himself.

12.    Given that Secretary Kennedy has already published a book[2] describing the connection of childhood vaccines with regressive autism, there is little question that vaccines will be found to be at least a risk factor for regressive autism for at least some children. The only remaining question is how many more California children, **one in every twelve boys**, and families will be devastated by these vaccines until that reality is acknowledged by California by repealing its vaccine mandates?


**McDowell Triplets Before Vaccines**


**McDowell Triplets, Three Months Post-Vaccines**

13.    The rebuttal argument is that autism is genetic, and, indeed, it is more common in some sibships that in others, such as the well-known and tragic case of the McDowell triplets, where all three became autistic, lost in their own little worlds. However, all three became autistic **on the same day within six hours of their vaccinations** at nine months of age. https://rumble.com/v6riho3-mcdowells-triplets-shut-down-after-routine-injections-later-diagnosed-with-.html. That was no coincidence.

---

[1] RFK Jr. says Trump administration will identify and eliminate cause of autism 'by September'. PBS, April 10, 2025, at: https://www.youtube.com/watch?v=w9D-9lNV5JY.

[2] Vax-Unvax. Robert F. Kennedy, Jr. and Brian Hooker. Skyhorse Publishing, 2023.

SECOND AMENDED COMPLAINT - PAGE 11

14.     Thus, while genetics may be an underlying cause that cannot be changed, it only loads the gun. Vaccines are often the proximate cause that pulls the trigger, a proximate cause that can be changed.

15.     Nor does California allow any exceptions to its vaccination requirements for a child who already has a sibling with autism, or **even for the autistic child himself!**

16.     There is also a very close relationship between the increased childhood vaccines recommended by the CDC and the increased number of autistic children between 1970 and 2015, as seen in this graphic.



17.     The recently released report of the U.S. Centers For Disease Control in their Morbidity and Mortality Weekly Report, entitled "Prevalence and Early Identification of Autism Spectrum Disorder Among Children Aged 4 and 8 Years — Autism and Developmental Disabilities Monitoring Network, 16 Sites, United States, 2022," was shocking.[3]

> Among children aged 8 years in 2022, ASD prevalence was 32.2 per 1,000 children (one in 31) across the 16 reporting sites, ranging from 9.7 in Texas (Laredo) to 53.1 in California. The overall observed prevalence estimate was similar to estimates calculated using Bayesian hierarchical and random effects models. ASD was 3.4 times as prevalent among boys (49.2) than girls (14.3). Overall, ASD prevalence was lower among non-Hispanic White (White) children (27.7) than among Asian or Pacific Islander (A/PI) (38.2), American Indian or Alaska Native (AI/AN) (37.5), non-Hispanic Black or African American (Black) (36.6), Hispanic or Latino (Hispanic) (33.0), and multiracial children (31.9).
> Among 5,292 (61.4% of 8,613) children aged 8 years with ASD with information on cognitive ability, 39.6% were classified as having an intellectual disability. Intellectual disability was present among 52.8% of Black, 50.0% of AI/AN, 43.9% of A/PI, 38.8% of

---

[3] Morbidity and Mortality Weekly Report (MMWR), Prevalence and Early Identification of Autism Spectrum Disorder Among Children Aged 4 and 8 Years — Autism and Developmental Disabilities Monitoring Network, 16 Sites, United States, 2022, Surveillance Summaries, April 17, 2025 / 74(2);1–22. https://www.cdc.gov/mmwr/volumes/74/ss/ss7402a1.htm?utm_source=substack&utm_medium=email.

Hispanic, 32.7% of White, and 31.2% of multiracial children with ASD.

18.     The reported rate of 53.1 per thousand in California is one in every nineteen. Given that ASD is 3.4 times more common in boys, the odds of ASD for California boys is one in every twelve.

19.     The prevalence of intellectual disability, *i.e.,* I.Q. less or equal to 70,  was particularly shocking at 39.6% overall. Thus, the rate of severe ASD (intellectual disability) for California boys would be one in every thirty. These are children who will typically not have a vocabulary of more than a few dozen words, will never be continent, will always require special education, never be employable, and will require custodial care for their entire lives at great personal and public expense. Individual children and parents should not have to, themselves, bear the personal and financial costs of public health measures.

20.     The CDC reports that Sudden Unexpected Infant Death (SUID) strikes about 3,700 otherwise healthy U.S. infants per year, about ten every day. About one in ten of those is a California infant, about one every day. A veteran police SUID investigator estimates that about half of SUID occur within 72 hours of an immunization and, overall, about 85% were likely due to immunization. If a California child was killed in a school shooting every single day, we would put a stop to it immediately. Not so for the children killed by California-mandated immunizations.

21.     It is unconscionable for California to continue to mandate vaccine-related death, literally lethal injections, for all these innocent children.

**1.2     *Jacobson v. Massachusetts* Is Not Authority For California's Vaccine Mandates For School Children Because Those Vaccines Do Not Prevent Transmission Of The Relevant Infections**

22.     Heretofore, the courts have deferred to laws mandating these deadly vaccines under the Supreme Court's 1905 decision in *Jacobson v. Massachusetts* permitting Massachusetts to require smallpox vaccinations for adults under its police powers on the basis that those vaccinations were known: (1) **to be safe**, and**(2) to prevent the transmission of the infection to the public.**

23.     However, the Ninth Circuit Court of Appeals recently ruled, in *Health Freedom Def. Fund v. Carvalho*, that *Jacobson* would not apply to COVID-19 immunization requirements

1    under *Jacobson's* public health rationale if COVID-19 vaccines **did not prevent transmission of**
2    **COVID-19 infections.**

3        24.    Here, California does not have data to show that the vaccines that it requires for
4    schoolchildren do actually prevent  transmission of the relevant infections and the VICP data,
5    above and below, show that California's mandated immunizations do often cause injury and death.

6        25.    Besides the *Health Freedom Def. Fund* decision*, Jacobson*, decided 120 years ago
7    under rational basis review, has long been superceded by two developments, (1) the line of
8    decisions by the U.S. Supreme Court setting forth the doctrine of strict scrutiny for the
9    infringement of fundamental rights, and (2) the enactment by Congress of the National Childhood
10   Vaccine Injury Act establishing a multi-billion dollar fund to provide compensation for at least
11   some of the vaccine injuries.

12       26.    In 1986 the Congress recognized that newer vaccines, developed since 1905, can
13   have serious, permanent, and even fatal, complications when it enacted the Nation Childhood
14   Vaccine Injury Act (NCVIA). The NCVIA established the National Vaccine Injury Compensation
15   Program to compensate the victims of vaccine injury as the sole means of compensation for such
16   injuries in lieu of tort claims asserted against vaccine makers, who now enjoy statutory immunity
17   under that Act.

18       27.    The enormity of vaccine-related injury and death from these often mandated
19   immunizations is staggering. Since 1988, over 28,292 petitions have been filed with the National
20   Vaccine Injury Compensation Program (NVICP). Over that 30-year time period, 24,602 petitions
21   have been adjudicated, with 11,671 of those determined to be compensable, while 12,931 were
22   dismissed. Total compensation paid over the life of the program is approximately $5.3 billion.[4] As
23   of December 1, 2011 the NVICP had paid awards for 390 deaths. Furthermore, the NCVIA does
24   not generally cover autism and Sudden Unexpected Infant Death cases, among the most common
25   and serious vaccine injuries.

26

27   _____

28       [4] National Vaccine Injury Compensation Program, Monthly Statistics Report, February 2025, as
     downloaded at:
     https://www.hrsa.gov/sites/default/files/hrsa/advisory-committees/vaccines/vicp-stats-02-01-25.pdf

28.     All these vaccine injuries and deaths requiring all this compensation has put many states, including California, in the position of requiring children to be immunized with vaccines that California knows full well will seriously and permanently injure, and even kill, some of them, with its courts still relying upon *Jacobson* for the authority to do so.[5]

29.     **However, by mandating immunizations that it knows full well will permanently injure and kill some children, California has crossed a red line that forbids the state to harm some for the benefit of others.**

30.     That bedrock principle of Anglo-Saxon law was cogently expressed in *McFall v. Shimp*.[6] In that case McFall suffered from a rare bone marrow disease with a very dim prognosis for survival unless he received a bone marrow transplant from a compatible donor. A cousin, Shimp, was the only compatible donor but refused to donate the necessary bone marrow. McFall then sought an order from the court to require Shimp to donate the necessary bone marrow but the court refused to issue such an order, stating that:

> The common law has consistently held to a rule which provides that one human being is under no legal compulsion to give aid or to take action to save another human being or to rescue. A great deal has been written regarding this rule which, on the surface, appears to be revolting in a moral sense. Introspection, however, will demonstrate that the rule is founded upon the very essence of our free society. It is noteworthy that counsel for plaintiff has cited authority which has developed in other societies in support of plaintiff's request in this instance. Our society, contrary to many others, has as its first principle, the respect for the individual, and that society and government exist to protect the individual from being invaded and hurt by another. Many societies adopt a contrary view which has the individual existing to serve the society as a whole. In preserving such a society as we have, it is bound to happen that great moral conflicts will arise and will appear harsh in a given instance. In this case, the chancellor is being asked to force one member of society to undergo a medical procedure which would provide that part of that individual's body would be removed from him and given to another so that the other could live. Morally, this decision rests with defendant, and, in the view of the court, the refusal of defendant is morally indefensible. **For our law to compel defendant to submit to an intrusion of his body would change every concept and principle upon which our society is founded. To do so would defeat the sanctity of the individual, and would impose a rule which would know no limits, and one could not imagine where the line would be drawn.**[7]

31.     Shimp was not asked to submit to anything known to the Congress to cause severe

---

[5] *Love v. State Dep't of Educ*, 29 Cal.App.5th 980, 985, 240 Cal.Rptr.3d 861 (2018).

[6] *McFall v. Shimp*, 10 Pa. D. & C. 3d 90 - Pa: Court of Common Pleas 1978

[7] *Id.,* at 91 (emphasis added.)

injury and death, such as childhood vaccines, but only to donate some of his bone marrow which would have caused him little harm in the short term and none in the long term.

32.    *McFall v. Shimp* is an unusual case, not because the need to procure organs from donors is uncommon, the need is very common. What was uncommon about the *McFall* case is that McFall thought that he could get a court to order it, that's the unusual part. Everyone knows that, in this country, the government and the courts do **not order** people to give up their organs for the benefit of others, even if the donation would not seriously harm them. Indeed, reports of forced organ donation in China are universally condemned in this country.

33.    Many years before *McFall* the *Jacobson* court labored to find a legal principle upon which it could justify the mandated smallpox vaccination policies that were enacted in that era. It settled on the existing power of quarantine, analogizing that compulsory vaccination was just another police powers measure for controlling the spread of infection. However, neither the *Jacobson* court nor subsequent courts have considered that: (1) whereas quarantine is merely a temporary inconvenience with no lasting physical harms, mandated immunizations often do cause permanent harm and death, (2) whereas quarantine is only applied for a short time to those few who are known to pose an imminent threat to the public, mandated immunizations are applied long term to multitudes of healthy people who pose no imminent threat to anyone, (3) whereas those subjected to quarantine are entitled to due process of law to challenge the medical necessity for their quarantine,[8] those subjected to mandated immunizations are entitled to no due process as to the medical necessity for their immunizations.

34.    The *Jacobson* court more broadly construed mandated vaccination as being among the police powers of the state to "enact quarantine laws and health laws of every description... [a]ccording to settled principles, the police power of a state must be held to embrace, at least, such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety."

35.    The *Jacobson* court then inquired as to whether "...any right given or secured by the

_____

[8] *Jew Ho v. Williamson*, 103 F. 10 (1900)(finding that quarantine was simply a pretext to confine the Chinese population in San Francisco.)

Constitution is invaded by the statute as interpreted by the state court." *Id.,* at 25-26. The Court

held that, "[t]he possession and enjoyment of all rights are subject to such **reasonable** conditions

as may be deemed by the governing authority of the country essential to the safety, health, peace,

good order, and morals of the community. *Id.,* at 26, emphasis added. Thus, under *Jacobson* in

1905, such mandated vaccination was reviewed under a deferential rational basis standard of

review for a public health purpose under the state's inherent policing powers.

36.     The *Jacobson* court considered the objections that Jacobson raised as to potential

beneficial and harmful effects of smallpox vaccination in light of the medical opinion of the day

and specifically limited its holding to that small pox vaccination under the common understanding

of the time that it was safe: "We now decide only that the statute covers the present case, and that

nothing clearly appears that would justify this court in holding it to be unconstitutional and

inoperative in its application to the plaintiff in error."[9]

37.     Thus, *Jacobson* is not authority for the power of the state to mandate, without

infringing upon any constitutional rights, *any and all current or future* vaccines, for all persons,

adults or children, regardless of their harms or effectiveness for a public health purpose, especially

now that the U.S. Congress has found that childhood vaccines **do cause injuries and deaths** and

the federal government has paid out $5.3 billion for those injuries and deaths under that legislation.

38.     The other key *post-Jacobson* development was the Supreme Court's adoption of the

"strict scrutiny" standard of review in 1942 for state-mandated medical procedures in *Skinner v.

Oklahoma.*[10] Given that the federal government has already determined that at least 11,000 have

been injured or killed by childhood vaccines, there is no real room left to debate whether the

vaccines mandated by the State of California for school attendance can cause serious, permanent,

physical injury, just as in *Skinner.* Clearly, strict scrutiny applies.

39.     The requirements for strict scrutiny review are well known and accepted: the

---

[9] *Henning Jacobson v. Commonwealth of Massachusetts,* 197 U.S. 11, 39, 25 S.Ct. 358, 49 L.Ed. 643 (1905).

[10] *Skinner v. State of Oklahoma Williamson*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). The High Court has since expanded strict scrutiny review to many other cases where the state proposes to restrict or eliminate fundamental constitutional rights.

measures under review must serve a "compelling government interest" and must do so "using the least restrictive means available."[11] But, what if the government *does* have a "compelling interest" and it *is* using the "least restrictive means available" can the government still then go ahead and impose hazardous conditions or treatments upon individuals or infringe on fundamental rights in order to achieve that greater, compelling government interest? Clearly, under *McFall*, the answer is **no.**

40.     Indeed, the Congress has already found that the risk of harm from those mandated immunizations is so constant and foreseeable as to require legislation to provide compensation for it. This clearly violates *McFall's* "first principle, the respect for the individual, and that society and government exist to protect the individual from being invaded and hurt by another," especially being intentionally hurt by the government itself.

41.     The objection to this argument is that the parents are not forced to vaccinate their children if they are willing to forfeit their *Meyer-Pierce* right to educate their children. This, of course, is an unconstitutional conditions violation.[12] The state cannot require a child to give up one fundamental right in order to enjoy another. Furthermore, under *Jacobson,* there was an opt-out by paying a modest fine; the person did not entirely forfeit a very valuable government benefit.

42.     Yet another objection is that healthy children should not have to sit next to infectious children in school. The simple solution is that children with fevers should not be sent to school and, if in school, should be dismissed, similar to the quarantine approved in *Jacobson.* Quarantine is a temporary solution that causes no harm other than temporary inconvenience, focused on actually infectious persons, whereas vaccination broadly affects an entire population, infectious or not, permanently and often without full knowledge of the long term effects of such immunizations. Furthermore, if persons wish themselves or their children to be vaccinated with approved vaccines, they may do so. But, if those vaccines are, indeed, effective, then there is no risk of infection regardless of whether the children sitting next to their children are immunized or

---

[11] *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 US 520 (1993).

[12] *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)(government ... may not deny a benefit to a person on a basis that infringes his constitutionally protected interests.)

1    not. As held in *McFall,* children do not have a duty to put themselves in harm's way for the

2    supposed benefit of other children who should be protected by their own immunizations anyway if

3    the parents wish for the child to be so protected.

4            43.     Finally, there is a great problem in this case with the allocation of the burden of

5    proof, which, under strict scrutiny, belongs to the state. Congress has already found childhood

6    vaccines to be harmful such that Congress has given the manufacturers robust immunity from

7    damage claims. Furthermore, those vaccines are all under investigation by the Department of

8    Health and Human Services as possible causes of the autism epidemic. Yet, California insists that

9    it is the parents who should bear the burden of proof as to whether their children are at risk from

10   those vaccines by being required to get exemption letters from doctors, doctors who are then

11   stripped of their medical licenses for writing more than five in a year out of the thousands of

12   children that they see.[13] It is as if the FAA mandated that people must fly in airplanes that are under

13   investigation for causing crashes, yet the FAA insists that they are safe, ignoring all evidence to the

14   contrary, that the burden of proving otherwise rests with the lay passengers to prove that the

15   airplane are unsafe for themselves and their children to fly in, that any airplane inspectors who

16   report any hazards will be investigated and likely fired, that the airplane manufacturers enjoy

17   statutory immunity, and the children whose parents refuse to accept such risks may then never

18   leave home. Seriously, how does such a law survive strict, or even rational basis, scrutiny?

19           44.     Far more importantly, this is not a strict scrutiny case where competing interests

20   must be balanced "in the least restrictive" way. No, this is a *McFall* case where California has

21   crossed a bright red line forbidding the state to compel innocent little infants and children to risk,

22   and even lose, their lives and health for the alleged benefit of others, a line that must be strictly

23   enforced or no one will be free from government oppression in the name of public health.

24   **2.      JURISDICTION AND VENUE**

25           **2.1      Subject Matter Jurisdiction**

26           45.     This court has jurisdiction over this action because it arises under the laws of the

27

28
_____
[13] California Health and Safety Code Section 120372(d)(2)(B).

United States, 28 U.S.C. §§ 1331, 1343, and 1346, with the claims arising under 42 U.S.C. § 1983 (deprivation of civil rights).

46.     This Court has authority to grant the requested injunctive relief under 28 U.S.C. Section 1343; the requested declaratory relief under 28 U.S.C. Sections 2201 and 2202, and costs and attorneys and expert's fees under 42 U.S.C. section 1988 (b)-(c).

**2.2     Personal Jurisdiction**

47.     Personal jurisdiction as to defendant Erica Pan, in her official capacity as Director of the California Department of Public Health ("CDPH"), arises under Fed.R.Civ.P., Rule 4(j).

**2.3     Venue**

48.     Venue is appropriate in this court, under 28 U.S.C. § 1391, because a substantial part of the acts giving rise to this lawsuit occurred in this district, specifically the acts of Tomás Aragón, former Director of the California Department of Public Health, and Erica Pan, current Director of the California Department of Public Health.

**3.     THE PLAINTIFFS**

**3.1     Plaintiff Free Now Foundation**

49.     Plaintiff Free Now Foundation was incorporated as a non-profit corporation on April 7, 2023 and operates principally in California. It maintains a website at https://freenowfoundation.org/.

50.     The main caption on that page is, "Defending Medical Freedom." The sub-caption on that page is, "Because Parents Call the Shots."

51.     One of the primary stated purposes of Free Now Foundation is to protect civil liberties and health rights for all, especially children.

52.     To this date, Free Now Foundation has approximately 30,000 members, with social media followings in the tens of thousands. The Foundation included a "Legal Warrior Club." Members of the Legal Warriors Club contribute funds monthly or as one time gifts to support the Foundation's litigation activities.

53.     A substantial number of Free Now Foundation's membership includes individuals who question the constitutionality of CA Health & Safety Code Section 120335, and what right

1  any governmental or legislative body has to mandate that an individual forego one fundamental

2  right for another.

3      54.    The members and followers of Free Now Foundation include significant numbers of

4  parents and grandparents of California children who wish to attend California schools, pre-schools,

5  and daycare centers without regard to their immunization status.

6      **3.2**    **Minor Child D.Q. And His Next Friend, Alix Mayer**

7      55.    Minor Child D.Q. is 15 years old.

8      56.    D.Q. attended high school in the Ventura Unified School District until the school

9  went on vacation break at the end of calendar year 2024.

10     57.    In December of 2024 the VUSD requested D.Q.'s immunization records from his

11 mother, which she submitted on December 20, 2024. It was her understanding at that time, and still

12 is, that those records met the requirements of both SB277 and CA Code of Regulations Title 17,

13 Division 1 Chapter 4 Article 4 Records as Evidence of Immunization.

14     58.    When D.Q. returned to high school on January 7, 2025 to resume his classes he was

15 summoned to the school's administrative offices and informed that he could not return to school

16 until he complied with the school district's immunization policies.

17     59.    At that time his mother was summoned to the school to take D.Q. home with her

18 until she could produce school immunization records that were satisfactory to the school.

19     60.    An email to D.Q.'s mother later that day informed her that the school would review

20 the materials that she had provided to the school but that D.Q. would continue to be excluded until

21 that review was complete.

22     61.    The VUSD submitted D.Q.'s immunization records to the Ventura County

23 Department of Public Health and the Immunization Branch of the California Department of Public

24 Health (CDPH). The VUSD was advised by the CDPH that D.Q.'s immunization records were not

25 sufficient to allow him to attend school in California.

26     62.    On the basis of the position of the CDPH, VUSD advised D.Q.'s mother that D.Q.

27 would continue to be excluded from his school. He has now been excluded from attending school

28 for the past six months.

63. D.Q.'s mother has asked her friend, Alix Mayer, to serve as D.Q.'s Next Friend for the purposes of this lawsuit and Alix Mayer has agreed to so serve, subject to the modification or termination of that Next Friend status by D.Q.'s mother at any time.

64. Alix Mayer is a member of plaintiff Free Now Foundation.

**3.3     Minor Child A.R.. And His Next Friend, Alix Mayer**

65. Minor child A.R. is 11 years of age. He is a Hispanic American.

66. A.R. attends a private church school in Santa Cruz County.

67. The adult brother of A.R. was informed by the secretary of that school that she had been contacted by Lauren Tranchitia, BSN, RN, the Immunization Coordinator for the County of Santa Cruz Department of Public Health, and told by nurse Tranchita that his brother (A.R.) must show that he has all the immunizations on the schedule that Ms. Tranchita left with the secretary, and which the secretary forwarded to the adult brother of A.R. in order to remain enrolled at the church school. The secretary stated to the adult brother of A.R. that nurse Tranchita had stated that the immunizations should be completed within ten days.

68. Nurse Tranchita was at A.R.'s school to do an audit of the school's immunization records pursuant to California immunization law. Once her audit was complete she sent the documented findings to schools with students out of compliance. She will also sent a copy upon request to the California Department of Public Health. Additionally, her findings recommended that the school send a 10 day notice to out of compliance students. This recommendation was in accordance with the requirements of the California School Immunization Law, Health and Safety Code sections 120325-120375.

69. The parents and adult brother of A.R. have asked that Alix Mayer serve as A.R.'s Next Friend for the purposes of this lawsuit and Alix Mayer has agreed to so serve, subject to the modification or termination of that Next Friend status by the parents and/or the adult brother of A.R. at any time.

**3.4     Minor Child T.E. And His Next Friend, Kathleen Lynch**

70. Minor Child T.E. resides in Santa Cruz County. T.E. is 16 years of age.

71. On the first day back from winter break 1/5/2022, T.E. was sent to the office of the

Junior High School he then attended and told that he had to be picked up by his parents. He was no longer allowed to attend that school due to the fact that his immunizations were not up to date.

72.     T.E. was, at the time, a straight A student in accelerated classes. He was a member of the Junior Scholars Federation. He had many friends and participated in multiple clubs. He was devastated and humiliated having to leave and ultimately be excluded from in-person education. The school district actually sent his parents an exclusion letter.

73.     T.E.'s parents do not wish him to have those immunizations because they believe that those immunizations could be harmful to their son and do not wish him to be thus harmed.

74.     T.E. and his parents wish that T.E. could return to a public high school in his area but are barred from doing so by the vaccination requirements imposed upon T.E. by the California Department of Public Health.

75.     The parents of T.E. have asked that Kathleen Lynch serve as T.E.'s Next Friend for the purposes of this lawsuit and Kathleen Lynch has agreed to so serve, subject to the modification or termination of that Next Friend status by the parents of T.E. at any time.

76.     Kathleen Lynch is a member of Brave and Free Santa Cruz.

**3.5     Minor Child N.D. And His Next Friend, Kathleen Lynch**

77.     Minor Child N.D. resides in Santa Cruz County. N.D. is 13 years of age.

78.     N.D. wishes to attend the same school he has gone to since he was 2 years old. It is a small school and he has life long friends that go there.

79.     N.D. did not need any vaccines to attend until he started 7th grade. He is now attending that school even though he is out of compliance with the immunization requirements enforced upon him by the California Department of Public Health (CDPH).

80.     Thus, N.D. is at risk of being excluded from his school by the CDPH for that non-compliance.

81.     N.D. has been on the basketball team for the last three years, excels in math and is loved by all his teachers, staff, faculty and friends. He has rarely been sick in his lifetime, maybe 2 ear aches (due to swimming), 2 fevers and COVID one time. He did not go to any doctors for those, and healed nicely, he was over COVID after a one hour nap.

82. N.D. did not get the recommended vaccines or the COVID vaccines and has been a healthy boy and is fine. All off his friends and classmates get the vaccines and are sick and miss school often. His parents strongly believe the vaccines would make his immune system weaker in the short term and possibly deadly in the long term.

83. The parents of N.D. have asked that Kathleen Lynch serve as N.D.'s Next Friend for the purposes of this lawsuit and Kathleen Lynch has agreed to so serve, subject to the modification or termination of that Next Friend status by the parents of N.D. at any time.

**3.6    Plaintiff Free Now Foundation Has Associational Standing In This Case**

84. Alix Mayer has standing in her own right as the Next Friend of D.Q. and A.R.

85. Alix Mayer is also the Founder, Chair, and Member of the Free Now Foundation.

86. Because a member of Free Now Foundation, Alix Mayer, has the right and ability to sue in her own capacity as Next Friend of D.Q. and A.R., she has elected to have her interests, and those of D.Q. and A.R., represented by plaintiff Free Now Foundation in this case.

87. For these reasons, Free Now Foundation has associational standing in this proceeding.

88. The primary purpose of this lawsuit, to stop any and all further enforcement of Section 120335 by the State of California as applied to all California children, is specifically in line with and germane to the purpose of Free Now Foundation's existence.

89. Free Now Foundation's primary mission is to raise money to fund litigation to advance medical freedom.

90. Free Now Foundation, formerly the California Chapter of Children's Health Defense, has filed numerous lawsuits to advance medical freedom in California for many years prior to commencing this action, including:

(a)    CHD-CA v. Loyola Marymount, suit over medical segregation for COVID

(b)    CHD-CA v. Santa Clara University, suit over mandated COVID shots

(c)    CHD-CA v. LAUSD, suit over mandated COVID shots

(d)    CHD-CA v. Piedmont School District, suit over mandated COVID shots

(e)    CHD-CA v. Placentia Yorba Linda School District, suit over mandated COVID

1     masks

2     (f)     CHD-CA v. OC Board of Supervisors, abuse of COVID CARES Act funds

3     (g)     CHD-CA v. Newsom, suit over COVID lockdowns

4     (h)     CHD-CA & Hoang, suit over AB 2098 COVID doctor gag act.

5     102.    For these reasons, Free Now Foundation has organizational standing in this

6     proceeding.

7     **3.7     Plaintiff Brave And Free Santa Cruz Has Associational Status In This Case**

8     91.     Kathleen Lynch has standing in her own right as the Next Friend of T.E. and N.D.

9     92.     Kathleen Lynch is also the Co-Chair, and Member of Brave and Free Santa Cruz.

10    93.     Because a member of Brave and Free Santa Cruz, Kathleen Lynch, has the right and

11    ability to sue in her own capacity as Next Friend of T.E. and N.D., she has elected to have her

12    interests, and those of T.E. and N.D. represented by plaintiff Brave and Free Santa Cruz in this

13    case.

14    94.     For these reasons, Brave and Free Santa Cruz has associational standing in this

15    proceeding.

16    95.     Plaintiff Brave And Free Santa Cruz is an unincorporated freedom advocacy group

17    that was organized on July 4, 2022 with its principal activities in Santa Cruz County, California. It

18    meets regularly in Santa Cruz County. It maintains a website at braveandfreesantacruz.org/.

19    96.     The group meets monthly with attendance that varies between 20 and 100,

20    depending on the speaker. It has 365 people on its email list. The group has a steering committee

21    comprised of eight members that meets once a month. The group does a weekly outreach literature

22    table at the Santa Cruz Farmer's Market.

23    97.     The members of Brave and Free Santa Cruz include significant numbers of parents

24    and grandparents of children who attend California schools, preschools, and daycare centers

25    without regard to their immunization status.

26    98.     Those members of Brave and Free Santa Cruz who are the parents and grandparents

27    of children who wish to attend California schools, preschools, and daycare centers without regard

28    to their immunization status, such as T.E. and N.D., would have standing in their own right in this

case: (1) as advocates for the rights of their minor children and grandchildren to attend California schools, pre-schools, and daycare centers without regard to their immunization status, (2) because those parents and grandparents of children who forego their rights to refuse those mandated immunizations in order to attend California schools under Health and Safety Code Section 120335 are at risk of bearing the personal and financial costs of caring for any of those children who become injured as a result of any immunizations mandated for those children under California law, and (3) because they may have to bear the personal and financial burdens of home-schooling the children excluded from public and private schools under Health and Safety Code 120335 who choose not to comply with those immunization mandates.

99. Because a member of Brave and Free Santa Cruz, such as Kathleen Lynch, has the right and ability to sue in her own capacity, she has elected to have her interests represented by plaintiff Brave and Free Santa Cruz in this case on behalf of all such members.

100. The primary purpose of this lawsuit, to stop any and all further enforcement of Section 120335 by the State of California as applied to all California children, is specifically in line with and germane to the purpose of Brave and Free Santa Cruz's existence, which is set forth in the group's Mission Statement:

**MISSION STATEMENT**

Our mission is to build a large people's movement in Santa Cruz County to fight the World Economic Forum's "Great Reset." Our movement will reach a critical mass strong enough to maintain our freedoms, our health choices, and our economic well-being. We are active locally to stop the damaging and unconstitutional mandates occurring under the pretext of the Covid-19 pandemic, part of the Globalist's "Great Reset" plan for totalitarian control and population reduction. We will resist and not cooperate with coercion and censorship. We will not be subject to any form of dangerous injections and medical tyranny. We employ powerful nonviolent strategies and educate ourselves to defeat the diabolical "Great Reset." We strive to create a community that is based on loving cooperation and service to each other, so that we may all thrive in a world that we are proud to pass on to future generations.

101. For all these reasons, Brave and Free Santa Cruz has associational standing in this proceeding.

**4.  DEFENDANT, ERICA PAN, IN HER OFFICIAL CAPACITY AS DIRECTOR OF THE CALIFORNIA DEPARTMENT OF PUBLIC HEALTH**

102. The California Department of Public Health oversees the enforcement of California Health and Safety Code Section 120335 as applied to all California educational and child care

1 facilities.

2      103.    All California schools, public and private, and all pre-schools are required to file

3 annual reports with the California Department of Public Health as to the immunization status of all

4 their students.

5      104.    Defendant Erica Pan, in her official capacity as Director of the California

6 Department of Public Health, has overall authority for the enforcement of California immunization

7 requirements for all of California public and private schools, pre-schools, and daycare centers.

8      105.    Defendant Erica Pan, in her official capacity as Director of the California

9 Department of Public Health, has direct oversight responsibility for the California Immunization

10 Registry Medical Exemption (CAIR-ME) Web Site.

11      106.    Defendant Erica Pan, in her official capacity as Director of the California

12 Department of Public Health, is, by virtue of his office, also the State Registrar of Vital Statistics

13 under Health and Safety Code Section 102175. As the State Rgistrar, he has supervisory powers

14 over the local registrars in each county. Health and Safety Code Section 102185, including as to

15 the registration of Sudden Unexpected Infant Deaths.

16 **5.**     **STATEMENT OF FACTS**

17      **5.1**     **California's Mandated Immunizations Under Health And Safety Code Section 120335**

18

19      107.    California Health and Safety Code Section 120335, subsection (b) provides that:

20 (a) As used in this chapter, "governing authority" means the governing board of each school district or the authority of each other private or public institution responsible for the operation and control of the institution or the principal or administrator of each school or

21 institution.
(b) The governing authority shall not unconditionally admit any person as a pupil of any

22 private or public elementary or secondary school, child care center, day nursery, nursery school, family day care home, or development center, unless, prior to his orher first

23 admission to that institution, he or she has been fully immunized. The following are the diseases for which immunizations shall be documented:

24 (1) Diphtheria.
(2) Haemophilus influenzae type b.

25 (3) Measles.
(4) Mumps.

26 (5) Pertussis (whooping cough).
(6) Poliomyelitis.

27 (7) Rubella.
(8) Tetanus.

28 (9) Hepatitis B.

(10) Varicella (chickenpox).

**5.2    Congress Finds That California's Mandated Immunizations Cause Permanent, Compensable, Injury Under The National Childhood Vaccine Injury Act (NCVIA) Of 1986**

108.    In 1986 Congress enacted the National Childhood Vaccine Injury Act ("NCVIA"), now codified as 42 U.S.C. §§ 300aa-1 to 300aa-34.

109.    42 U.S.C. § 300aa-22, subsection (b)(1) of the NCVIA provides that:

> No vaccine manufacturer shall be liable in a civil action for damages arising from a vaccine-related injury or death associated with the administration of a vaccine after October 1, 1988, if the injury or death resulted from side effects that were unavoidable even though the vaccine was properly prepared and was accompanied by proper directions and warnings.

110.    Thus, when a child sustains a "vaccine-related injury or death associated with the administration of a vaccine" due to "side effects that were unavoidable," the manufacturer is immune from suit for damages resulting from that "vaccine-related injury or death."

111.    Instead, the child or surviving family must turn to the National Vaccine Injury Compensation Fund ("NVICF")(42 U.S.C. §§ 300aa-10 to 19) for compensation for damages.

112.    That process is initiated by the filing of a petition for compensation with the U.S. Court of Federal Claims, which then forwards the petition to a court-appointed special master for adjudication. (42 U.S.C. § 300aa-11.)

113.    The special master then determines, by a preponderance of the evidence, whether the claimed injury or death was vaccine-related and thus compensable. (42 U.S.C. § 300aa-13.)

114.    In doing so, the special master is guided by the Vaccine Injury Table, as set forth under 42 U.S.C. (I)(J) § 100.3:

> In accordance with section 312(b) of the National Childhood Vaccine Injury Act of 1986, title III of Public Law 99-660, 100 Stat. 3779 (42 U.S.C. 300aa-1 note) and section 2114(c) of the Public Health Service Act, as amended (PHS Act) (42 U.S.C.300aa-14(c)), the following is a table of vaccines, the injuries, disabilities, illnesses, conditions, and deaths resulting from the administration of such vaccines, and the time period in which the first symptom or manifestation of onset or of the significant aggravation of such injuries, disabilities, illnesses, conditions, and deaths is to occur after vaccine administration for purposes of receiving compensation under the Program. Paragraph (b) of this section sets forth additional provisions that are not separately listed in this Table but that constitute part of it.

115.    The current, as of December 4, 2024, Vaccine Injury Table recognizes the following

vaccine-related injuries as compensable under the NCVIA:

| Vaccine | Illness, disability, injury or condition covered | Time period for first symptom or manifestation of onset or of significant aggravation after vaccine administration |
|---|---|---|
| I. Vaccines containing tetanus toxoid (e.g., DTaP, DTP, DT, Td, or TT) | A. Anaphylaxis | ≤4 hours. |
| | B. Brachial Neuritis | 2-28 days (not less than 2days and not more than 28 days). |
| | C. Shoulder Injury Related to Vaccine Administration | ≤48 hours. |
| | D. Vasovagal syncope | ≤ 1 hour. |
| II. Vaccines containing whole cell pertussis bacteria, extracted or partial cell pertussis bacteria, or specific pertussis antigen(s) (e.g., DTP, DTaP, P, DTP-Hib) | A. Anaphylaxis | ≤4 hours. |
| | B. Encephalopathy or encephalitis | ≤72 hours. |
| | C. Shoulder Injury Related to Vaccine Administration | ≤48 hours. |
| | D. Vasovagal syncope | ≤ 1 hour. |
| III. Vaccines containing measles, mumps, and rubella virus or any of its components (e.g., MMR, MM, MMRV) | A. Anaphylaxis | ≤4 hours. |
| | B. Encephalopathy or encephalitis | 5-15 days (not less than 5 days and not more than 15days). |
| | C. Shoulder Injury Related to Vaccine Administration | ≤48 hours. |
| | D. Vasovagal syncope | ≤ 1 hour. |
| IV. Vaccines containing rubella virus (e.g., MMR, MMRV) | A. Chronic arthritis | 7-42 days (not less than 7 days and not more than 42 days). |
| V. Vaccines containing measles virus(e.g., MMR, MM, MMRV) | A. Thrombocytopenic purpura | 7-30 days (not less than 7 days and not more than 30days). |
| | B. Vaccine-Strain Measles Viral Disease in an immunodeficient recipient | |
| | —Vaccine-strain virus identified | Not applicable. |
| | —If strain determination is not done or if laboratory testing is inconclusive | ≤12 months. |

| | | |
|---|---|---|
| VI. Vaccines containing polio live virus(OPV) | A. Paralytic Polio | |
| | —in a non-immunodeficient recipient | ≤30 days. |
| | —in an immunodeficient recipient | ≤6 months. |
| | —in a vaccine associated community case | Not applicable. |
| | B. Vaccine-Strain PolioViral Infection | |
| | —in a non-immunodeficient recipient | ≤30 days. |
| | —in an immunodeficient recipient | ≤6 months. |
| | —in a vaccine associated community case | Not applicable. |
| VII. Vaccines containing polio inactivated virus (e.g., IPV) | A. Anaphylaxis | ≤4 hours. |
| | B. Shoulder Injury Related to Vaccine Administration | ≤48 hours. |
| | C. Vasovagal syncope | ≤1 hour. |
| VIII. Hepatitis B vaccines | A. Anaphylaxis | ≤4 hours. |
| | B. Shoulder Injury Related to Vaccine Administration | ≤48 hours. |
| | C. Vasovagal syncope | ≤1 hour. |
| IX. Haemophilus influenzae type b (Hib) vaccines | A. Shoulder Injury Related to Vaccine Administration | ≤48 hours. |
| | B. Vasovagal syncope | ≤1 hour. |
| X. Varicella vaccines | A. Anaphylaxis | ≤4 hours. |
| | B. Disseminated varicella vaccine-strain viral disease | |
| | —Vaccine-strain virus identified | Not applicable. |
| | —If strain determination is not done or if laboratory testing is inconclusive | 7-42 days (not less than 7days and not more than 42days). |
| | C. Varicella vaccine-strain viral reactivation | Not applicable. |
| | D. Shoulder Injury Related to Vaccine Administration | ≤48 hours. |

| | | |
|---|---|---|
| | E. Vasovagal syncope | ≤1 hour. |
| XI. Rotavirus vaccines | A. Intussusception | 1-21 days (not less than 1 day and not more than 21 days). |
| XII. Pneumococcal conjugate vaccines | A. Shoulder Injury Related to Vaccine Administration | ≤48 hours. |
| | B. Vasovagal syncope | ≤1 hour. |
| XIII. Hepatitis A vaccines | A. Shoulder Injury Related to Vaccine Administration | ≤48 hours. |
| | B. Vasovagal syncope | ≤1 hour. |
| XIV. Seasonal influenza vaccines | A. Anaphylaxis | ≤4 hours. |
| | B. Shoulder Injury Related to Vaccine Administration | ≤48 hours. |
| | C. Vasovagal syncope | ≤1 hour. |
| XV. Meningococcal vaccines | A. Anaphylaxis | ≤4 hours. |
| | B. Shoulder Injury Related to Vaccine Administration | ≤48 hours. |
| | C. Vasovagal syncope | ≤1 hour. |
| XVI. Human papillomavirus (HPV) vaccines | A. Anaphylaxis | ≤4 hours. |
| | B. Shoulder Injury Related to Vaccine Administration | ≤48 hours. |
| | C. Vasovagal syncope | ≤1 hour. |
| XVII. Any new vaccine recommended by the Centers for Disease Control and Prevention for routine administration to children and/or pregnant women, after publication by the Secretary of a notice of coverage | A. Shoulder Injury Related to Vaccine Administration | ≤48 hours. |
| | B. Vasovagal syncope | ≤1 hour. |

116.    Paragraph (b) of Section 100.3 above (the Vaccine Injury Table) provides that:

(b) Provisions that apply to all conditions listed.
(1) Any acute complication or sequela, including death, of the illness, disability, injury, or condition listed in paragraph (a) of this section (and defined in paragraphs (c) and (d) of this section) qualifies as a Table injury under paragraph (a) except when the definition in paragraph (c) requires exclusion...

117.    If the special master determines that the claimed injury or death is compensable, then compensation is awarded from the Vaccine Injury Compensation Trust Fund, funded by a levy on vaccines. (42 U.S.C. § 300aa-14.)

118.    When any of the adverse events listed in the Vaccine Injury Table occur, the health care provider(s) who administered the vaccine must report the adverse event to the Secretary of Health and Human Service. (42 U.S.C. § 300aa-25.) Those reports are then tabulated into the Vaccine Adverse Event Reporting System (VAERS).

119.    As of November 29, 2024 there were 3,091 post-vaccination deaths in the U.S. reported to the VAERS system, with about two thirds of them in infants less than six months of age.

120.    As of November 29, 2024 there were 262 post-vaccination deaths in California reported to the VAERS system, with about two thirds of them in infants less than six months of age.

**5.3**    **Most Injuries And Deaths Due To California's Mandated Immunizations Are Not Compensable Under The NCVIA**

121.    Neither of the most common serious side effect of childhood vaccine administration, regressive autism spectrum disorder ("ASD"), nor Sudden Unexpected Infant Death Syndrome ("SUID") are even mentioned in the Vaccine Injury Table, much less compensated.

122.    Autism Spectrum Disorder now causes long term disability in about 1 in every 22 California children, with 80% of the affected being boys. About one fourth are profoundly affected, meaning that they have a vocabulary of only a few dozen words and will require supervision for their whole lives, usually borne by their families, especially their mothers.

123.    The most common cause of death in infants between the ages of one month and twelve months of age is Sudden Unexpected Infant Death ("SUID"), now about 3,300 per year in the U.S., with more than half occurring within the first 72 hours after an immunization and more than 70% within the first week.

124.    Nor are vaccine manufacturers required to warn parents of the dangers of ASD or SUID since all they are required to provide for warnings are those developed by the Secretary of the U.S. Department of Health and Human Services, known as Vaccine Information Sheets ("VIS"). (42 U.S.C. § 300aa-26.) None of those Vaccine Information Sheets even mention Autism

1  Spectrum Disorder or Sudden Unexpected Infant Death.

2  **5.4    California's Mandated Immunizations Have Many Unavoidable Adverse Effects, Including Neuro-Developmental Delay And Learning Disability**

3  **5.4.1    The Many Immunizations Required To Attend School In California**

4  125.    Thirty-two immunizations for ten different infectious diseases are mandated for

5  children to be allowed to enter kindergarten in California, as shown below:[14]

6

7  # Shots Required for TK–12 and 7th Grade



8  En Español

9  ## Students Admitted at TK/K–12 Need Records of:

10 - Diphtheria, Tetanus, and Pertussis (DTaP, DTP, Tdap, or Td) — 5 doses
   (4 doses OK if one was given on or after 4th birthday. 3 doses OK if one was given on or after 7th birthday.)
11   For 7th–12th graders, at least 1 dose of pertussis-containing vaccine is required on or after 7th birthday.

12 - Polio (OPV or IPV) — 4 doses
   (3 doses OK if one was given on or after 4th birthday)

13

14 - Hepatitis B — 3 doses
   (Required at admission to any grade except 7th grade)

15 - Measles, Mumps, and Rubella (MMR) — 2 doses
   (Both given on or after 1st birthday)
16 - Varicella (Chickenpox) — 2 doses

17 The TK/K–12 immunization requirements apply to new admissions and transfers for all grades, including 7th
   grade, and students whose exemptions are no longer valid.

18

19 ## Students Advancing to 7th Grade Need Records of:

20 - Tetanus, Diphtheria, Pertussis (Tdap) —1 dose
   (Whooping cough booster usually given at 11 years and up)

21 - Varicella (Chickenpox) — 2 doses
   (Usually given at ages 12 months and 4-6 years)

22 California schools are required to check immunization records for all new student admissions at transitional
23 kindergarten (TK)/Kindergarten through 12th grade and all students advancing to 7th grade before entry. Parents
   must show their child's Immunization Record as proof of immunization.

24

25 126.    The CDC recommends that the following twenty eight immunizations be given

26 within the first fifteen months of life, including fifteen immunizations within the first six month of

27 _____

28 [14] Shots Required For TK-12 and 7th Grade. California Department of Public Health.
   https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/School/tk-12-immunizations.aspx

life when children are most vulnerable to Sudden Unexplained Death Syndrome:[15]

## Birth to 15 Months

**These recommendations must be read with the notes that follow.** For those who fall behind or start late, provide catch-up vaccination at the earliest opportunity as indicated by the green bars. To determine minimum intervals between doses, see the catch-up schedule (Table 2).

| Vaccine and other immunizing agents | Birth | 1 mo | 2 mos | 4 mos | 6 mos | 9 mos | 12 mos | 15 mos |
|---|---|---|---|---|---|---|---|---|
| Respiratory syncytial virus (RSV-mAb [Nirsevimab]) | 1 dose depending on maternal RSV vaccination status, See notes | | | | | 1 dose (8 through 19 months), See notes | | |
| Hepatitis B (HepB) | 1st dose | ←2nd dose→ | | | | ←3rd dose→ | | |
| Rotavirus (RV) RV1 (2-dose series); RV5 (3-dose series) | | | 1st dose | 2nd dose | See notes | | | |
| Diphtheria, tetanus, & acellular pertussis (DTaP: <7 yrs) | | | 1st dose | 2nd dose | 3rd dose | | ←4th dose→ | |
| Haemophilus influenzae type b (Hib) | | | 1st dose | 2nd dose | See notes | | ←3rd or 4th dose, See notes→ | |
| Pneumococcal conjugate (PCV15, PCV20) | | | 1st dose | 2nd dose | 3rd dose | | ←4th dose→ | |
| Inactivated poliovirus (IPV: <18 yrs) | | | 1st dose | 2nd dose | | ←3rd dose→ | | |
| COVID-19 (1vCOV-mRNA, 1vCOV-aPS) | | | | | 1 or more doses of updated (2023–2024 Formula) vaccine (See notes) | | | |
| Influenza (IIV4) | | | | | Annual vaccination 1 or 2 doses | | | |
| or Influenza (LAIV4) | | | | | | | | |
| Measles, mumps, rubella (MMR) | | | | | See notes | | ←1st dose→ | |
| Varicella (VAR) | | | | | | | ←1st dose→ | |
| Hepatitis A (HepA) | | | | | (See notes) | | ←2-dose series. See notes→ | |
| Tetanus, diphtheria, & acellular pertussis (Tdap: ≥7 yrs) | | | | | | | | |
| Human papillomavirus (HPV) | | | | | | | | |
| Meningococcal (MenACWY-CRM ≥2 mos, MenACWY-TT ≥2years) | | | | | See notes | | | |
| Meningococcal B (MenB-4C, MenB-FHbp) | | | | | | | | |
| Respiratory syncytial virus vaccine (RSV [Abrysvo]) | | | | | | | | |
| Dengue (DEN4CYD: 9-16 yrs) | | | | | | | | |
| Mpox | | | | | | | | |

5.4.2 Neither California Nor The CDC Have Reported Studies Comparing The Adverse Events In Vaccinated Children Versus Those In Unvaccinated Children ("VU Studies", Similar To Placebo-

---

[15] Child and Adolescent Immunization Schedule by Age. CDC. https://www.cdc.gov/vaccines/schedules/hcp/imz/child-adolescent.html

**Controlled Studies) To Prove The Safety And Effectiveness Of Their Vaccines**

127.     The VU studies shown below raise substantial questions about the safety of the vaccines mandated by California and recommended by the CDC. Plaintiffs offer these VU studies to raise the issue of the safety of the vaccines that California mandates for children and that the CDC recommends. While the merits of these various VU studies can and should be debated, the larger and more important point of presenting these VU studies is to make the point that neither California nor the CDC have ever reported any of their own VU studies to refute them. The failure of California and the CDC to report any refuting VU studies of their own should be taken as an adverse admission by California and the CDC that the VU studies presented below are generally valid. Such VU studies are, as Dr. Fauci once told the Congress,[16] the "gold standard" for clinical research studies. The CDC should have done them many years ago before recommending these vaccines for general use, including for school children in California.

> **5.4.3    Unofficial Studies Show That The Immunizations Mandated Under Health and Safety Code Section 120335 Cause Serious, Irreparable, Injury And Death**
>
> **5.4.3.1 Comparison Of Autism Rates Between Vaccinated And Unvaccinated Children ("VU Studies") Show That Mandated Immunizations Are The Likely Cause Of Many Cases Of Childhood Autism, Especially Among African-American Boys**

128.     As noted above, the CDC also continues, to this day, to represent that, "Any hint of a problem with a vaccine prompts the CDC and FDA to carry out further investigations."

129.     As shown next, there are a lot more than just a few hints. In fact, there are ample data from VU studies to show that many of the immunizations mandated under Health and Safety Code Section 120335 are not safe, that they have numerous, serious adverse effects, up to and including death.

130.     Prospective randomized clinical trials (RCT's) are ideal for identifying adverse events caused by drugs. Some retrospective, epidemiological studies can also be valid, such as studies in which a population of interest is identified wherein some subjects have already used the

---

[16] Fauci testifies on coronavirus response. CNN Politics, July 31, 2020. https://www.cnn.com/politics/live-news/fauci-coronavirus-testimony-07-31-20/index.html.

drug under study whereas other "control" subjects have not. The incidence of adverse events in the drug-treated population is then compared to the incidence in the control group and excess adverse events in the treated group are ascribed to the drug under study unless some other confounding factor(s) are identified to explain the differences.

131.    Retrospective studies where vaccinated and unvaccinated groups occur naturally are referred to as "VU studies."

### 5.4.3.1.1    Vaccinated Florida Children On Medicaid Have Far Higher Rates of Neuro-developmental Delay, Including Autism, Than Those Who Are Unvaccinated

132.    On January 23, 2025 Mawson and Jacob reported the prevalence of neuro-developmental delay among Florida children cared for under Florida's Medicaid Program was 3.12 times higher for those fully vaccinated as compared to those unvaccinated, and 3.58 times higher among the subset of those born pre-term:[17]

> The analysis of claims data for 47,155 nine-year-old children revealed that: 1) vaccination was associated with significantly increased odds for all measured NDDs; 2) among children born preterm and vaccinated, 39.9% were diagnosed with at least one NDD compared to 15.7% among those born preterm and unvaccinated (OR 3.58, 95% CI: 2.80, 4.57); and 3) the relative risk of ASD increased according to the number of visits that included vaccinations. Children with just one vaccination visit were 1.7 times more likely to have been diagnosed with ASD than the unvaccinated (95% CI: 1.21, 2.35) whereas those with 11 or more visits were 4.4 times more likely to have been diagnosed with ASD than those with no visit for vaccination (95% CI: 2.85, 6.84).

### 5.4.3.1.2    Two VU Studies Found Lower Than Expected Rates Of Autism In The Amish Community That Has Low Rates Of Vaccination

133.    In 2010, Robinson *et. al.* studied autism rates in an Old Order Amish community, where immunization is much less common, and reported that the incidence of Autism Spectrum Disorder in that community was 1 in 271 children and compared to the rate then prevailing

---

[17] Mawson A R., Jacob B. Vaccination and Neurodevelopmental Disorders: A Study of Nine-Year-Old Children Enrolled in Medicaid. Science, Public Health Policy and the Law. 2025 Jan 23; v6.2019-2025.
https://publichealthpolicyjournal.com/vaccination-and-neurodevelopmental-disorders-a-study-of-nine-year-old-children-enrolled-in-medicaid/.

generally in the United States of 1 in 91.[18]

134. In 2005 journalist Dan Olmsted looked into the question of, "Where are the autistic Amish?"[19] He calculated, based on the then prevailing incidence of autism, that there should be about 50 children with classic, full-blown autism, easily recognized autism among the Amish population living in Lancaster County, Pennsylvania. (*Id.*) Despite diligently searching, even among classes for "special needs" children, he could only identify three such children. (*Id.*)

### 5.4.3.1.3 Autism And Other Neurodevelopmental Disorders Are Four Times More Common Among Vaccinated Homeschooled Children Than Among Those Homeschooled That Are Unvaccinated, And Even More Common Among Non-White Boys

135. In 2017 Mawson *et. al.* reported, in two published reports, Mawson I[20] and Mawson II[21], a study of 666 children who were home-schooled, of whom 261 (39%) were unvaccinated, 208 (31%) were partially vaccinated, and 197 (30%) were fully vaccinated. As a group the children were similar, mostly white (88%), with a slight preponderance of females (52%), and averaged 9 years of age. (*Id.*)

136. The first Mawson report (Mawson I) described the incidence of several acute and chronic conditions in both the vaccinated and unvaccinated groups.

137. The Mawson I paper presented its data in tabular format, more precise but less readable. In their book, Vax-Unvax, Robert Kennedy Jr. and Brian Hooker transformed the Mawson tabular data into graphic form, which is more readily comprehended, as presented next.

138. Vaccinated children had far more chronic diseases than did those not vaccinated,

---

[18] Prevalence Rates of Autism Spectrum Disorders Among the Old Order Amish. Robinson, J.L., *et al.*, https://imfar.confex.com/imfar/2010/webprogram/Paper7336.html.

[19] The Age of Autism, The Amish anomaly. Dan Olmstead, April 18, 2005. Available at https://drive.google.com/file/d/1BCJfmWLMrjSuZ8vRYa6LL4slSnhXdfk3/view.

[20] Mawson AR, Ray BD, Bhuiyan AR, Jacob B (2017) Pilot comparative study on the health of vaccinated and unvaccinated 6- to 12-year-old U.S. children. J Transl Sci 3: DOI: 10.15761/JTS.1000186 (Mawson I).

[21] Mawson AR, Bhuiyan A, Jacob B, Ray BD (2017) Preterm birth, vaccination and neurodevelopmental disorders: a cross-sectional study of 6- to 12-year-old vaccinated and unvaccinated children. *J Transl Sci* 3: DOI: 10.15761/JTS.1000187 (Mawson II).

including allergic rhinitis, allergy, attention deficit disorder, autism, eczema, learning disability, and neuro-developmental disorders, as illustrated below:[22]



Figure 2.1—The odds ratios of chronic diseases for vaccinated versus unvaccinated children (Mawson et al. 2017a).

139.    According to the CDC, the incidence of autism in eight year old U.S. children is higher among African-American and Hispanic children.[23]

---

[22] Robert Kennedy Jr, Brian Hooker. Vax-Unvax, Figure 2.1 (data of Mawson).

[23] Autism Spectrum Disorder (ASD) Identification among 8-year-old Children. CDC. https://www.cdc.gov/ncbddd/autism/addm-community-report/spotlight-on-racial-ethnic-differences.html

| Prevalence of Autism Spectrum Disorder in 8-year-olds (2020) Data Courtesy of CDC[1] | | Prevalence[2] | Percent[2] |
|---|---|---|---|
| Overall | | 27.6 per 1,000 | 2.8% |
| Sex | Boys | 43.0 per 1,000 | 4.3% |
| | Girls | 11.4 per 1,000 | 1.1% |
| Race/Ethnicity | White | 24.3 per 1,000 | 2.4% |
| | Black | 29.3 per 1,000 | 2.9% |
| | Asian/Pacific Islander | 33.4 per 1,000 | 3.3% |
| | Hispanic[3] | 31.6 per 1,000 | 3.2% |
| | American Indian or Alaska Native (AI/AN) | 26.5 per 1,000[4] | 2.7% |
| | Two or more races | 22.9 per 1,000 | 2.3% |

[1]The percent (i.e., rate per 100) was calculated by NIMH.

[2]Please see the measurement caveats regarding age below.

[3]All other groups are non-Hispanic.

[4]Arizona was the only Autism and Developmental Disabilities Monitoring Network site meeting the threshold for statistical precision for AI/AN autism spectrum disorder prevalence in 2020; the Arizona site-specific prevalence was 26.8 per 1,000. Please see the ADDM publication for more information.

140.    What the CDC has found but never publicly disclosed is that children vaccinated with the MMR (measles-mumps-rubella) vaccine before the age of 36 months are more likely to develop autism that those vaccinated after 36 month of age, with the difference being much more striking among African-American children:[24]

---

[24] Robert Kennedy Jr, Brian Hooker. Vax-Unvax, Figure 4.1 (data of DeStephano *et al,* 2004).



## Odds of Autism with MMR Vaccine Before and After 36 Months of Age

- Vaccinated Prior to 36 Months
- Vaccinated After 36 Months

141. The CDC concealed the data about the increased autism rate among the African-American children for many years until CDC whistle-blower William W. Thompson revealed it in 2014. Dr. Thompson released, through his attorney, a public statement on his role in publishing a research paper from the CDC on the relationship of immunization with the Measles/Mumps/Rubella (MMR) vaccine and the subsequent development of childhood autism:

> I regret that my coauthors and I omitted statistically significant information in our 2004 article published in the journal Pediatrics. The omitted data suggested that African American males who received the MMR vaccine before age 36 months were at increased risk for autism. Decisions were made regarding which findings to report after the data were collected, and I believe that the final study protocol was not followed.[25]

142. It took ten years for this information to get to the public, and then not from the CDC

---

[25] Statement of William W. Thompson, Ph.D., Regarding the 2004 Article Examining the Possibility of a Relationship Between MMR Vaccine and Autism. August 27, 2014.

itself but only from one lone whistle blower, Dr. William Thompson. During that time untold numbers of African-American boys developed autism following CDC-recommended immunizations. Even after Dr. Thompson revealed the CDC's concealment of this important information from the public, and especially from African-American parents of infant boys, the CDC still made no attempt to get the word out to African-American parents. Instead, the CDC told parents, including African-American parents, that "[a]dditional studies and a more recent rigorous review by the Institute of Medicine have found that MMR vaccine does not increase the risk of autism,[26] even though the Institute of Medicine review did not include African-American children.[27]

> **5.4.3.1.4** **According To The CDC's Vaccine Adverse Event Reporting System (VAERS), The Most Common Age For The Onset Of Autism Spectrum Disorder Is Age One To Three Years And It Most Commonly Strikes On The Very Same Day As A Vaccination**

143.    According th the CDC's VAERS database, the most common age for the onset of Autism Spectrum Disorder (ASD) is age one to three years:

---

[26] CDC Statement: 2004 MMR and Autism Study. https://www.cdc.gov/vaccinesafety/concerns/autism/cdc2004pediatrics.html.

[27] Adverse Effects of Vaccines: Evidence and Causality [Institute of Medicine. 2012], pp. 145-148. https://www.nap.edu/catalog/13164/adverse-effects-of-vaccines-evidence-and-causality



**Age At Onset Of Autism Spectrum Disorder As Reported To VAERS, 1990 To Present**

144. Among those one to three year old children who had the onset of ASD, it **most commonly occurred on the same day as a vaccination:**



**Onset Of Autism Spectrum Disorder By Number Of Days Since Any Vaccination, Age 1-2 Years, As Reported To VAERS, 1990 To Present**

145. As can be seen below on Table 2 of Mawson I, vaccinated children were less likely

than unvaccinated children to have had the acute illnesses chickenpox (varicella, 74% less), whooping cough (pertussis, 70% less), and rubella (84% less) while the vaccinated were more likely than the unvaccinated to have had otitis media (middle ear infection, 3.8 times more likely) and pneumonia (5.9 times more likely).[28]

**Table 2.** Vaccination status and health outcomes – Acute Conditions

| | Vaccinated (n=405) | Unvaccinated (n=261) | Total (n=666) | Chi-square | P-value | Odds Ratio (95% CI) |
|---|---|---|---|---|---|---|
| Chickenpox | | | | | | |
| Yes | 32 (7.9%) | 66 (25.3%) | 98 (14.7%) | 38.229 | < 0.001 | 0.26 (0.2 - 0.4) |
| No | 373 (92.1%) | 195 (74.7%) | 568 (85.3%) | | | |
| Otitis media | | | | | | |
| Yes | 80 (19.8%) | 16(5.8%) | 96 (14.4%) | 26.643 | < 0.001 | 3.8 (2.1 - 6.6) |
| No | 325 (80.2%) | 245 (94.2%) | 507 (85.6%) | | | |
| Pneumonia | | | | | | |
| Yes | 26 (6.4%) | 3 (1.2%) | 29 (4.4%) | 10.585 | < 0.001 | 5.9 (1.8 - 19.7) |
| No | 379 (93.6%) | 258 (98.8%) | 637 (95.6%) | | | |
| Whooping cough | | | | | | |
| Yes | 10 (2.5%) | 22 (8.4%) | 32 (4.8%) | 12.326 | < 0.001 | 0.3 (0.1 - 0.6) |
| No | 395 (97.5%) | 239 (91.6%) | 634 (95.2%) | | | |
| Rubella | | | | | | |
| Yes | 1 (0.3%) | 5 (1.9%) | 6 (0.9%) | 4.951 | 0.037 | 0.1 (0.01 - 1.1) |
| No | 404 (99.6%) | 256 (98.1%) | 660 (99.1%) | | | |

146.    As can be seen below on Table 3 of Mawson I,[29] vaccinated children were more likely than unvaccinated children to have had the chronic illnesses: (a) allergic rhinitis (30 times more likely), (b) allergies (3.9 times more likely), (c) attention deficit hyperactivity disorder (ADHD, (d) 4.2 times more likely), (e) autism spectrum disorder (ASD, 4.2 times more likely), (f) eczema (2.9 times more likely), (g) learning disability (5.2 times more likely), (h) neuro-developmental disorder (3.7 times more likely), and (i) any chronic condition (2.4 times more likely):

---

[28] Mawson, Table 2.

[29] Mawson Table 3.

**Table 3.** Vaccination status and health outcomes – Chronic Conditions

| Chronic Disease | Vaccinated (n=405) | Unvaccinated (n=261) | Chi-square | P-value | Odds Ratio (95% CI) |
|---|---|---|---|---|---|
| Allergic rhinitis | | | | | |
| Yes | 42 (10.4%) | 1 (0.4%) | 26.21 | < 0.001 | 30.1 (4.1 - 219.3) |
| No | 363 (89.6%) | 260 (99.6%) | | | |
| Allergies | | | | | |
| Yes | 90 (22.2%) | 18 (6.9%) | 29.44 | < 0.001 | 3.9 (2.3 - 6.6) |
| No | 315 (77.9%) | 243 (93.1%) | | | |
| ADHD | | | | | |
| Yes | 19 (4.7%) | 3 (1.0%) | 6.23 | 0.013 | 4.2 (1.2 - 14.5) |
| No | 386 (95.3%) | 258 (99.0%) | | | |
| ASD | | | | | |
| Yes | 19 (4.7%) | 3 (1.0%) | 6.23 | 0.013 | 4.2 (1.2 - 14.5) |
| No | 386 (95.3%) | 258 (99.0%) | | | |
| Eczema (atopic dermatitis) | | | | | |
| Yes | 38 (9.5%) | 9 (3.6%) | 8.522 | 0.035 | 2.9 (1.4 - 6.1) |
| No | 367 (90.5%) | 252 (96.4%) | | | |
| Learning Disability | | | | | |
| Yes | 23 (5.7%) | 3 (1.2%) | 8.6803 | 0.003 | 5.2 (1.6 - 17.4) |
| No | 382 (94.3%) | 258 (98.9%) | | | |
| Neurodevelopment Disorder | | | | | |
| Yes | 42 (10.5%) | 8 (3.1%) | 12.198 | < 0.001 | 3.7 (1.7 - 7.9) |
| No | 313 (89.5%) | 253 (96.9%) | | | |
| Any Chronic Condition | | | | | |
| Yes | 178 (44.0%) | 65 (24.9%) | 24.8456 | < 0.001 | 2.4 (1.7 - 3.3) |
| No | 227 (56.0%) | 196 (75.1%) | | | |

147.    Mawson I also reported, in Table 8, significant differences in neuro-developmental delay (NDD) outcomes based on the child's vaccination status (vaccinated 3.1 times more likely than unvaccinated), race (non-white 2.3 times more likely than white), sex (males 2.3 times more likely than females), and gestational age (preterm 5.0 times more likely than term).

**Table 8.** Adjusted logistic regression analyses of risk factors and NDD*

| | Adjusted Model (Model 1) | Adjusted Model with Interaction (Model 2) |
|---|---|---|
| **Vaccination Status** | | |
| **Vaccinated** | 3.1 (1.4 - 6.8) | 2.5 (1.1 - 5.6) |
| **Not Vaccinated** | Ref | Ref |
| **Race** | | |
| **Non-White** | 2.3 (1.0 - 5.2) | 2.4 (1.1 - 5.4) |
| **White** | Ref | Ref |
| **Child's Gender** | | |
| **Male** | 2.3 (1.2 - 4.3) | 2.3 (1.2 - 4.4) |
| **Female** | Ref | Ref |
| **Preterm birth** | | |
| **Yes** | 5.0 (2.3 - 11.1) | NS |
| **No** | Ref | |
| **Preterm birth and Vaccination interaction** | | |
| **No interaction** | | Ref |
| **Preterm and Vaccinated** | Not in the model | 6.6 (2.8 - 15.5) |

*Number of observation read 666, number of observations used 629. NDD=47, Not NDD = 582

148.    The Mawson II report looked in more detail and at the interactions of preterm birth and vaccination in the incidence of neurodevelopmental delay (NDD). It found that, as compared to unvaccinated children born at term, preterm unvaccinated children were only about 1.14 times as likely to develop NDD, term and vaccinated children about 2.7 times as likely to develop NDD, preterm and vaccinated chlidren about 14.5 times more likely to develop NDD, as shown below:[30]

---

[30] Mawson II, Table 5.

**Table 3.** Vaccination status and types of NDD

| Condition | Vaccination Status | n (%) | OR (95% CI) | P-value* |
|---|---|---|---|---|
| **ADHD** | Vaccinated (N=405) | 19 (4.69) | 4.3 (1.3, 14.5) | 0.013 |
| | Unvaccinated (n=261) | 3 (1.15) | | |
| **ASD** | Vaccinated (N=405) | 19 (4.69) | 4.3 (1.2, 14.5) | 0.013 |
| | Unvaccinated (n=261) | 3 (1.15) | | |
| **Learning Disability** | Vaccinated (N=405) | 23 (5.68) | | |
| | Unvaccinated (n=261) | 3 (1.15) | 5.2 (1.5, 17.5) | 0.003 |
| **Any NDD** | Vaccinated (N=405) | 42 (10.37) | 3.7 (1.7, 7.9) | 0.005 |
| | Unvaccinated (n=261) | 8 (3.03) | | |

* From Fisher's exact test.

| | | | | |
|---|---|---|---|---|
| **Not Preterm and Unvaccinated (P-/V-)** | 8 | 241 | | |

* From Fisher's exact test.
** Calculated by adding 0.5 to each cell because of zero count.

149.     Table 3 in Mawson II broke down the subtypes of NDD reported. Attention Deficit Hyperactivity Disorder (ADHD) was 4.3 times more common in vaccinated children as compared to those unvaccinated; Autism Spectrum Disorder was 4.3 times more common in vaccinated children as compared to those unvaccinated; Learning Disability was 5.2 times more common in vaccinated children as compared to those unvaccinated; any neurodevelopmental delay (NDD) was 3.7 times more common in vaccinated children as compared to those unvaccinated; all as shown below:[31]

### 5.4.3.1.5     Autism Is More Common Among Ethiopian And Somali Children Born In Western Countries Than Among Those Born In Their Native Countries

150.     A 2004 Israeli study compared the incidence of Pervasive Developmental Disorder (PDD) among Israeli children born in Israel as compared to the incidence among Israeli children

---

[31]Mawson II, Table 3.

born abroad, especially in Ethiopia, who then emigrated to Israel.[32] Of 15,600 children born in

Israel of Ethiopian descent there were 13 cases of PDD for an incidence of 8.3 per 10,000 versus

no cases at all among 11,800 children born in Ethiopia who then emigrated to Israel. For children

born in Israel not of Ethiopian descent, the incidence was 991 cases among 1,098,300 for an

incidence rate of 9.0 per 10,000 as compared to 59 cases among 110,300 born abroad other than in

Ethiopia for an incidence of 5.3 per 10,000, as shown below:

| | Born abroad | | | Israel-born | | |
|---|---|---|---|---|---|---|
| | Ethiopian | Other | Total | Ethiopian | Other | Total |
| PDD | 0 | 59 | 59 | 13 | 991 | 1,004 |
| Total | 11,800 | 110,300 | 122,100 | 15,600 | 1,098,300 | 1,113,900 |
| Rate/10,000 | 0 | 5.3 | 4.8 | 8.3 | 9.0 | 9.0 |
| SE | 0 | 0.7 | 0.6 | 0.2 | 0.3 | 0.3 |

151.    A similar finding was made among Somali children born in the United States,

among whom severe autism is common whereas autism is unheard of in Somali or among Somali

children born in Somalia who emigrated to the U.S.[33]

        **5.4.3.1.6**    **U.S. Pediatric Doctors With Substantial Numbers Of Unvaccinated Children In Their Practices Find That Autism And Neurodevelopmental Delay Rates Are Much Higher Among The Vaccinated Than Among The Unvaccinated**

152.    In 2005 journalist Dan Olmsted did a follow-up study of an estimated 30,000 to

35,000 unvaccinated children in a Chicago-area pediatric practice that did not vaccinate its

patients.[34] He reported that that pediatric practice had never seen a case of autism among its

---

[32] A prevalence estimate of pervasive developmental disorder among Immigrants to Israel and Israeli natives. A. Kamer *et al.* Soc Psychiatry Psychiatr Epidemiol (2004) 39 : 141–145. Available at https://drive.google.com/open?id=1jXh9kgpJS77gnPZXw0-HX1BqeDloNAS3

[33] Why Is Autism Rate So High For Somalis In Minnesota? https://www.youtube.com/watch?v=xUf4L6UQhbk.

[34] The Age of Autism: 'A pretty big secret.' Dan Olmsted. UPI. December 7, 2005. https://www.upi.com/Health_News/2005/12/07/The-Age-of-Autism-A-pretty-big-secret/68291133982531/

unvaccinated patients in the more than thirty years of the practice's existence. (*Id.*)

153.    Another very detailed observational VU study was reported by Lyons-Weiler and Thomas in 2020 entitled, "Relative Incidence of Office Visits and Cumulative Rates of Billed Diagnoses Along the Axis of Vaccination."[35]

154.    The Lyons-Weiler and Thomas abstract stated that:

We performed a retrospective analysis spanning ten years of pediatric practice focused on patients with variable vaccination born into a practice, presenting a unique opportunity to study the effects of variable vaccination on outcomes. The average total incidence of billed office visits per outcome related to the outcomes were compared across groups (Relative Incidence of Office Visit (RIOV)). RIOV is shown to be more powerful than odds ratio of diagnoses. Full cohort, cumulative incidence analyses, matched for days of care, and matched for family history analyses were conducted across quantiles of vaccine uptake. Increased office visits related to many diagnoses were robust to days-of-care-matched analyses, family history, gender block, age block, and false discovery risk. Many outcomes had high RIOV odds ratios after matching for days-of-care (e.g., anemia (6.334), asthma (3.496), allergic rhinitis (6.479), and sinusitis (3.529), all significant under the Z-test). Developmental disorders were determined to be difficult to study due to extremely low prevalence in the practice, potentially attributable to high rates of vaccine cessation upon adverse events and family history of autoimmunity. Remarkably, zero of the 561 unvaccinated patients in the study had attention deficit hyperactivity disorder (ADHD) compared to 5.3% of the (partially and fully) vaccinated. The implications of these results for the net public health effects of whole-population vaccination and with respect for informed consent on human health are compelling. Our results give agency to calls for research conducted by individuals who are independent of any funding sources related to the vaccine industry. While the low rates of developmental disorders prevented sufficiently powered hypothesis testing, it is notable that the overall rate of autism spectrum disorder (0.361%) in the cohort is one-fifth that of the US national rate (1.851%). The practice-wide rate of ADHD was roughly half of the national rate. The data indicate that unvaccinated children in the practice are not unhealthier than the vaccinated and indeed the overall results may indicate that the unvaccinated pediatric patients in this practice are healthier overall than the vaccinated.

(*Id.*)

155.    Figure 3 of the Lyons-Weiler and Thomas report shows that the likelihood that a child was seen in the office for a febrile illness was highly correlated with the child's vaccination status, with highly vaccinated children far more likely than unvaccinated children to be seen for fever, while the rate of "wellness checks" did not vary with vaccination status:

---

[35] Relative Incidence of Office Visits and Cumulative Rates of Billed Diagnoses Along the Axis of Vaccination. J. Lyons-Weiler and Paul Thomas. Int. J. Environ. Res. Public Health 2020, 17, 8674. Available at doi:10.3390/ijerph17228674. This paper was retracted by the publisher on July 22, 2021 for unstated reasons.

Figure 3. Relative Incidence of Office Visit (RIOV) percentile vaccinated vs. unvaccinated design of analysis: power decreases from left to right; thus, a stable trend (increase or decrease) becomes noteworthy. The data shown are for the Relative Incidence of Office Visits (RIOVs) to average incidence ratio of billed office visits related to fever in the vaccinated compared to the unvaccinated...conditions and for "Well Child" visit on the right. For all the clinical conditions studied, RIOV reflects the total number of billed office visits per condition per group, reflecting the total disease burden on the group and the population that it represents.

156.    Figure 5 of the Lyons-Weiler and Thomas report shows that vaccinated children (in blue) were more likely to be seen earlier in life for most common pediatric illnesses than were unvaccinated children (in orange):



Figure 5. Analysis 5. Cumulative office visits in the vaccinated (orange) vs. unvaccinated (blue) patients born into the practice: the clarity of the age-specific differences in the health fates of individuals who are vaccinated (2,763) compared to the 561 unvaccinated in patients born into the practice over ten years is most strikingly clear in this comparison of the cumulative numbers of diagnoses in the two patient groups. The number of office visits for the unvaccinated is adjusted by

a sample size multiplier factor (4.9) to the expected value as if the number of unvaccinated in the study was the same as the number of vaccinated.

157.     Table 7 of the Lyons-Weiler and Thomas report shows that unvaccinated children developed three of thirteen vaccine-preventable illnesses, pertusis (whooping cough)(9 cases), rotavirus (causes diarrhea)(2 cases), and varicella (chickenpox)(23 cases) more commonly than did vaccinated children (1 case of pertussis), but these infections caused no deaths and there was no increased incidence for ten of the thirteen vaccine-preventable illnesses:

**Table 7.** Incidence of vaccine-targeted diagnoses in the study cohort.

| Vaccine Targeted Diagnosis | Vaccinated | Unvaccinated | Deaths |
|---|---|---|---|
| Diphtheria | 0 | 0 | 0 |
| Hepatitis A | 0 | 0 | 0 |
| Hepatitis B | 0 | 0 | 0 |
| HiB * | 0 | 0 | 0 |
| Measles | 0 | 0 | 0 |
| Meningococcus | 0 | 0 | 0 |
| Mumps | 0 | 0 | 0 |
| Pertussis | 1 | 9 | 0 |
| Pneumococcal | 0 | 0 | 0 |
| Rotavirus | 0 | 2 | 0 |
| Rubella | 0 | 0 | 0 |
| Tetanus | 0 | 0 | 0 |
| Varicella | 6 | 23 | 0 |
| Total ** | 7 | 34 | 0 |

* Haemophilus influenzae type B; ** Overall for all $\chi^2 = 99.51$. $p < 0.00001$.

### 5.4.3.1.7    If Childhood Vaccines Don't Cause Autism, How Do You Explain The McDowell Infant Triplets All Becoming Autistic On The Very Same Day Within A Few Hours Of Their CDC-Recommended Vaccinations?

158.     If childhood vaccines don't cause autism, as the U.S. Centers For Disease Control (CDC) insists, then how does the CDC explain the case of the McDowell triplets who all became

SECOND AMENDED COMPLAINT - PAGE 51

autistic within hours of a vaccination?

We had beautiful, healthy triplets in 2006: two boys and a girl. We had an agreed upon plan of spacing out vaccinations with our doctor.

On June 25, 2007 we went to a scheduled well baby visit with our healthy, completely neuro-typical nine month old triplets. On this visit the planned vaccination was pneumococcal. Upon injection, our daughter Claire screamed and became inconsolable, with immediate swelling in her leg. We figured this was a normal reaction to a shot, so we went on to give both boys their shot.

I am an educational audiologist who works with autistic children, so when by 12 noon Claire lost all of her facial expressions and her reflexes disappeared, I recognized that she was regressing before my eyes. By 2 pm we watched Richie shut down like Claire. By 5 pm we watched in disbelief as Robbie lost all eye contact and desire to communicate.

All three children regressed into autism within hours of vaccination. They were diagnosed with autoimmune encephalitis. A geneticist explained that the chance to this happening to 2 of our triplets would be 1 in 4 million. It happened to all 3. It is not genetic.

Where are all of the people who said that vaccines were safe? The vaccine injury was acknowledged by our doctor, but was not reported to the vaccine adverse event reporting system (VAERS), even though we specifically requested it. We were unaware that we could self-report.[36]

159.     There are about 10,000 children born in the U.S. each day. The current rate at which they will likely be diagnosed with Autism Spectrum Disorder is about 1 in 31,[37] or about 325 new autism cases per day, day after day, month after month, year after year.

### 5.4.3.1.8     California, Where Childhood Immunizations Are Strictly Enforced, Has A Child Autism Rate 64% Higher Than The National Average

160.     California, a state in which childhood immunizations are strictly enforced,  leads the nation in autism rate, 1 in 19, 65% higher than the national average, . Four out of five are boys, making the incidence among California boys a shocking one out of every 12. As seen above, it is likely that many, likely most, of them are vaccine-related.

### 5.4.3.2 Infant Immunizations Are The Likely Cause Of A Substantial

---

[36] Brenda and David [McDowell] tell the story of their infant triplets, injured by a recalled pneumococcal vaccine. https://www.michiganvaccineinjury.org/post/2017/01/01/brenda-and-david-tell-the-story-of-their-infant-triplets-injured-by-a-recalled-pneumococc, Video at https://www.youtube.com/watch?v=rLv_gNA0O54.

[37] Prevalence and Early Identification of Autism Spectrum Disorder Among Children Aged 4 and 8 Years — Autism and Developmental Disabilities Monitoring Network, 16 Sites, United States, 2022. Morbidity and Mortality Weekly Report (MMWR), April 17, 2025 / 74(2);1–22. https://www.cdc.gov/mmwr/volumes/74/ss/ss7402a1.htm?utm_source=substack&utm_medium=email.

**Number Of Sudden Unexpected Infant Deaths (SUID)(Crib Deaths)**

161.     While autism causes a great deal of cognitive harm to children and can lead to decreased life expectancy, it does not kill very many children.

162.     However, Sudden Unexpected Infant Death (SIUD) is estimated to actually *kill* about 3,400 otherwise healthy infants each year in the United States.[38] Most of these infant deaths are categorized into either Sudden Infant Death Syndrome (SIDS)(41%), unknown cause (32%), or accidental suffocation or strangulation in bed (27%)(*id.*), based on investigative findings and post-mortem examinations.

163.     For unknown reasons, most such post-mortem investigations and post-mortem examinations do not comment on the temporal relationship of the deceased infant's death with recent immunizations.

### 5.4.3.2.1     A Veteran Police Investigator Has Reported That 50% Of The More Than 250 SUID Cases She Has Investigated Occurred Within 48 Hours Of The Infant's Immunization And 70% Within One Week

164.     According to the CDC, "Vaccines have not been shown to cause sudden infant death syndrome (SIDS), citing "[m]ultiple research studies and safety reviews [that] ... do not show any links between childhood immunization and SIDS."[39]

165.     But none of those cited studies were done in the modern era in which many more immunizations are done to infants and few looked carefully at the time from immunization to the time of death, and none studied the police reports of those deaths, which are done in all cases of unexpected death.

166.     Sudden unexpected infant deaths are routinely investigated by police investigators to attempt to determine whether they were accidental or otherwise. A veteran SIDS police investigator, Jennifer, was recently interviewed by medical commentator Steve Kirsch on her

---

[38] "Sudden Unexpected Infant Death and Sudden Infant Death Syndrome." CDC. https://www.cdc.gov/sids/data.htm.

[39] Sudden Infant Death Syndrome (SIDS) and Vaccines. CDC. https://www.cdc.gov/vaccinesafety/concerns/sids.html.

experience with the temporal relationship of those deaths with infant immunizations:[40]

**Kirsch:** Hi. Steve Kirsch here. I'm with Jennifer. Jennifer, uh, was a police officer at a in a major city, about, what, three over 300,000 people. Both she and her husband worked in the child abuse section of the of the police department, and so they handled the SIDS cases. So she was very familiar with the SIDS cases that happened over approximately a seven year period, which would comprise about 250 or more cases. So, tell me what you just told me about the percentage of those cases that happened within 48 hours of a vaccination shot.

**Jennifer:** So I would, if I were to put a number on it, I would say around 50% of what we saw was within 48 hours of vaccination.

**Kirsch:** Okay. And, uh, how about within a week? What percentage would of the of the SIDS deaths would happen within a week after the shot?

**Jennifer:** I would say about 70%.
...

**Kirsch:** Now you said that your husband, did you or your husband go to this police conference ... was it a meeting with detectives who investigate these kinds of cases and other cases?

**Jennifer:** Correct. And prosecutors and things like that.

**Kirsch:** So, so tell us what happened, what your husband reported at that conference in terms of what the official narrative was, in terms of the speakers on the program and what they talked about, and what the side conversations were at that conference.

**Jennifer:** So the central theme was that almost no death is a SIDS death. That, that was fully admitted, and that was what the presenters, you know, reiterated throughout this-- this was in St. Louis, throughout this conference. I think it was like a three-day conference. And I would corroborate that by saying I've never seen a SIDS autopsy report that didn't list at least one symptom. Never did the presenters say it was vaccines, but detectives throughout, you know, the various agencies that came there for the training would have their side conversations, and all of the detectives would say, "Yeah, we always see it after vaccinations too." So it's kind of a common thing for detectives who investigate SIDS deaths to know at least SIDS is kind of a false diagnosis ...

**Kirsch:** It sounds like from, from your well, I mean, if you had to put a percentage on it, I mean, we talked about 70% within a week.

**Jennifer:** Correct.

**Kirsch:** Of the total number of deaths from SIDS, if you were to ascribe a cause of death, because some are, are accidental, some are ... very interesting cases, but what percentage would you put on that vaccine caused the [death] ... your personal opinion?

**Jennifer:** I would say probably 85% of the time, it's vaccine related.

**Kirsch:** 85% of the time. So essentially, the medical community realizes this, but they write it off, what you're basically saying is they write it off and they justify it by saying that the ends justify the means in that, "Yeah, we're gonna have these, these kids who are dying from this, but the vaccine is so beneficial for the for the other kids that it's a good tradeoff. And we'll try to minimize the vaccine hesitancy by telling parents that it wasn't the vaccine; these things just happen," and hope...

**Jennifer:** Correct.

**Kirsch:** ...that the parents don't compare notes.

**Jennifer:** Correct.

**Kirsch:** That's how it's done?

**Jennifer:** That's how it's done.

**Kirsch:** And the physicians feel probably okay about that because they'll say, "Oh, well, this is saving so many lives from polio and, and all this"

---

[40] "Former police detective reveals 50% of SIDS cases happened within 48 hours post vaccine." 9-26-2023.
https://rumble.com/v3l4f9k-former-police-detective-reveals-50-of-sids-cases-happened-within-48-hours-p.html?utm_source=substack&utm_medium=email

**Jennifer**: Yeah, the greater good ...

**Kirsch:** ...that, those deaths and if we were to tell people, admit to the public about the deaths, that SIDS was, that 85% of these deaths are caused by vaccines, if we were to admit to the problem, then that would destroy the public confidence in the vaccination program. People wouldn't get vaccinated, and then people would get polio and meningitis and all this other stuff, and, and that's far worse. So well, well, basically, we'll, we'll keep our mouth shut about that and try to take them off that. In fact, they're, they're trained, you mentioned that they were trained ...to get people off the scent.

**Jennifer:** Correct. 100%.

...

**Kirsch:** Okay. And no doubt about these numbers, 50%.

**Jennifer:** No doubt ... Well, I will stand by that. I will die on that hill.

**Kirsch:** So, 50% within 48 hours of the vaccine. That is mortality.

**Jennifer:** Oh, and, you know, the other thing we didn't talk about was that that never goes on an autopsy report. That was the other thing we never talked about.

**Kirsch:** What you mean, you mean that [the fact that] it was within 48 hours of a vaccine, never goes on the autopsy report?

**Jennifer:** Oh, no. No. So anytime you do death...

**Kirsch:** No, I'm wrong or, or no, it doesn't?

**Jennifer:** No, no, no, you're correct. It does not go on an autopsy report.

**Kirsch:** That's, that seems very, very strange to me.

**Jennifer:** Well, and, and, and I...

**Kirsch:** Isn't it to you?

**Jennifer:** Oh, yeah. But I found out the reason why a couple of years later.

**Kirsch:** Okay.

**Jennifer:** Um, it's because it's a pharmaceutical that doesn't carry liability. So if the child had a round of antibiotics, that would 100% be on a death report. But you can sue an antibiotic pharmaceutical company, right? But...

**Kirsch:** Yeah.

**Jennifer:** ...are there any stats that show antibiotics kill people? No. I mean, maybe, like, in really rare reactions, but they definitely don't have the record that vaccines have, right, which was why the liability was removed in the first place, which would be a whole nother show. But, so I that's honestly, that was, like, my trigger, where I'm like, "Whoa, wait. Why, why is that not, not on there? But the fact that you put Johnson & Johnson baby lotion on the baby the day before they died, like, why is that on there but this isn't?" That seemed kind of a big deal to me.

**Kirsch:** Right.

**Jennifer:** And nobody in my office had an answer. I'm like, "Why don't we, why isn't the medical examiner putting this on here?" And they were like, "I don't know." I mean, they thought it was as crazy as I did. So I, and I don't remember where I found out, I don't know if it was, like, in an online conversation with another police officer somewhere else or what it was, but then it was like, "Oh, it's because of the liability. It's the only pharmaceutical that doesn't have it. Therefore, it doesn't they don't have to do that." And I never really looked past it. So you might...

**Kirsch:** Wow.

**Jennifer:** ...wanna look into that more and see if it's constant...

**Kirsch:** Yeah.

**Jennifer:** ...in other jurisdictions.

**Kirsch:** Yep.

**Jennifer:** I don't know.

167.    This is a firsthand account of a police investigator specifically trained and experienced in the investigation of these infant deaths, based on may years of experience investigating such deaths. For these reasons she should be considered highly credible on this issue.

SECOND AMENDED COMPLAINT - PAGE 55

168.    This police investigator also stated that the temporal relationship of infant immunizations to SIDS deaths would be acknowledged informally at conferences of SIDS police investigators but never formally.

169.    This police investigator also stated that, in her experience, there seemed to be an unspoken rule that the medical examiner's report never stated the relationship of the time of death to any recent immunizations. (*Id.*)

**5.4.3.2.2    VAERS Data From The CDC Also Show Increased Frequency Of Sudden Unexplained Infant Death (SUID) Immediately Following Infant Immunizations**

170.    Data from the CDC's VAERS database corroborates investigator Jennifer's personal observation that most SUID deaths occur shortly after an infant immunization:[41]

**Table 2**
Onset interval of infant deaths post-vaccination, USA.

| Onset interval post-vaccination | Events reported | Cumulative % of total events |
|---|---|---|
| Day of Vaccination | 440 | 16.9 % (440/2605) |
| Day 2 | 760 | 46.1 % (1200/2605) |
| Day 3 | 312 | 58.0 % (1512/2605) |
| Day 4 | 214 | 66.3 % (1726/2605) |
| Day 5 | 131 | 71.3 % (1857/2605) |
| Day 6 | 92 | 74.8 % (1949/2605) |
| Day 7 | 92 | 78.3 % (2041/2605) |
| Days 8–60 | 564 | 100 % (2605/2605) |
| **Total deaths** | **2605** | |

Fifty-eight percent of all infant deaths reported to VAERS occurred within 3 days post-vaccination; 78.3% occurred within 7 days post-vaccination. The remaining deaths occurred between 8- and 60-days post-vaccination, an average of 11 per day (564/53 days) as compared to 760 infant deaths that occurred on Day 2 post-vaccination—a 69-fold increase. Data obtained from VAERS 1990-2019, age < 1 year, deaths reported within 60 days from day of vaccination.

171.    The above data of Miller can be graphically represented thusly:

---

[41] N.Z. Miller: Vaccines and sudden infant death: An analysis of the VAERS database 1990–2019 and review of the medical literature. Toxicology Reports 8 (2021) 1324–1335. https://doi.org/10.1016/j.toxrep.2021.06.020.



### Deaths Of U.S. Infants Age 1 To 12 Months By Day After Vaccination As Reported To VAERS, 1990-2019

172. The clustering of infant deaths reported to VAERS could be expected to follow vaccinations since the deaths shortly after vaccination, even if random, could be expected to be more likely to be reported to VAERS than deaths occurring much later and without such an obvious temporal connection to the vaccination. But, if such ascertainment and reporting bias was the explanation for that clustering of infant deaths shortly after vaccination, then one would expect the number of infant deaths reported to have occurred on the first post-vaccination day would be similar to or greater that occurring on post-vaccination day 2. But, in fact, the number of deaths reported to have occurred on day 2 were nearly twice those reported to have occurred on day 1. Thus, these results do not square with an explanation that they simply represent randomly distributed deaths with a reporting bias favoring deaths occurring sooner rather than later following vaccination.

173. A 2015 report from the CDC of post-vaccine deaths reported to VEARS between 1997-2013 found that the median interval between vaccination and death for infants less than one year of age was 2 days.[42]

---

[42] Moro, P.L., Arana, J., Cano, M., Lewis, P., & Shimabukuro T.T. Deaths Reported to the Vaccine Adverse Event Reporting System, United States, 1997–2013. Clinical Infectious Diseases, Vol 61 (6) 980-987. https://doi.org/10.1093/cid/civ423.

174.     Similar findings of an association between recent infant immunization and Sudden Infant Death Syndrome (a subcategory of SUID) were reported by Walker *et al.*:[43]



## SIDS in Infants within Three Days of DTP Vaccination Compared to Thirty Days After Vaccination

Figure 8.8—Sudden infant death syndrome (SIDS) deaths reported within three days of DTP vaccination compared to SIDS deaths reported starting thirty days after vaccination (Walker et al. 1987).

### 5.4.3.2.3     The Rate Of Sudden Unexpected Infant Death For African-American Infants Is Twice That Of Non-Hispanic White And Hispanic Infants

175.     The rate of Sudden Unexpected Infant Death for African-American infants is twice

---

[43] A.M. Walker *et al.,* Diphtheria-Tetanus-Pertussis Immunization and Sudden Infant Death Syndrome. Am. J. Pub. Health 77, no. 8 (1987): 945-951. https://doi.org/10.2105/AJPH.77.8.945.

that of Non-Hispanic White and Hispanic infants:[44]



Sudden Unexpected Infant Death by Race/Ethnicity, 2016–2020

■ Sudden infant death syndrome  ■ Unknown cause  ■ Accidental suffocation and strangulation in bed  [Reset]

NH AI/AN = Non-Hispanic American Indian/Alaska Native; NHB = Non-Hispanic Black; NH NHOPI = Non-Hispanic Native Hawaiian/Other Pacific Islander; NHW = Non-Hispanic White; NH Asian = Non-Hispanic Asian

<blockquote>
<strong>5.4.3.2.4</strong>      <strong>The Studies Cited By The CDC To Show That Infant Immunizations Do Not Cause SUID Did Not Examine The Interval Between Immunization And Death</strong>
</blockquote>

176.    The CDC maintains a webpage captioned as, "<u>Sudden Infant Death Syndrome (SIDS) and Vaccines.</u>"[45] That page contains a paragraph heading stating that, "Vaccines have not been shown to cause sudden infant death syndrome" followed by a paragraph stating that:

> Babies receive multiple vaccines when they are between 2 to 4 months old. This age range is also the peak age for sudden infant death syndrome (SIDS). The timing of the 2 month and 4 month shots and SIDS has led some people to question whether they might be related. However, studies have found that vaccines do not cause and are not linked to SIDS.[46]

This statement is followed by the statement that:

---

[44] Sudden Unexpected Infant Death by Race/Ethnicity, 2016–2020. CDC. https://www.cdc.gov/sids/data.htm.

[45] Sudden Infant Death Syndrome (SIDS) and Vaccines. https://www.cdc.gov/vaccinesafety/concerns/sids.html.

[46] "Sudden Infant Death Syndrome (SIDS) and Vaccines." CDC. https://www.cdc.gov/vaccinesafety/concerns/sids.html.

Multiple research studies and safety reviews have looked at possible links between vaccines and SIDS. The evidence accumulated over many years do not show any links between childhood immunization and SIDS. (*Id.*)

177.    This last statement cites several studies to support it (*id.,* footnotes.), including reports by: Moro *et al,* 2018, Moon *et al,* 2016, Moro *et al.*, 2015, Eriksen *et al.,* 2015, Institute of Medicine Immunization Safety Review Committee, 2003, Silvers *et al.,* 2001, and Griffin *et al.,* 1988.

178.    But none of these cited studies were done in the modern era in which many more immunizations are done to infants and few looked carefully at the time from immunization to the time of death.

179.    With regard to the study reported by Moro *et al.* in 2018 entitled, "Safety Surveillance of Diphtheria and Tetanus Toxoids and Acellular Pertussis (DTaP) Vaccines," this study came from the Immunization Safety Office of the Division of Healthcare Quality Promotion of the CDC.[47] It reviewed adverse events following DtaP vaccinations reported to the CDC's Vaccine Adverse Event Reporting System (VAERS). It was published in the medical journal, *Pediatrics*, a publication of the American Academy of Pediatrics.

180.    Dr. Moro and his CDC colleagues searched the CDC's VAERS database for deaths reported following DtaP vaccinations between January 1, 1991 and December 31, 2016 and found 844 deaths so reported. They reviewed death certificates and autopsy reports that could be obtained for 725 of those deaths. Of those 725, 350 listed "sudden infant death syndrome" as the cause of death, 62% of which were male and 90% of which were less than six months of age. (*Id.*)

181.    The authors admit that, "[w]ith VAERS, whether an AE (adverse event) is causally associated with vaccination generally cannot be assessed."[48] Most importantly, they state that, **"[i]n this review, we made no attempt to assess causality of the reported AEs."** Thus, this study by the CDC, cited as authority for the CDC's statement that, "studies have found that vaccines do not

---

[47] Moro PL, Perez-Vilar S, Lewis P, Bryant-Genevier M, Kamiya H, Cano M. Safety Surveillance of Diphtheria and Tetanus Toxoids and Acellular Pertussis (DTaP) Vaccines. Pediatrics. 2018;142(1). https://www.researchgate.net/publication/325552504_Safety_Surveillance_of_Diphtheria_and_Tetanus_Toxoids_and_Acellular_Pertussis_DTaP_Vaccines.

[48] *Id.*, at p. 2.

cause and are not linked to SIDS," **did not even "attempt to assess causality."** More importantly, if the allegation of former police investigator, Jennifer, is correct that there is a general rule against linking vaccinations to medical examiner's report on SIDS cases, then any studies based on those reports, such as the Moro study, would be invalid.

182.     With regard to the study reported by Moon and the Task Force On Sudden Infant Death Syndrome entitled, "SIDS and Other Sleep-Related Infant Deaths: Evidence Base for 2016 Updated Recommendations for a Safe Infant Sleeping Environment," published in 2016 in the medical journal *Pediatrics*,[49] this was a report from a task force convened by the American Academy of Pediatrics that reviewed the literature in SIDS but presented no new data of its own. The Task Force dismissed any linkage between SIDS and infant vaccines, stating that, "Four of the 6 studies showed no relationship between diphtheria-tetanus toxoid-pertussis vaccination and subsequent SIDS; the other 2 suggested a temporal relationship, but only in specific subgroup analysis." However, all four of the first group, showing no relationship, were old, from the 1980's, before many more immunizations were added to the schedule.

183.     With regard to the report by Eriksen *et al.* cited by the CDC, (1) it only looked at one vaccine, a neonatal Hepatitis B vaccine, and (2) it was funded by the CDC.

184.     With regard to the 2003 Institute of Medicine review cited by the CDC entitled "Immunization Safety Review: Vaccinations and Sudden Unexpected Death in Infancy,"[50] the committee had no original data but merely reviewed literature already extent to look for evidence of causality between infant immunizations and Sudden Unexpected Infant Death. The levels of causality that the committee used were: (1) no evidence, (2) evidence is inadequate to accept or reject a causal relationship, (3) evidence favors rejection of a causal relationship, and (4) evidence

---

[49] Moon RY; TASK FORCE ON SUDDEN INFANT DEATH SYNDROME. SIDS and Other Sleep-Related Infant Deaths: Evidence Base for 2016 Updated Recommendations for a Safe Infant Sleeping Environment. Pediatrics. 2016;138(5). https://www.cpsc.gov/s3fs-public/AAP_Sleep%20Death%20Technical%20Report%202016.pdf

[50] Institute of Medicine (US) Immunization Safety Review Committee; Stratton K, Almario DA, Wizemann TM, et al., editors. Immunization Safety Review: Vaccinations and Sudden Unexpected Death in Infancy. Washington (DC): National Academies Press (US); 2003. https://www.ncbi.nlm.nih.gov/books/NBK221465/?report.

favors acceptance of a causal relationship. The committee reported these conclusions:

1. The committee concludes the evidence is inadequate to accept or reject causal relationships between SIDS and the individual vaccines Hib, HepB, OPV, and IPV.
2. The committee concludes that the evidence favors rejection of a causal relationship between exposure to multiple vaccines and SIDS.
3. The committee concludes that the evidence is inadequate to accept or reject a causal relationship between exposure to multiple vaccines and sudden unexpected death in infancy, other than SIDS.
4. The committee concludes that the evidence is inadequate to accept or reject a causal relationship between exposure to multiple vaccines and sudden unexpected death in infancy, other than SIDS.
5. Because of the nature of the available case reports and the limited, unpublished epidemiological data, the committee concludes that the evidence is inadequate to accept or reject a causal relationship between hepatitis B vaccine and neonatal death.

185. The only causality conclusion that the committee reached was that "the evidence favors rejection of a causal relationship between exposure to multiple vaccines and SIDS." However, all the studies used to support that conclusion were case-control studies and none reported the temporal relationship of the vaccination to the death, specifically whether the infant death occurred within the first 48-72 hours after the vaccination. Furthermore, the study was funded by the CDC.

186. With regard to the report by Silvers *et al.* entitled, "The epidemiology of fatalities reported to the Vaccine Adverse Event Reporting System 1990-1997" cited by the CDC as evidence showing that infant vaccines don't cause sudden unexpected infant death,[51] the authors reviewed all deaths reported to VAERS, most of whom were infants, and concluded that, "[t]hese data may support findings of past controlled studies showing that the association between infant vaccination and SIDS is coincidental and not causal. VAERS reports of death after vaccination may be stimulated by the temporal association, rather than by any causal relationship." However, these authors did look at the temporal relationship of the vaccination to the death of the infant and reported that, **"SIDS, the largest category of deaths, occurred at a median of 3 days following immunization, with a quarter of these deaths occurring within 24 h." This observation is at odds with their conclusion of no causal relationship.**

---

[51] Silvers et al., The epidemiology of fatalities reported to the vaccine adverse event reporting system 1990-1997. Pharmacoepidemiol Drug Saf. 2001 Jun-Jul;10(4):279-85. https://www.researchgate.net/publication/11596287_The_epidemiology_of_fatalities_reported_to_the_Vaccine_Adverse_Event_Reporting_System_1990-1997.

187.    With regard to the report by Griffin *et al.*, entitled "Risk of sudden infant death syndrome after immunization with the diphtheria-tetanus-pertussis vaccine,"[52] the authors reviewed infant deaths following DTP immunization in four Tennessee counties during the years 1974-1984, well before the numbers of infant immunizations increased in later years. They did look at the temporal relationship of the immunization with the ensuing death and found no difference in the numbers of infants dying within the first few days, 0-3 days, 4-7 days, versus those dying between 15 and 30 days post-immunization.

188.    In summary, none of the reports relied upon by the CDC in making its statement that, "Vaccines have not been shown to cause sudden infant death syndrome (SIDS)" looked at the temporal relationship of the vaccination to the death of the infant during the modern era when all the vaccines required under Health and Safety Code section 120335 were being given routinely to infants.

### 5.4.3.2.5    Neurotoxic Aluminum Adjuvant Overload May Also Contribute To Sudden Unexpected Infant Death (SUID)

189.    One of the reasons that older studies fail to detect adverse events may be because the numbers of immunizations now required is much greater than in earlier years and more are given on the same day and, thus, the adverse event may reflect a cumulative or even synergistic injury.

190.    One such mechanism of cumulative injury may be that many vaccines use additives, called adjuvants, to enhance their immunogenicity. The most common adjuvant is aluminum, a known neurotoxin that must be eliminated by the kidneys. Patients with little or no kidney function who are on long-term dialysis cannot excrete the trace amounts of aluminum in the dialysis fluids and can develop Dialysis Dementia Syndrome.

191.    Infants may also not excrete aluminum efficiently. The FDA has warned that:

Term infants with normal renal function may also be at risk because of their rapidly growing and immature brain and skeleton, and an immature blood-brain barrier. Until they are 1 to 2 years old, infants have lower glomerular filtration rates than adults, which affects

---

[52] Griffin *et al.* Risk of sudden infant death syndrome after immunization with the diphtheria-tetanus-pertussis vaccine. N Engl J Med . 1988 Sep 8;319(10):618-23. https://pubmed.ncbi.nlm.nih.gov/3261837/.

their kidney function. The agency is concerned that young children and children with immature renal function are at a higher risk resulting from any exposure to aluminum.[53]

192.    For this reason draft guidance from the FDA sets a limit of 5 micrograms per kilogram of body weight per day of aluminum allowed in the intravenous feeding solutions given to infants continuously over 24 hours each day.[54]

193.    The average full-term newborn infant weighs about 3.25 kilograms; a one-month-old infant weighs about 4.4 kilograms, a two-month-old infant weighs about 5.4 kilograms; a four-month-old about 6.7 kilograms, and six-month-old about 7.6 kilograms.

194.    Thus, the FDA-allowable aluminum per day for a newborn would be about 16 micrograms; for a one-month-old about 22 micrograms, for a two-month-old about 27 micrograms, for a four-month-old about 34 micrograms, and for a six-month-old about 38 micrograms.

195.    The amount of neurotoxic aluminum injected into a newborn infant at birth who receives the CDC-recommended hepatitis B vaccine is 500 micrograms (as amorphous aluminum hydroxyphosphate sulfate),[55] all at once, about 30 times the FDA-recommended daily maximum for that age.

196.    The CDC then recommends a second dose of hepatitis B vaccine at 1 to 2 months of age, about 23 times the FDA daily allowable amount for that age.

197.    At age two months the CDC recommends a DtaP immunization, the aluminum in which can range from 330 to 625 micrograms of elemental aluminum (as aluminum phosphate).[56]

---

[53] U.S. Food and Drug Administration, Department of Health and Human Services. Rules and regulations. Fed Regist. 2003 Jun 9;68(110):34286. https://www.govinfo.gov/content/pkg/FR-2003-06-09/pdf/03-14140.pdf

[54] Small Volume Parenteral Drug Products and Pharmacy Bulk Packages for Parenteral Nutrition: Aluminum Content and Labeling Recommendations Guidance for Industry. U.S. Food and Drug Administration, December 2022 (draft). https://www.federalregister.gov/documents/2022/12/07/2022-26564/small-volume-parenteral-drug-products-and-pharmacy-bulk-packages-for-parenteral-nutrition-aluminum.

[55] FDA-approved package insert for hepatitis B vaccine, at p. 7. https://www.fda.gov/files/vaccines,%20blood%20&%20biologics/published/package-insert-recombivax-hb.pdf.

[56] About Diphtheria, Tetanus, and Pertussis Vaccines. Centers for Disease Control. https://www.cdc.gov/vaccines/vpd/dtap-tdap-td/hcp/about-vaccine.html#:~:text=Tetanus%2C Diphtheria%2C and Pertussis (Tdap) Vaccines&text=5 µg FIM).

198.     At the same office visit the infant will also be injected with a pneumococcal vaccine containing 125 micrograms of elemental aluminum (as aluminum phosphate).[57,58]

199.     If the infant did not receive the HepB vaccine at one month, then that would also be given at the two-month visit, for an additional 500 micrograms of aluminum.

200.     Thus, the total amount of neurotoxic aluminum give at the two-month visit could total as much as 1.250 micrograms, or 46 times the FDA daily allowable amount for that age.

201.     At the four-month visit the CDC recommends an additional DtaP immunization (330 to 625 micrograms of aluminum) and an additional pneumococcal vaccine (125 micrograms of aluminum) to be injected, for a possible total of another 750 micrograms. This is about 22 times the FDA recommended daily maximum for that age.

202.     The total aluminum injected at the six-month visit includes an additional DtaP (330-625 micrograms) and an additional pneumococcal vaccine for an additional 750 micrograms of injected aluminum. Since the CDC recommends a second HepB immunization some time between six and eighteen months, that would be another 500 micrograms of injected aluminum if given at the six-month visit, bringing the total for the six-month visit up to 1,250 micrograms. This is about 33 times the FDA recommended daily maximum for that age.

203.     Thus, by age six months the infant has been subjected, on five different occasions, to injections of neurotoxic aluminum far in excess of the FDA daily allowable amount. Altogether, the total aluminum injected during the first six months of life, when infants are at the highest risk of Sudden Unexpected Infant Death, could total as much as 3,750 micrograms.

204.     It has been estimated that, by 18 months of age, a child may have received 5,000 micrograms of neurotoxic aluminum via immunizations.[59]

205.     In 2008 the U.S. Agency for Toxic Substances and Disease Registry (ATSDR), a unit within the U.S. Public Health Service and the U.S. Department of Health and Human Services

---

[57] PCV 15 vaccine. https://www.fda.gov/media/150819/download.

[58] PCV 20 vaccine. https://www.fda.gov/media/149987/download?attachment.

[59] Miller NZ. Aluminum in Childhood Vaccines is Unsafe. Journal of American Physicians and Surgeons Volume 21 Number 4, Winter 2016. https://www.researchgate.net/publication/311824598_Aluminum_in_Childhood_Vaccines_is_Unsafe

issued a report entitled, "Toxicological Profile For Aluminum."[60] This report found that, "There is a limited amount of information available on the toxicity of aluminum in children. As with adults, neurological and skeletal (osteomalacia) effects have been observed in children with impaired renal function...Bishop et al. (1997) found significant decreases in the Bayley Mental Development Index in pre term infants receiving a standard intravenous feeding solution compared to preterm infants receiving an aluminum-depleted feeding solution." *Id.*, at p. 122.

206.    Since the amount of aluminum injected at these discreet times of immunization is far in excess of the amount that can be immediately excreted, the question naturally arises as to where does the excess go and does it become permanently bound there such that it cannot be later excreted?

207.    In a very important study, Mold, Umar, King, and Exley looked at this question as it applies to those with autism.[61] The Abstract summary of that investigation reported that:

> Autism spectrum disorder is a neurodevelopmental disorder of unknown aetiology. It is suggested to involve both genetic susceptibility and environmental factors including in the latter environmental toxins. Human exposure to the environmental toxin aluminium has been linked, if tentatively, to autism spectrum disorder. Herein we have used transversely heated graphite furnace atomic absorption spectrometry to measure, for the first time, the aluminium content of brain tissue from donors with a diagnosis of autism. We have also used an aluminium-selective fluor to identify aluminium in brain tissue using fluorescence microscopy. The aluminium content of brain tissue in autism was consistently high. The mean (standard deviation) aluminium content across all 5 individuals for each lobe were 3.82(5.42), 2.30(2.00), 2.79(4.05) and 3.82(5.17) µg/g dry wt. for the occipital, frontal, temporal and parietal lobes respectively. *These are some of the highest values for aluminium in human brain tissue yet recorded* and one has to question why, for example, the aluminium content of the occipital lobe of a 15 year old boy would be 8.74 (11.59) µg/g dry wt.? Aluminium-selective fluorescence microscopy was used to identify aluminium in brain tissue in 10 donors. While aluminium was imaged associated with neurones it appeared to be present intracellularly in microglia-like cells and other inflammatory non-neuronal cells in the meninges, vasculature, grey and white matter. The pre-eminence of intracellular aluminium associated with non-neuronal cells was a standout observation in autism brain tissue and may offer clues as to both the origin of the brain aluminium as well as a putative role in autism spectrum disorder.

208.    The Discussion section of this important paper pointed out that:

---

[60] Agency for Toxic Substances and Disease Registry (ATSDR). Toxicological profile for aluminum. Washington, D.C.: U.S. Department of Health and Human Services; 2008. https://www.atsdr.cdc.gov/ToxProfiles/tp22.pdf.

[61] Mold, M, Umar, D, King, A, and Exley, C: Aluminum in brain tissue in autism. Journal of Trace Elements in Medicine and Biology, Volume 46, March 2018, pp 76-82 (emphasis added). https://www.sciencedirect.com/science/article/pii/S0946672X17308763?via%3Dihub.

The aluminium content of brain tissues from donors with a diagnosis of ASD was extremely high (Table 1). While there was significant inter-tissue, inter-lobe and inter-subjectvariability the mean aluminium content for each lobe across all 5 individuals was towards the higher end of all previous (historical) measurements of brain aluminium content, including iatrogenic disorders such as dialysis encephalopathy. All 4 male donors had significantly higher concentrations of brain aluminium than the single female donor. *We recorded some of the highest values for brain aluminium content ever measured in healthy or diseased tissues in these male ASD donors* including values of 17.10, 18.57 and 22.11 μg/g dry wt. What discriminates these data from other analyses of brain aluminium in other diseases is the age of the ASD donors. Why, for example would a 15 year old boy have such a high content of aluminium in their brain tissues? There are no comparative data in the scientific literature, the closest being similarly high data for a 42 year old male with familial Alzheimer's disease.

(*Id.,* emphasis added.)

209.    The brains studied in this report were from five deceased individuals between the ages of 15 to 50 years of age.

210.    The significance of this study is that the investigators found much higher levels of neurotoxic aluminum in the brains of five deceased autistic patients than they had ever found in normal patients or even those with other neuropathologies. This strongly implicates aluminum as a cause of autism.

211.    The increased occurrence of aluminum particles in the brains of infants dying of Sudden Infant Death Syndrome (SIDS) versus those dying of other causes or intrauterine death has also been reported.[62]

212.    Given the large excess amounts of neurotoxic aluminum injected into infants under the CDC's recommendations and California's mandates and the finding of excess aluminum in the brains of infants dying of Sudden Infant Death Syndrome and of autistic adults, and the absence of any studies from the CDC refuting these findings, the State of California cannot possibly show that its mandates for aluminum-containing vaccines are safe.

### 5.4.3.3 Increased Rates Of Asthma, Type 1 Diabetes, Inflammatory Bowel Disease, Rheumatoid Arthritis, and Thyroid Inflammation Are Reported In Vaccinated Children Versus Those Unvaccinated

213.    Hooker and Miller analyzed data extracted from electronic medical records of three

---

[62] Gatti, A.M., Ristic, M, Stanzani, S., & Lavezzi, AM. Novel chemical-physical autopsy investigation in sudden infant death and sudden intrauterine unexplained death syndromes. Nanomedicine (London)(2022) 17(5) 275-288. https://www.tandfonline.com/doi/full/10.2217/nnm-2021-0203.

pediatric private practices that included data for 2,047 children born into those practices of which 633 (30.9%) received no vaccinations during the first year of life whereas 1414 (69.1%) had received at least one vaccination during the first year of life, and all had reached the age of three at the time of the study. Electronic medical records were examined for diagnosis codes for several diagnoses, including asthma and eczema that occurred in those patients after the age of one.

214.    As shown below, children vaccinated before one year of age and not breastfed were far more likely to have been diagnosed with asthma (23.8 times) by the time they were three years old as compared to those not vaccinated within the first year of life and breastfed:[63]

---

[63]Kennedy, RF and Hooker, B: Vax-Unvax. Children's Health Defense (2023), citing Hooker, BS, and Miller, NZ: Analysis of health outcomes in vaccinated and unvaccinated children: Developmental delays, asthma, ear infections and gastrointestinal disorders. SAGE Open Medicine, Vol 8, 1. https://journals.sagepub.com/doi/10.1177/2050312120925344.

## Odds Ratios for Asthma Accounting for Vaccination and Breastfeeding Status

Figure 2.7—Odds ratios for a diagnosis of asthma within vaccinated and unvaccinated children accounting for breastfeeding status (Hooker and Miller, 2021).

215.    In 2008 Classen compared the rate of type 1 diabetes in Danish children who received thee doses of polio vaccine within the first year of life as compared to those who did not receive any polio vaccine in the first year of life and who later developed type 1 diabetes.

216.    As shown below, the Danish children vaccinated with three doses of polio vaccine in the first year of life were 2.5 times more likely to develop type 1 diabetes as compared to those

unvaccinated in the first year of life with polio vaccine:[64]



Type I Diabetes Incidence per 100,000 Children Vaccinated with All 3 Recommended Polio Vaccines or Unvaccinated

Figure 4.6—Incidence of Type 1 diabetes in children receiving all three recommended polio vaccines versus children unvaccinated for polio (Classen 2008).

217.     In 2015 de Chambrun *et al.* published a meta-analysis of three studies related to vaccination and the risk of developing inflammatory bowel disease, such as Crohn's Disease or ulcerative colitis.[65] They found that children who received polio vaccines in childhood were 2.28 times more likely to later develop Crohn's Disease or 3.48 times more likely to develop ulcerative

[64] Kennedy, RF and Hooker, B: Vax-Unvax. Children's Health Defense (2023), p. 64, citing Classen, JB: Risk of Vaccine Induced Diabetes in Children with a Family History of Type 1 Diabetes. The Open Pediatric Medicine Journal, 2008, 2, 7-10. https://benthamopen.com/contents/pdf/TOPEDJ/TOPEDJ-2-7.pdf

[65] de Chambrun GP *et al.*: Vaccination and Risk for Developing Inflammatory Bowel Disease: A Meta-Analysis of Case–Control and Cohort Studies. Clinical Gastroenterology and Hepatology 2015;13:1405–1415. https://www.cghjournal.org/article/S1542-3565(15)00638-2/pdf

colitis, as illustrated below:[66]



**Relative Risk of Crohn's Disease and Ulcerative Colitis Following Polio Vaccination**

Figure 4.7—Relative risk of Crohn's disease and ulcerative colitis in children vaccinated against polio versus children unvaccinated against polio (Pineton de Chambrun et al. 2015).

218.    Thus, various childhood vaccines have been reported to be associated with increased risk of developing a host of autoimmune disorders.

### 5.4.3.4 Parents Share Their Tragic Stories Of Vaccination Injuries

#### 5.4.3.4.1    The One Year-Old Daughter Of Shanticia Nelson And Dayon Carter Died Suddenly Just A Few Hours After Her Routine Immunizations

---

[66] Kennedy, RF and Hooker, B: Vax-Unvax. Children's Health Defense (2023), p. 62, citing de Chambrun GP *et al., supra.*

219.     The one year-old daughter of Shanticia Nelson and Dayon Carter, Saniya, went to the doctor for a one-year checkup on March 26 of this year. At that checkup she received several immunizations as required for her age. On the way home Saniya went into convulsions. Her parents rushed her to a nearby hospital where she continued to have convulsions. Then her heart stopped. Hospital staff tried for forty minutes to bring her back, while her parents waited anxiously, but Saniya could not be saved.



**Saniya Carter, Age One, Rest In Peace**

220.     Saniya's parents want the world to know that routine immunizations can kill children and that no one at the doctor's office told them this, otherwise they never would have consented to those shots.

### 5.4.3.4.2     Other Parents Share Their Tragic Stories Of Vaccination Injuries

221.     In a sworn declaration,[67] Darlene Culotta stated that her son was seven weeks old when she had him vaccinated with the DTP shot now required under Health and Safety Code Section 120335(b). He was in good health at the time. The next morning she found him dead in his crib. No one told her that this was a possibility when she gave consent for that shot and she never would have given that consent if she had known that. *Id.*

222.     In a sworn declaration,[68] Sally Rubin of Oakland, California states that her son was three years and seven months old when he had the sudden onset of regressive autism shortly after he received  immunizations required under Health and Safety Code Section 120335(b), including diphtheria, tetanus, measles, mumps, and rubella. He now suffers, to a severe degree, from all of these characteristics of autism, including: (1) difficulty understanding and using social cues, such

---

[67] Declaration of Darlene Culotta, exhibit #1.

[68] Declaration of Sally Rubin, exhibit #2.

SECOND AMENDED COMPLAINT - PAGE 72

as eye contact, facial expressions, and body language, (2) limited eye contact and avoidance of eye contact, (3) lack of interest in social interactions and difficulty sharing experiences, (4) challenges with understanding and responding to emotions in others, (5) repetitive movements, such as hand flapping, spinning, or rocking, (6) insistence on routines and resistance to change, highly focused interests or obsessions with specific objects or activities, (8) stereotyped speech patterns, such as repeating words or phrases, (9) intense and narrow interests that may consume a significant amount of time and attention, (10) difficulty shifting focus from their interests to other activities, (11) preference for certain objects, textures, or sensory experiences, (12) delayed language development or unusual language patterns, (13) difficulty with pretend play and imaginative activities, (14) sensory sensitivities, such as over- or undersensitivity to sounds, textures, or smells, (15) challenges with motor coordination or fine motor skills, (16) unusual eating habits or food preferences. *Id.* As for the impact on her family, she further states that, "I had my own company at the time and closed it to be able to devote myself full time to helping my son. It has been financially devastating." *Id.* She further states that, "When I gave consent for the immunizations (shots) right before my child became autistic, the possibility of autism was never mentioned to me. If I knew at the time I gave consent for the immunizations right before my child became autistic, I never would have given that consent." *Id.*

223.     Sally Rubin's tragic story is typical. Jennifer Silva's daughter had the sudden onset of regressive autism at age 18 months after immunizations.[69] Her daughter is seriously afflicted with all the same symptoms as the Rubin child. *Id.* No one told her that this was a possibility before she consented to those immunizations and she never would have consented if she had known. *Id.* Her comments are haunting:

> My daughter became very agitated initially, unable to cope with daily life, experiencing several tantrums, which had never occurred before. She then lost her eye contact and ability to answer her name. She wandered around our home as if we weren't there. I felt like I had lost my girl. The regret and sadness that enveloped me as a mother was overpowering. *Id.*

224.     Meena Kurian's previously healthy son was fourteen months old when he was

---

[69] Declaration of Jennifer Silva, exhibit #3.

suddenly stricken by regressive autism after immunizations.[70] He has all the same symptoms as the children above. That possibility was never mentioned to her before she consented and she never would have consented if she had known. She commented that, "Financial strain, could not work as an RN as my son needed me. Girls felt neglected as we had to focus on son. Strained marital and family bonds." *Id.*

225.    Salvadore Newton's son developed regressive autism in 2012 after immunizations at age two and one half months. He has all the same symptoms as the other children above. That possibility was never mentioned to Salvadore before he consented to the shots and he never would have consented had he known. He commented:

> [Redacted] developed seizures and still has them to this day. The first 7 years of his life [redacted] had trouble sleeping. Little to no trouble before the shots. He would pace back and forth endlessly, sometimes until 1 or 2 in the morning. I had many sleepless nights. To this day he can't sleep without melatonin supplements. [Redacted] was forming words and crawling at an extremely early age. Now at 13 he can't speak and is still in diapers. He needs care for food preparation and personal hygiene. I pray one day he can function on his own and have a good productive life.

226.    In a sworn declaration,[71] Ann Todd stated that her twenty month old daughter was developing normally until the child suddenly developed regressive autism after immunizations. The child has all the same symptoms as the other autistic children above and is severely affected. She was not told of this possibility and never would have consented had she known. The child was in special education throughout school and is now an adult under conservatorship.

227.    In a sworn declaration,[72] Janet Fry states that her son was in previously good health when he suddenly became autistic after immunizations. He has the same symptoms as the other autistic children above and is severely affected in all respects. She was not told of this possibility before giving consent and never would have done so had she known. She further states that:

> My child became a completely different person, it was like a light switched off in him. He was social and talkative he was already saying basic words, signing to communicate. And after he became withdrawn would get angry, anti social, didn't even like his brothers out want to interact with any other children like he did prior. And now at 5 I am dealing with being his full time caregiver he hits other people and spits on them. He is non verbal. He

---

[70] Declaration of Meena Kurian, exhibit #4.

[71] Declaration of Ann Todd, exhibit #5.

[72] Declaration of Janet Fry, exhibit #6.

hits himself, the list is long.

228.    In a sworn declaration,[73] Marie Bacsik states that her daughter was 10 months old when the daughter suddenly regressed into autism. The child now has all the same symptoms as the other children above and to a severe degree in all respects. She was never told of this possibility and never would have consented had she known of it.  She further states that:

> She was in the hospital with Infantile Spasms about 24 hours after her vaccines and lost all abilities within a few days. She now has Severe Autism, Severe Autoimmune Encephalitis and is on IVIG (insurance approved because of how severe), severe gut dysbiosis, rashes, and has suffered Infantile Spasms and Syncope. We have all the testing to prove all of this and it all matches up with her hospital admissions. She is still receiving these treatments at age 10.

229.    Regressive autism is not the only post-vaccine injury seen. Kara Morales' son developed seizures at five and a half months after immunizations.[74] She commented that:

> He received the Hepatitis B vaccine as a newborn, and was in the hospital 2.5 weeks later with a high fever. The two events may be unrelated. However, we did not vaccinate him again until 5.5 months old . He was in generally good health at the time, but had a little dry cough. I asked if we should wait again since he had some kind of mild illness, but the nurse said he had no fever, no juicy cough, and so it was "perfectly safe". Within 24 hours of receiving those vaccines, he began having absence seizures. Within 72 hours of receiving the vaccines he collapsed in my arms, stopped breathing, and was taken by ambulance to Rady Children's Hospital. He had further seizures in the presence of an attending neurologist. He was moved to a room for observation, and at one point crashed and they moved him to the ICU. He spent 4 days total at Rady's. He was put on anti-seizure medication and remained on anti-seizure medication for several years. He continued to see the neurologist for breakthrough seizures.

230.    Wendy Chin's daughter developed chronic severe eczema after getting immunizations as a newborn infant but her doctor continued to give those shots.[75] She commented that:

> My daughter was fully vaccinated at at age 5, and by that point she had developed life threatening food allergies and had anaphylactic reactions. In her teen years she was diagnosed with MCAS (mast cell activation syndrome) and suffers from chronic eczema, constipation, insomnia, and brain fog. *Id.*

231.    In a sworn declaration,[76] Grace Shain states that her son was 15 years old and in

---

[73] Declaration of Marie Bacsik, exhibit #7.

[74] Declaration of Kara Morales, exhibit #8.

[75] Declaration of Wendy Chin, exhibit #9.

[76] Declaration of Grace Shain, exhibit #10.

good health until he received the HPV vaccine recommended by the California Department of Public Health. Thereafter he developed, "vaccine induced myalgic encephalomyelitis, dysautonomia, POTS (postural orthostatic tachycardia syndrome), gastroparesis, and a host of other neurological symptoms."

> My son was a straight A student, on 2 swim teams, super social, and shortly after receiving the Gardasil HPV vaccine became very sick, dropped out of all school, exercise, eventually became bed-bound for many years. He has never recovered and this has put an immense financial and emotional toll on the entire family.

232.    These stories reflect the daily tragedy of post-vaccine injury and death for tens of thousands families just within California.

### 5.4.4    Childhood Immunizations Required By California Health And Safety Code Section 120335 Are Not Clearly Necessary To Prevent Serious Infection In Children

#### 5.4.4.1 No Overall Net Benefit Of Measles Immunization Has Been Shown By VU Studies

233.    The measles virus is the most highly contagious infectious agent for which California Health and Safety Code section 120335 requires immunization.

234.    For this reason measles is the infection most likely to break out among non-immunized children. The fact that measles breaks out among populations of children not fully immunized for measles and does not break out among populations of children fully immunized for measles argues strongly that measles immunization is effective at preventing th at infection.

235.    Given that the measles vaccine is effective, is it safe and is it worth it?

236.    Because the FDA and CDC do not test the measles vaccines for adverse effects as compared to placebo controls, there is no certainty as to the nature and frequency of those adverse effects, leading many parents to decline to follow California's requirements and the CDC's recommendations for measles immunization.

237.    Indeed, in 1998 Wakefield *et al.* reported that some children developed autism following parent-reported measles immunization but did not claim that the latter caused the former.[77] This report was widely attacked and was retracted by the publisher (but not the authors)

---

[77] Wakefield AJ Murch SH Anthony A et al. Ileal-lymphoid-nodular hyperplasia, non-specific colitis, and pervasive developmental disorder in children. *Lancet*. 1998; 351: 637-641. https://www.thelancet.com/pdfs/journals/lancet/PIIS0140-6736(97)11096-0.pdf.

twelve years later.[78] However, the finding was never actually refuted since, undeniably, most children who develop autism have received a measles immunization and the rate of autism in unvaccinated children is still either unknown or a matter of dispute.

238.    However, measles cases occurring in unvaccinated children do not poses such a serious health problem that measles immunization is clearly necessary because, **even before the measles vaccine was introduced, the death rate for measles in otherwise healthy children in the United States was nearly zero as shown below:[79]**



239.    Furthermore, there is simple and effective treatment for the infection, ordinary vitamin A, that likely reduces that mortality rate to zero in immuno-competent children and

[78]   Retraction—Ileal-lymphoid-nodular hyperplasia, non-specific colitis, and pervasive developmental disorder in children. The Editors of The Lancet. *Lancet.* 2010:375. https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(10)60175-4/fulltext.

[79]   Suzanne Humphries, MD and Roman Bystrianyk. Dissolving Illusions, page 201. www.dissolvingillusions.com.

reduces measles complications drastically[80] and as also shown below:[81]



240. The CDPH cannot show that there is any overall net benefit of the measles vaccine for children in California to justify the risks of permanent injury from it.

### 5.4.4.2 No Overall Net Benefit Of Polio Immunization Has Been Shown By VU Studies

241. The polio vaccines developed by Salk and Sabin are the poster children for the vaccine proponents, purportedly saving millions of children and young adults from living with crippled limbs walking with cumbersome leg braces like Franklin Roosevelt or, even worse, existing immobilized in massive iron lung machines.

[80] G.D. Hussey, M. Klein: A Randomized, Controlled Trial of Vitamin A In Children With Severe Measles. N. Engl. J. Med. Jul 19, 1990: 160-4. doi: 10.1056/NEJM199007193230304.

[81] A. Coutsoudis *et al.* Vitamin A Supplementation Reduces Measles Morbidity In Young African Children: A Randomized, Placebo-Controlled, Double-Blind Trial. Am. J. Clinical Nutrition 54:5 890-895 (Nov. 1991). https://doi.org/10.1093/ajcn/54.5.890

242. However, the reality of paralytic polio is more complicated and, to this day, still poorly understood.

243. While most of the dread infectious diseases of mankind, small pox for example, have been common and prevalent for much of recorded history and then receded with modern sanitation and improved nutrition, polio was just the opposite, mainly appearing only in advanced industrial societies and virtually unknown in primitive societies. Indeed, the incidence of polio was dropping sharply before the polio vaccine was introduced.

244. The CDPH cannot show any overall net benefit of polio immunization to the child.

245. In summary, increased rates of: (1) learning disability, (2) autism, (3) neurodevelopmental delay, (4) Sudden Unexpected Infant Death, (5) asthma, (6) Type 1 Diabetes, (7) inflammatory bowel disease, (8) rheumatoid arthritis, (9) eczema, and (10) thyroid inflammation occur in children immunized with the vaccines required by California for school attendance as compared to those children not so immunized, with none of these injuries or deaths eligible for compensation under the Vaccine Injury Table adopted under the National Vaccine Injury Act.

**5.5    The California Department Of Public Health, Working With The Medical And Osteopathic Medical Boards Of California Have Made Medical Exemptions Very Difficult For Parents To Obtain For Their Children In Derogation Of Their Due Process Rights Under A Strict Scrutiny Standard Of Review**

246. Under California Health and Safety Code Section 120370, subsection (a)(3), students are exempt from the immunization requirements imposed under Health and Safety Code Section 120335 if they obtain a medical exemption from a licensed physician complying with Health and Safety Code Section 120372.

247. However, under Health and Safety Code Section 120372, stringent but vague guidelines are applied to such medical exemptions. Several physicians have lost their medical licenses for writing such exemptions with no prior warnings to them that they have strayed from those vague guidelines.

248. Under Health and Safety Code Section 120372, subsection (e), the California Department of Public Health works closely with the Medical and Osteopathic Medical Boards of California to police these vague guidelines.

249.    Pediatrician Dr. Douglas Hulstedt, M.D. is one of those whose medical license was so revoked. His medical license was revoked by the Medical Board of California in 2023 for, purportedly, practicing "below the standard of care."

250.    Specifically, the Medical Board ostensibly revoked Dr. Hulstedt's medical license for recommending, in 2017, to the parent of one of his pediatric patients that the child should not receive any more immunizations due to the child's medical and family history.

251.    The Medical Board found this to be below the applicable standard of care since, according to the Medical Board, doctors are only allowed to make recommendations on immunizations that comport with the "guidelines" of the Centers For Disease Control (CDC).

252.    However, under Health and Safety Code Section 120370, subsection (a)(1), physicians were specifically permitted to provide medical exemptions based upon family medical history in 2017.

253.    Under California's immunization statutes, Health and Safety Code Section 120325 *et seq.*, parents bear the burden of proof in exempting their children from those immunization requirements, which infringe on fundamental rights of medical and educational freedom, fundamental rights entitled to strict scrutiny protection.

## 6.    CALIFORNIA'S IMMUNIZATION STATUTES

254.    California Health and Safety Code Section 120335 requires California school children to be immunized with numerous listed vaccines, known to Congress under the National Childhood Vaccine Injury Act (21 U.S.C. §§ 300aa-1 et seq.) and as set forth above in section 5.4, to cause serious injury and disability, up to and including death.

255.    As shown below, Defendant Erica Pan, as Director of the California Department of Public Health (CDPH), comprehensively regulates school attendance by children based upon their immunization status under California's statutes and, therefore, regulates children's fundamental right to attend school, the *Meyer-Pierce* right, based upon the child's immunization status.

256.    Specifically, California Health and Safety Code section 131000 provides that, "There is in the California Health and Human Services Agency a State Department of Public Health.."

257.     California Health and Safety Code section 131005 further provides for a California State Department of Public Health (the "department" or CDPH) headed by a State Public Health Officer (the "director" of the CDPH).

> (a) There is in state government an executive officer known as the State Public Health Officer, who shall be appointed by the Governor, subject to confirmation by the Senate, and hold office at the pleasure of the Governor. The State Public Health Officer shall receive the annual salary provided by Article 1 (commencing with Section 11550) of Chapter 6 of Part 1 of Division 3 of Title 2 of the Government Code.
> (b) The State Public Health Officer shall serve as the director of, and have control over, the State Department of Public Health.
> (c) Any statutory reference to "director," "the Director of Health Services," "the Director of Public Health," or the "Director of the State Department of Public Health," regarding a function transferred to the State Department of Public Health pursuant to Chapter 2 (commencing with Section 131050), is deemed to, instead, refer to the State Public Health Officer.
> (d) Any statutory reference to "department" or "state department" regarding a function transferred to the State Department of Public Health pursuant to Chapter 2 (commencing with Section 131050), shall refer to the State Department of Public Health.

258.     Defendant Erica Pan is California's State Public Health Officer and the Director of the California Department of Public Health (CDPH).

259.     California Health and Safety Code section 120325(a) provides that:

> In enacting this chapter, but excluding Section 120380, and in enacting Sections 120400, 120405, 120410, and 120415, it is the intent of the Legislature to provide:
>  (a) A means for the eventual achievement of total immunization of appropriate age groups against the following childhood diseases:
> (1) Diphtheria, (2) Hepatitis B, (3) Haemophilus influenzae type b, (4) Measles, (5) Mumps, (6) Pertussis (whooping cough), (7) Poliomyelitis, (8) Rubella, (9) Tetanus, (10) Varicella (chickenpox), (11) Any other disease deemed appropriate by the department, taking into consideration the recommendations of the Advisory Committee on Immunization Practices of the United States Department of Health and Human Services, the American Academy of Pediatrics, and the American Academy of Family Physicians.
> (b) That the persons required to be immunized be allowed to obtain immunizations from whatever medical source they so desire, subject only to the condition that the immunization be performed in accordance with the regulations of the department and that a record of the immunization is made in accordance with the regulations.
> (c) Exemptions from immunization for medical reasons.
> (d) For the keeping of adequate records of immunization so that health departments, schools, and other institutions, parents or guardians, and the persons immunized will be able to ascertain that a child is fully or only partially immunized, and so that appropriate public agencies will be able to ascertain the immunization needs of groups of children in schools or other institutions.

260.     Furthermore, California Health and Safety Code section 120330 provides that:

> The department, in consultation with the Department of Education, shall adopt and enforce all regulations necessary to carry out Chapter 1 (commencing with Section 120325, but excluding Section 120380) and to carry out Sections 120400, 120405, 120410, and 120415.

261.    California Health and Safety Code section 120335 further provides that:

(a) As used in this chapter, "governing authority" means the governing board of each school district or the authority of each other private or public institution responsible for the operation and control of the institution or the principal or administrator of each school or institution.

(b) The governing authority shall not unconditionally admit any person as a pupil of any private or public elementary or secondary school, child care center, day nursery, nursery school, family day care home, or development center, unless, prior to his or her first admission to that institution, he or she has been fully immunized. The following are the diseases for which immunizations shall be documented: (1) Diphtheria, (2) Haemophilus influenzae type b, (3) Measles, (4) Mumps, (5) Pertussis (whooping cough), (6) Poliomyelitis, (7) Rubella, (8) Tetanus, (9) Hepatitis B, (10) Varicella (chickenpox), (11) Any other disease deemed appropriate by the department, taking into consideration the recommendations of the Advisory Committee on Immunization Practices of the United States Department of Health and Human Services, the American Academy of Pediatrics, and the American Academy of Family Physicians.

(c) Notwithstanding subdivision (b), full immunization against hepatitis B shall not be a condition by which the governing authority shall admit or advance any pupil to the 7th grade level of any private or public elementary or secondary school.

(d) The governing authority shall not unconditionally admit or advance any pupil to the 7th grade level of any private or public elementary or secondary school unless the pupil has been fully immunized against pertussis, including all pertussis boosters appropriate for the pupil's age.

(e) The department may specify the immunizing agents that may be utilized and the manner in which immunizations are administered.

(f) This section does not apply to a pupil in a home-based private school or a pupil who is enrolled in an independent study program pursuant to Article 5.5 (commencing with Section 51745) of Chapter 5 of Part 28 of the Education Code and does not receive classroom-based instruction.

262.    California Health and Safety Code section 120370, subdivision (a)(3), further provides that:

Except as provided in this subdivision, on and after July 1, 2021, the governing authority shall not unconditionally admit or readmit to any of those institutions specified in this subdivision, or admit or advance any pupil to 7th grade level, unless the pupil has been immunized pursuant to Section 120335 or the parent or guardian files a medical exemption form that complies with Section 120372.

263.    Thus, a child who does not meet California's school immunization requirements under section 120335 cannot attend classes without a medical exemption form that complies with Section 130372.

264.    California Health and Safety Code section 120372 then provides that:

(a)    (1) By January 1, 2021, the department shall develop and make available for use by licensed physicians and surgeons an electronic, standardized, statewide medical exemption certification form that shall be transmitted directly to the department's California Immunization Registry (CAIR) established pursuant to Section 120440. Pursuant to Section 120375, the form shall be printed, signed, and submitted directly to the school or institution at which the child will attend, submitted directly

SECOND AMENDED COMPLAINT - PAGE 82

to the governing authority of the school or institution, or submitted to that governing authority through the CAIR where applicable. Notwithstanding Section 120370, commencing January 1, 2021, the standardized form shall be the only documentation of a medical exemption that the governing authority may accept.

(2) At a minimum, the form shall require all of the following information:

(A) The name, California medical license number, business address, and telephone number of the physician and surgeon who issued the medical exemption, and of the primary care physician of the child, if different from the physician and surgeon who issued the medical exemption.

(B) The name of the child for whom the exemption is sought, the name and address of the child's parent or guardian, and the name and address of the child's school or other institution.

(C) A statement certifying that the physician and surgeon has conducted a physical examination and evaluation of the child consistent with the relevant standard of care and complied with all applicable requirements of this section.

(D) Whether the physician and surgeon who issued the medical exemption is the child's primary care physician. If the issuing physician and surgeon is not the child's primary care physician, the issuing physician and surgeon shall also provide an explanation as to why the issuing physician and not the primary care physician is filling out the medical exemption form.

(E) How long the physician and surgeon has been treating the child.

(F) A description of the medical basis for which the exemption for each individual immunization is sought. Each specific immunization shall be listed separately and space on the form shall be provided to allow for the inclusion of descriptive information for each immunization for which the exemption is sought.

(G) Whether the medical exemption is permanent or temporary, including the date upon which a temporary medical exemption will expire. A temporary exemption shall not exceed one year. All medical exemptions shall not extend beyond the grade span, as defined in Section 120370.

(H) An authorization for the department to contact the issuing physician and surgeon for purposes of this section and for the release of records related to the medical exemption to the department, the Medical Board of California, and the Osteopathic Medical Board of California.

(I) A certification by the issuing physician and surgeon that the statements and information contained in the form are true, accurate, and complete.

(3) An issuing physician and surgeon shall not charge for either of the following:

(A) Filling out a medical exemption form pursuant to this section.

(B) A physical examination related to the renewal of a temporary medical exemption.

(b) Commencing January 1, 2021, if a parent or guardian requests a licensed physician and surgeon to submit a medical exemption for the parent's or guardian's child, the physician and surgeon shall inform the parent or guardian of the requirements of this section. If the parent or guardian consents, the physician and surgeon shall examine the child and submit a completed medical exemption certification form to the department. A medical exemption certification form may be submitted to the department at any time.

(c) By January 1, 2021, the department shall create a standardized system to monitor immunization levels in schools and institutions as specified in Sections 120375 and 120440, and to monitor patterns of unusually high exemption form submissions by a particular physician and surgeon.

(d)      (1) The department, at a minimum, shall annually review immunization reports from all schools and institutions in order to identify medical exemption forms submitted to the department and under this section that will be subject to paragraph (2).

(2) A clinically trained immunization department staff member, who is either a

SECOND AMENDED COMPLAINT - PAGE 83

physician and surgeon or a registered nurse, shall review all medical exemptions from any of the following:

    (A) Schools or institutions subject to Section 120375 with an overall immunization rate of less than 95 percent.

    (B) Physicians and surgeons who have submitted five or more medical exemptions in a calendar year beginning January 1, 2020.

    (C) Schools or institutions subject to Section 120375 that do not provide reports of vaccination rates to the department.

(3)    (A) The department shall identify those medical exemption forms that do not meet applicable CDC, ACIP, or AAP criteria for appropriate medical exemptions. The department may contact the primary care physician and surgeon or issuing physician and surgeon to request additional information to support the medical exemption.

(B) Notwithstanding subparagraph (A), the department, based on the medical discretion of the clinically trained immunization staff member, may accept a medical exemption that is based on other contraindications or precautions, including consideration of family medical history, if the issuing physician and surgeon provides written documentation to support the medical exemption that is consistent with the relevant standard of care.

(C) A medical exemption that the reviewing immunization department staff member determines to be inappropriate or otherwise invalid under subparagraphs (A) and (B) shall also be reviewed by the State Public Health Officer or a physician and surgeon from the department's immunization program designated by the State Public Health Officer. Pursuant to this review, the State Public Health Officer or physician and surgeon designee may revoke the medical exemption.

(4)    Medical exemptions issued prior to January 1, 2020, shall not be revoked unless the exemption was issued by a physician or surgeon that has been subject to disciplinary action by the Medical Board of California or the Osteopathic Medical Board of California.

(5)    The department shall notify the parent or guardian, issuing physician and surgeon, the school or institution, and the local public health officer with jurisdiction over the school or institution of a denial or revocation under this subdivision.

(6)    If a medical exemption is revoked pursuant to this subdivision, the child shall continue in attendance. However, within 30 calendar days of the revocation, the child shall commence the immunization schedule required for conditional admittance under Chapter 4 (commencing with Section 6000) of Division 1 of Title 17 of the California Code of Regulations in order to remain in attendance, unless an appeal is filed pursuant to Section 120372.05 within that 30-day time period, in which case the child shall continue in attendance and shall not be required to otherwise comply with immunization requirements unless and until the revocation is upheld on appeal.

(7)    (A) If the department determines that a physician's and surgeon's practice is contributing to a public health risk in one or more communities, the department shall report the physician and surgeon to the Medical Board of California or the Osteopathic Medical Board of California, as appropriate. The department shall not accept a medical exemption form from the physician and surgeon until the physician and surgeon demonstrates to the department that the public health risk no longer exists, but in no event shall the physician and surgeon be barred from submitting these forms for less than two years.

(B) If there is a pending accusation against a physician and surgeon with the Medical Board of California or the Osteopathic Medical Board of California relating to immunization standards of care, the department shall not accept a medical exemption form from the physician and surgeon unless and until the

accusation is resolved in favor of the physician and surgeon.

(C) If a physician and surgeon licensed with the Medical Board of California or the Osteopathic Medical Board of California is on probation for action relating to immunization standards of care, the department and governing authority shall not accept a medical exemption form from the physician and surgeon unless and until the probation has been terminated.

(8) The department shall notify the Medical Board of California or the Osteopathic Medical Board of California, as appropriate, of any physician and surgeon who has five or more medical exemption forms in a calendar year that are revoked pursuant to this subdivision.

(9) Notwithstanding any other provision of this section, a clinically trained immunization program staff member who is a physician and surgeon or a registered nurse may review any exemption in the CAIR or other state database as necessary to protect public health.

(e) The department, the Medical Board of California, and the Osteopathic Medical Board of California shall enter into a memorandum of understanding or similar agreement to ensure compliance with the requirements of this section.

(f) In administering this section, the department and the independent expert review panel created pursuant to Section 120372.05 shall comply with all applicable state and federal privacy and confidentiality laws. The department may disclose information submitted in the medical exemption form in accordance with Section 120440, and may disclose information submitted pursuant to this chapter to the independent expert review panel for the purpose of evaluating appeals.

(g) The department shall establish the process and guidelines for review of medical exemptions pursuant to this section. The department shall communicate the process to providers and post this information on the department's website.

(h) If the department or the California Health and Human Services Agency determines that contracts are required to implement or administer this section, the department may award these contracts on a single-source or sole-source basis. The contracts are not subject to Part 2 (commencing with Section 10100) of Division 2 of the Public Contract Code, Article 4 (commencing with Section 19130) of Chapter 5 of Part 2 of Division 5 of Title 2 of the Government Code, or Sections 4800 to 5180, inclusive, of the State Administrative Manual as they relate to approval of information technology projects or approval of increases in the duration or costs of information technology projects.

(i) Notwithstanding the rulemaking provisions of the Administrative Procedure Act (Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code), the department may implement and administer this section through provider bulletins, or similar instructions, without taking regulatory action.

(j) For purposes of administering this section, the department and the California Health and Human Services Agency appeals process shall be exempt from the rulemaking and administrative adjudication provisions in the Administrative Procedure Act (Chapter 3.5 (commencing with Section 11340), Chapter 4 (commencing with Section 11370), Chapter 4.5 (commencing with 11400), and Chapter 5 (commencing with Section 11500) of Part 1 of Division 3 of Title 2 of the Government Code).

265. Nowhere does California's statutory scheme for the regulation of school attendance by defendant Erica Pan and California's Department of Public Health, based upon the child's immunization status, provide for any procedural rights or protections for the child's rights, under federal and/or California law, to attend the school of the parents' choice, the *Meyer-Pierce* right.

**7.     CAUSES OF ACTION**

**7.1 FIRST CAUSE OF ACTION: Infringement Of The Fundamental Substantive Due Process Right Of Plaintiffs, And All Other Innocent California Minor Children, To Be Free From Mandated, Potentially Lethal, Injections That Can Cause Death Or Serious Permanent Illnesses, Such As Autism And Sudden Infant Death Syndrome, U.S. Constitution, Fourteenth Amendment, 42 U.S.C. § 1983**

266.     Plaintiffs incorporate here by reference paragraphs 1 through 265, *supra*, as if fully set forth herein.

267.     The Substantive Due Process rights under the Fifth Amendment have been incorporated to and made enforceable against the states through the Fourteenth Amendment guarantee of Due Process. *NAACP v. Alabama*, 357 U.S. 449 (1958); *Gitlow v. New York*, 268 U.S. 652 (1925).

268.     42 U.S.C. § 1983 provides a cause of action against any person who, under color of law of any state, subjects any person within the jurisdiction of the United States to a deprivation of any rights, privileges, or immunities secured by the Constitution.

269.     Plaintiffs challenge California's mandated childhood immunizations as infringements of the fundamental substantive due process rights of plaintiffs, and all other innocent California minor children, to be free from mandated, potentially lethal, injections that can cause death or serious permanent illness and injury, such as autism and Sudden Infant Death Syndrome, as verified by data from the Vaccine Injury Compensation Program (VICP).

270.     These infringements cannot pass strict scrutiny review since California has the burden of proof to show that those infringements are narrowly tailored to achieve a compelling state interest.

271.     California cannot make that stringent showing because it has no data of its own to meet that burden. It relies entirely on data and recommendations from the U.S. Advisory Committee on Immunization Practices (ACIP), a unit of the U.S. Centers For Disease Control (CDC).

272.     Recently the CDC released updated data on the prevalence of autism in U.S. children showing that it continues to skyrocket, with the overall California prevalence now increased to one of every twenty children and the rate for California boys now being one in twelve.

273. U.S. DHHS Secretary Kennedy recently announced these data and declared that a pandemic of autism is now upon us. He also announced that his department would launch a "massive" investigation of the cause(s) of it and announce the results by September of this year, at which time he would announce measures to eliminate those causes.

274. The data and the parents' stories above leave no doubt that childhood vaccines are a major proximate cause of this autism pandemic.

275. As such, California's immunization mandates infringe upon the fundamental substantive due process rights of California children to be free from government-mandated harms. Nor can these government-mandated harms be avoided by the payment of a modest fine, as in *Jacobson v. Massachusetts.*

276. These infringements cannot pass strict scrutiny review since California cannot show that those infringements are narrowly tailored to achieve a compelling state interest; here that being that California cannot show that each of the mandated harms are absolutely necessary ("narrowly tailored") for the public health, California's only "compelling state interest."

**7.2 SECOND CAUSE OF ACTION: Infringement Of The Fundamental Substantive Due Process Right Of Plaintiffs, And All Other California Minor Children, To Be Free From Mandated Medical Injections Where The Injections Have Not Been Shown To Serve A Public Health Purpose By Preventing The Transmission Of Infection, U.S. Constitution, Fourteenth Amendment, 42 U.S.C. § 1983**

277. Plaintiffs incorporate here by reference paragraphs 1 through 276, *supra,* as if fully set forth herein.

278. Under *Jacobson v. Massachsetts,* the legal justification for mandatory vaccinations is as a public health measure, to prevent the transmission of an infectious disease, epidemic small pox, to the public and not as a private health measure, to prevent or ameliorate illness in individuals.

279. The California Department of Public Health and the CDC have no data to show that California's mandated childhood immunizations are effective as a public health measure, *i.e.,* at preventing person-to-person transmission of the infections that they target.

280. Plaintiffs challenge California's mandated childhood immunizations as infringements of the fundamental substantive due process right of plaintiffs, and all other

California minor children, to be free from mandated medical injections that do not serve a public health purpose by preventing the transmission of infection.

281.    These infringements cannot pass strict scrutiny review since California cannot show that those infringements are narrowly tailored to achieve a compelling state interest; here that being that California cannot show that each of the mandated immunizations are absolutely necessary ("narrowly tailored") for the public health, *i.e.* prevention of transmission of infection to the public, California's only "compelling state interest".

**7.3    THIRD CAUSE OF ACTION: Infringement Of The Fundamental Substantive Due Process Right Of Plaintiff Children, And All Other California Minor Children, To Attend School, U.S. Constitution, Fourteenth Amendment, 42 U.S.C. § 1983**

282.    Plaintiffs incorporate here by reference paragraphs 1 through 281, *supra,* as if fully set forth herein.

283.    Under *Meyer v. Nebraska,* all children have a fundamental, substantive due process, right under the Fourteenth Amendment to attend school, as the Court put it, to "acquire useful knowledge:"

> The problem for our determination is whether the statute as construed and applied unreasonably infringes the liberty guaranteed to the plaintiff in error by the Fourteenth Amendment:
>> 'No state * * * shall deprive any person of life, liberty or property without due process of law.'
> While this court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. **Without doubt, it denotes not merely freedom from bodily restraint** but also the right of the individual to contract, to engage in any of the common occupations of life, **to acquire useful knowledge**, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.

*Meyer v. State of Nebraska*, 262 U.S. 390, 399 (1923)(holding that Nebraska could not forbid the teaching of the German language in its public schools)(emphasis added.)

284.    California Health and Safety Code Section 120335 categorically denies California children who wish to assert their right to be free from restraint (unvaccinated) from also enjoying their right to attend school and "acquire useful knowledge," thus infringing those fundamental rights.

285.    These infringements cannot pass strict scrutiny review since California cannot show that those infringements are narrowly tailored to achieve a compelling state interest; here that being

that California cannot show that each of the mandated immunizations are absolutely necessary ("narrowly tailored") for the public health, *i.e.* prevention of transmission of infection to the public, California's only "compelling state interest".

**7.4    FOURTH CAUSE OF ACTION: Unconstitutional Conditioning Of The Rights Of Plaintiffs, And All Other California Minor Children, To Their California Benefit Of A Free Public Education On Condition That Plaintiffs Give Up Their Fundamental Right To Be Free Of Mandated Injections, 42 U.S.C. § 1983**

286.    Plaintiffs incorporate here by reference paragraphs 1 through 285, *supra*, as if fully set forth herein.

287.    The Constitution of the State of California has provided, since 1879, that:

> The Legislature shall provide for a system of common schools by which a free school shall be kept up and supported in each district at least six months in every year, after the first year in which a school has been established.

288.    Thus, every school-age child residing within the State of California is entitled to the benefit of a free education in a common (public) school.

289.    Since 1891, the U.S. Supreme Court has recognized the fundamental common law right to refuse un-consented medical treatment. (*Union Pacific Railway Company v. Botsford* (1891) 141 U.S. 250.) Such un-consented medical treatment was regarded by the common law as a battery unless undertaken by order of a court.

290.    Thus, the right to be free from unwanted medical treatment is a fundamental right protected under the Substantive Due Process Clause of the Fourteenth Amendment to the Constitution of the United States.

291.    California Health and Safety Code section 120335 mandates that school age children who wish to avail themselves of their right, under the California Constitution, to attend, at no cost to themselves, their local public schools must then give up their fundament right, under the Substantive Due Process Clause of the Fourteenth Amendment, to refuse medical treatment with the state-mandated vaccines.

292.    Thus, California Health and Safety Code section 120335 runs afoul of the rule that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." (*Sheetz v. Cnty. of El Dorado* (2024) 601 U.S. __, citing the unconstitutional

conditions doctrine as set forth under *Perry v. Sindermann* (1972) 408 U.S. 593, 597.)

293. Because California Health and Safety Code section 120335 violates the unconstitutional conditions doctrine by conditioning the child's right to attend California's public school on the child's giving up the child's fundamental constitutional right to refuse unwanted medical treatment, it cannot stand and must be enjoined.

**7.5 FIFTH CAUSE OF ACTION: Failure To Afford Strict Scrutiny Procedural Due Process To Plaintiffs, And All Other California Minor Children, Who Wish To Exercise Their Fundamental Substantive Due Process Right To Be Free Of California's Mandated Injections Required For School Attendance, 42 U.S.C. § 1983**

294. Plaintiffs incorporate here by reference paragraphs 1 through 293, *supra,* as if fully set forth herein.

295. California Health and Safety Code Section 120335 requires California school children to be immunized with numerous listed vaccines, known to Congress under the National Childhood Vaccine Injury Act and as set forth above in section 4.4, to cause serious injury and disability, up to and including death.

296. Minor child plaintiffs, minor children belonging to the plaintiff organizations, and all others similarly situated minor children who do not comply with Health and Safety Code Section 120335 forfeit their constitutional right to pursue education in the public or private schools in California (the *Meyer-Pierce* right) and do so without being afforded any of their procedural due process rights, including appropriate notice and hearing, as required for the deprivation of fundamental constitutional rights.

297. The defendants failure to provide due process is a facial violation of the civil rights of those children under the Procedural Due Process Clause of the Fourteenth Amendment as enforced under 42 U.S.C. § 1983.

**8. IRREPARABLE INJURY**

298. Plaintiffs incorporate here by reference paragraphs 1 through 297, *supra*, as if fully set forth herein.

299. Minor child plaintiffs and all other California minor children and all others similarly situated will be severely and irreparably injured, and some even killed, by the denial of their

Fourteenth Amendment Substantive Due Process rights under Health and Safety Code Section 120335. They will suffer irreparable, in some cases fatal, physical and emotional injuries and their economic injuries will not be recoverable from California due to its sovereign immunity.

In the alternative, they will be obliged to forfeit their fundamental right to education (the *Meyer-Pierce* right). Those lost days of education, six months and still counting in the case of plaintiff minor child D.Q. who cannot now attend summer school to try to catch up, cannot be recovered and constitute irreparable harm. Prospective declaratory and injunction relief is both necessary and appropriate to prevent further irreparable harm to D.Q., A.R., T.E., N.D., and all other similarly situated California children.

**9. PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Free Now Foundation, Brave and Free Santa Cruz, Minor Children D.Q., A.R., T.E., and N.D. respectfully request and pray for judgment as follows:

1. A Declaration that the right of children to be free from California's mandated medical treatments of those children, here in the form of injections into those children required under Health and Safety Code Section 120335 and known to the Congress of the United States to cause permanent injury and death, potentially lethal injections, is a fundamental right under the Substantive Due Process Clause of the Fifth Amendment as applied to the States under the Fourteenth Amendment.

2. A Declaration that the right of children to be free from California's mandated medical treatments of those children, here in the form of injections into those children required under Health and Safety Code Section 120335 and known to the Congress of the United States to cause permanent injury and death, potentially lethal injections, where there is no public health benefit from those injections by the prevention of transmission of infection, is a fundamental right under the Substantive Due Process Clause of the Fifth Amendment as applied to the States under the Fourteenth Amendment.

3. A Declaration that the State of California may not deny children their fundamental right to education (the *Meyer-Pierce* right), based upon whether those children submit to California's mandated injections, injections known to the Congress of the United States to

SECOND AMENDED COMPLAINT - PAGE 91

1    cause permanent injury and death.

2    4.    A Declaration that the State of California may not condition its benefit of a free public

3          school education to California children based upon the child's forfeiture of the child's

4          fundamental right to refuse vaccines known to the Congress to cause serious, permanent

5          injury and death and that have not been shown to provide a public health benefit.

6    5.    A Declaration that the State of California may not infringe the right of California minor

7          children to be free of vaccines know to the Congress to be harmful upon pain of losing their

8          rights to a free public school education without adequate notice and hearing in which the

9          state must show that the required immunizations are narrowly tailored to serve a

10         compelling government interest, as required under the Procedural Due Process Clause of

11         the Fourteenth Amendment.

12   6.    An injunction enjoining the State of California and its Department of Public Health from

13         enforcing, either directly or through the school districts under its jurisdiction. the

14         immunization requirements set forth in Health and Safety Code Section 120335 as to any of

15         the four minor plaintiffs in this case.

16   7.    An injunction enjoining the State of California and its Department of Public Health from

17         enforcing, either directly or through the school districts under its jurisdiction. the

18         immunization requirements set forth in Health and Safety Code Section 120335 as to any

19         other similarly situated California minors.

20   8.    An injunction enjoining the State of California and its Department of Public Health to

21         announce the suspension of the enforcement of California's childhood immunization

22         requirements to the news media, on the website of the California Department of Public

23         Health, and to require the schools under the jurisdiction of the California Department of

24         Public Health to announce the suspension of the enforcement of California's childhood

25         immunization requirements to all the parents and guardians of their students.

26   9.    An injunction enjoining the State of California and its Department of Public Health from

27         enforcing, either directly or through the school districts under its jurisdiction the

28         immunization requirements set forth in Health and Safety Code Section 120335 as to any

plaintiffs or to any other similarly situated persons without adequate notice and hearing in which the state must show that the required immunizations are narrowly tailored to serve a compelling government interest.

Date: June 3, 2025

_Richard B. Fox_

Richard B. Fox, J.D., M.D.

Counsel For Plaintiffs

Exhibits


Exhibit 1

Richard B. Fox, J.D., M.D.
State Bar Number 283447
1875 S. Bascom Avenue, Ste. 2400
Campbell, CA 95008
Tel: 408-402-2452
Fax: 669-221-6281
drfox@drfoxlawoffice.com
Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Free Now Foundation, And Brave And Free Santa Cruz;<br><br>　　　　　Plaintiffs,<br><br>vs.<br><br>Erica Pan In Her Official Capacity As Director Of The California Department Of Public Health, And Courtney Johnson, In Her Official Capacity As Principal, Foothill Technology High School, Ventura Unified School District, Monica Morales, In Her Official Capacity As Director, Santa Cruz County Health Services Agency;<br><br>　　　　　Defendants | Case No.: 2:24−CV−03523−DJC−SCR<br>DECLARATION OF:<br><br>DARLENE CULOTTA<br><br>SUDDEN CHILD DEATH CASE |

1. I am ___DARLENE CULOTTA___,

2. I have personal knowledge of all matters and facts set forth herein and could and would competently testify thereto if called upon to do so.

3. My child was ___7 Weeks___ old when ___He___ died.

4. My child died ___Day after___ day(s) after ___He___ got immunizations (shots).

5. Before my child died ___He___ got ___One DPT shot___ separate injections (shots)

6. Prior to my child's sudden death, ___He___ was in:

   ◎ Good health ___ Minor illness ___ Major illness

7. The immunizations (shots) that my child got before (s)he died included:

☑ Diphtheria

___ Haemophilus influenzae type b

___ Hepatitis B

___ Measles

___ Mumps

☑ Pertussis (whooping cough)

___ Poliomyelitis

___ Rubella

☑ Tetanus

___ Varicella (chicken pox)

___ None

8. When I gave consent for the immunizations (shots) right before my child died, the possibility of death Was Never _____ mentioned to me.

9. If I knew at the time I gave consent for the immunizations (shots) right before my child died, I Would never _____ have given that consent.

10. Other Important Facts Or Opinions, Including The Impact On The Family:

I took him to his WELL BABY check up back in May of 1969 and found him dead in his crib the next morning.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Palmdale , on 04/06/2025

*Darlene Culotta*

(Signature)

Name: DARLENE CULOTTA

Exhibit 2

Richard B. Fox, J.D., M.D.
State Bar Number 283447
1875 S. Bascom Avenue, Ste. 2400
Campbell, CA 95008
Tel: 408-402-2452
Fax: 669-221-6281
drfox@drfoxlawoffice.com
Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Free Now Foundation, And Brave And Free Santa Cruz;<br><br>        PlaintiffS,<br><br>vs.<br><br>Erica Pan In Her Official Capacity As Director Of The California Department Of Public Health, And Courtney Johnson, In Her Official Capacity As Principal, Foothill Technology High School, Ventura Unified School District, Monica Morales, In Her Official Capacity As Director, Santa Cruz County Health Services Agency;<br><br>        Defendants | Case No.: 2:24−CV−03523−DJC−SCR<br>DECLARATION OF:<br><br>SALLY RUBIN<br><br>REGRESSIVE AUTISM DECLARATION |

1. I am SALLY RUBIN _____,

2. I have personal knowledge of all matters and facts set forth herein and could and would competently testify thereto if called upon to do so.

3. My child was 3 YEARS 7 MONTHS _____ old and developing normally when HIS _____ development and behavior suddenly regressed after getting immunizations.

4. After getting the immunizations my child regressed in the following ways (rate each on a 0 to 3 scale, with 0 being no regression, 1 being mild regression, 2 being moderate regression, and 3 being severe regression):

REGRESSION AUTISM DECLARATION

**Social Communication**:

3 ____ Difficulty understanding and using social cues, such as eye contact, facial
expressions, and body language

3 ____ Limited eye contact and avoidance of eye contact

2 ____ Lack of interest in social interactions and difficulty sharing experiences

3 ____ Challenges with understanding and responding to emotions in others

**Repetitive Behaviors:**

1 ____ Repetitive movements, such as hand flapping, spinning, or rocking

3 ____ Insistence on routines and resistance to change

3 ____ Highly focused interests or obsessions with specific objects or activities

3 ____ Stereotyped speech patterns, such as repeating words or phrases

**Restricted Interests:**

3 ____ Intense and narrow interests that may consume a significant amount of time and
attention

3 ____ Difficulty shifting focus from their interests to other activities

3 ____ Preference for certain objects, textures, or sensory experiences

**Other Characteristics:**

3 ____ Delayed language development or unusual language patterns

3 ____ Difficulty with pretend play and imaginative activities

3 ____ Sensory sensitivities, such as over- or undersensitivity to sounds, textures, or
smells

2 ____ Challenges with motor coordination or fine motor skills

3 ____ Unusual eating habits or food preferences

REGRESSION AUTISM DECLARATION

5. This regression began _____01/20/1997_____

6. This regression was complete or nearly complete   DAYS

7. Prior to my child's regression, _____HE_____ was in:

    ___ Good health   ◎ Minor illness   ___ Major illness

8. The immunizations (shots) that my child got before (s)he regressed included:

    ☑ Diphtheria

    ___ Haemophilus influenzae type b

    ___ Hepatitis B

    ☑ Measles

    ☑ Mumps

    ___ Pertussis (whooping cough)

    ___ Poliomyelitis

    ☑ Rubella

    ☑ Tetanus

    ___ Varicella (chicken pox)

    Other immunizations:   NONE

9. When I gave consent for the immunizations (shots) right before my child became
    autistic, the possibility of autism _____WAS NEVER_____ mentioned to me.

10. If I knew at the time I gave consent for the immunizations (shots) right before my
    child became autistic, I ___WOULD NEVER_____ have given that consent.

REGRESSION AUTISM DECLARATION

11. Other Important Facts Or Opinions, Including The Impact On The Family:

I HAD MY OWN COMPANY AT THE TIME AND CLOSED IT TO BE ABLE
TO DEVOTE MYSELF FULL TIME TO HELPING MY SON. IT HAS BEEN
FINANCIALLY DEVASTATING.

I declare under penalty of perjury under the laws of the State of CALIFORNIA
that the foregoing is true and correct.

Executed at ___OAKLAND, CA_____, on ___04/03/2025___

_SRubin_____
(Signature)

Name: _SALLY RUBIN_____

REGRESSION AUTISM DECLARATION

Exhibit 3

Richard B. Fox, J.D., M.D.
State Bar Number 283447
1875 S. Bascom Avenue, Ste. 2400
Campbell, CA 95008
Tel: 408-402-2452
Fax: 669-221-6281
drfox@drfoxlawoffice.com
Attorney for Plaintiffs

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Free Now Foundation, And Brave And Free Santa Cruz;<br><br>        PlaintiffS,<br><br>vs.<br><br>Erica Pan In Her Official Capacity As Director Of The California Department Of Public Health, And Courtney Johnson, In Her Official Capacity As Principal, Foothill Technology High School, Ventura Unified School District, Monica Morales, In Her Official Capacity As Director, Santa Cruz County Health Services Agency;<br><br>        Defendants | Case No.: 2:24−CV−03523−DJC−SCR<br>DECLARATION OF:<br><br>JENNIFER SILVA<br><br>REGRESSIVE AUTISM DECLARATION |

1. I am _JENNIFER SILVA_____,

2. I have personal knowledge of all matters and facts set forth herein and could and would competently testify thereto if called upon to do so.

3. My child was _18 MONTHS_____ old and developing normally when _HER_____ development and behavior suddenly regressed after getting immunizations.

4. After getting the immunizations my child regressed in the following ways (rate each on a 0 to 3 scale, with 0 being no regression, 1 being mild regression, 2 being moderate regression, and 3 being severe regression):

REGRESSION AUTISM DECLARATION

**Social Communication**:

3 ____ Difficulty understanding and using social cues, such as eye contact, facial expressions, and body language

3 ____ Limited eye contact and avoidance of eye contact

3 ____ Lack of interest in social interactions and difficulty sharing experiences

2 ____ Challenges with understanding and responding to emotions in others

**Repetitive Behaviors:**

2 ____ Repetitive movements, such as hand flapping, spinning, or rocking

3 ____ Insistence on routines and resistance to change

3 ____ Highly focused interests or obsessions with specific objects or activities

3 ____ Stereotyped speech patterns, such as repeating words or phrases

**Restricted Interests:**

2 ____ Intense and narrow interests that may consume a significant amount of time and attention

2 ____ Difficulty shifting focus from their interests to other activities

2 ____ Preference for certain objects, textures, or sensory experiences

**Other Characteristics:**

3 ____ Delayed language development or unusual language patterns

3 ____ Difficulty with pretend play and imaginative activities

2 ____ Sensory sensitivities, such as over- or undersensitivity to sounds, textures, or smells

1 ____ Challenges with motor coordination or fine motor skills

3 ____ Unusual eating habits or food preferences

REGRESSION AUTISM DECLARATION

5. This regression began _____09/04/2018_____

6. This regression was complete or nearly complete   11 MONTHS

7. Prior to my child's regression, ____SHE_____ was in:

   ◎ Good health    ___ Minor illness    ___ Major illness

8. The immunizations (shots) that my child got before (s)he regressed included:

   ☑ Diphtheria

   ___ Haemophilus influenzae type b

   ___ Hepatitis B

   ___ Measles

   ___ Mumps

   ☑ Pertussis (whooping cough)

   ___ Poliomyelitis

   ___ Rubella

   ☑ Tetanus

   ___ Varicella (chicken pox)

   Other immunizations:

9. When I gave consent for the immunizations (shots) right before my child became autistic, the possibility of autism ____NEVER_____ mentioned to me.

10. If I knew at the time I gave consent for the immunizations (shots) right before my child became autistic, I __WOULD NEVER_____ have given that consent.

REGRESSION AUTISM DECLARATION

11. Other Important Facts Or Opinions, Including The Impact On The Family:

MY DAUGHTER BECAME VERY AGITATED INITIALLY, UNABLE TO COPE WITH DAILY LIFE,
EXPERIENCING SEVERAL TANTRUMS, WHICH HAD NEVER OCCURRED BEFORE. SHE THEN LOST
HER EYE CONTACT AND ABILITY TO ANSWER TO HER NAME. SHE WANDERED AROUND OUR
HOME AS IF WE WERN'T THERE. I FELT LIKE I HAD LOST MY GIRL. THE REGRET AND SADNESS
THAT ENVELOPED ME AS A MOTHER WAS OVERPOWERING.

I declare under penalty of perjury under the laws of the State of CALIFORNIA
that the foregoing is true and correct.

Executed at ___HUNTINGTON BEACH, CA_____, on ___04/04/2025_____

_____
(Signature)

Name: ___JENNIFER SILVA_____

REGRESSION AUTISM DECLARATION

Exhibit 4

Richard B. Fox, J.D., M.D.
State Bar Number 283447
1875 S. Bascom Avenue, Ste. 2400
Campbell, CA 95008
Tel: 408-402-2452
Fax: 669-221-6281
drfox@drfoxlawoffice.com
Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Free Now Foundation, And Brave And Free Santa Cruz;<br><br>　　　　PlaintiffS,<br><br>vs.<br><br>Erica Pan In Her Official Capacity As Director Of The California Department Of Public Health, And Courtney Johnson, In Her Official Capacity As Principal, Foothill Technology High School, Ventura Unified School District, Monica Morales, In Her Official Capacity As Director, Santa Cruz County Health Services Agency;<br><br>　　　　Defendants | Case No.: 2:24−CV−03523−DJC−SCR<br>DECLARATION OF:<br><br>　　MEENA KURIAN<br><br>REGRESSIVE AUTISM DECLARATION |

1. I am _____Meena Kurian_____,

2. I have personal knowledge of all matters and facts set forth herein and could and would competently testify thereto if called upon to do so.

3. My child was ____14 months____ old and developing normally when his _____ development and behavior suddenly regressed after getting immunizations.

4. After getting the immunizations my child regressed in the following ways (rate each on a 0 to 3 scale, with 0 being no regression, 1 being mild regression, 2 being moderate regression, and 3 being severe regression):

REGRESSION AUTISM DECLARATION

**Social Communication**:

- [x] Difficulty understanding and using social cues, such as eye contact, facial expressions, and body language
- [x] Limited eye contact and avoidance of eye contact
- [x] Lack of interest in social interactions and difficulty sharing experiences
- [x] Challenges with understanding and responding to emotions in others

**Repetitive Behaviors:**

- [x] Repetitive movements, such as hand flapping, spinning, or rocking
- [x] Insistence on routines and resistance to change
- [x] Highly focused interests or obsessions with specific objects or activities
- [x] Stereotyped speech patterns, such as repeating words or phrases

**Restricted Interests:**

- [x] Intense and narrow interests that may consume a significant amount of time and attention
- [x] Difficulty shifting focus from their interests to other activities
- [x] Preference for certain objects, textures, or sensory experiences

**Other Characteristics:**

- [x] Delayed language development or unusual language patterns
- [x] Difficulty with pretend play and imaginative activities
- [x] Sensory sensitivities, such as over- or undersensitivity to sounds, textures, or smells
- [x] Challenges with motor coordination or fine motor skills
- [x] Unusual eating habits or food preferences

REGRESSION AUTISM DECLARATION

5. This regression began ___11/12/2008_____

6. This regression was complete or nearly complete

7. Prior to my child's regression, he_____ was in:

   ◎ Good health    ___ Minor illness    ___ Major illness

8. The immunizations (shots) that my child got before (s)he regressed included:

   ☑ Diphtheria

   ☑ Haemophilus influenzae type b

   ☑ Hepatitis B

   ☑ Measles

   ☑ Mumps

   ☑ Pertussis (whooping cough)

   ☑ Poliomyelitis

   ☑ Rubella

   ☑ Tetanus

   ___ Varicella (chicken pox)

   Other immunizations:   Flu

9. When I gave consent for the immunizations (shots) right before my child became autistic, the possibility of autism ___was never_____ mentioned to me.

10. If I knew at the time I gave consent for the immunizations (shots) right before my child became autistic, I ___would never_____ have given that consent.

REGRESSION AUTISM DECLARATION

11. Other Important Facts Or Opinions, Including The Impact On The Family:

Financial strain, could not work as an RN as my
son needed me. Girls felt neglected as we had
to focus on son. Strained marital and family
bonds.

I declare under penalty of perjury under the laws of the State of Virginia
that the foregoing is true and correct.

Executed at _____Wise_____, on ____04/03/2025____

_MeenaGK_

_____
(Signature)

Name: _Meena Kurian_____

REGRESSION AUTISM DECLARATION

Exhibit 5

Richard B. Fox, J.D., M.D.
State Bar Number 283447
1875 S. Bascom Avenue, Ste. 2400
Campbell, CA 95008
Tel: 408-402-2452
Fax: 669-221-6281
drfox@drfoxlawoffice.com
Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Free Now Foundation, And Brave And Free Santa Cruz; | Case No.: 2:24−CV−03523−DJC−SCR |
| Plaintiffs, | DECLARATION OF: |
| | ANN TODD |
| vs. | REGRESSIVE AUTISM DECLARATION |
| Erica Pan In Her Official Capacity As Director Of The California Department Of Public Health, And Courtney Johnson, In Her Official Capacity As Principal, Foothill Technology High School, Ventura Unified School District, Monica Morales, In Her Official Capacity As Director, Santa Cruz County Health Services Agency; | |
| Defendants | |

1. I am _____ANN TODD_____,

2. I have personal knowledge of all matters and facts set forth herein and could and would competently testify thereto if called upon to do so.

3. My child was _____20 MOS_____ old and developing normally when _____HER_____ development and behavior suddenly regressed after getting immunizations.

4. After getting the immunizations my child regressed in the following ways (rate each on a 0 to 3 scale, with 0 being no regression, 1 being mild regression, 2 being moderate regression, and 3 being severe regression):

REGRESSION AUTISM DECLARATION

**Social Communication**:

2 ____ Difficulty understanding and using social cues, such as eye contact, facial expressions, and body language

3 ____ Limited eye contact and avoidance of eye contact

3 ____ Lack of interest in social interactions and difficulty sharing experiences

3 ____ Challenges with understanding and responding to emotions in others

**Repetitive Behaviors:**

3 ____ Repetitive movements, such as hand flapping, spinning, or rocking

3 ____ Insistence on routines and resistance to change

3 ____ Highly focused interests or obsessions with specific objects or activities

3 ____ Stereotyped speech patterns, such as repeating words or phrases

**Restricted Interests:**

3 ____ Intense and narrow interests that may consume a significant amount of time and attention

2 ____ Difficulty shifting focus from their interests to other activities

2 ____ Preference for certain objects, textures, or sensory experiences

**Other Characteristics:**

3 ____ Delayed language development or unusual language patterns

3 ____ Difficulty with pretend play and imaginative activities

2 ____ Sensory sensitivities, such as over- or undersensitivity to sounds, textures, or smells

1 ____ Challenges with motor coordination or fine motor skills

2 ____ Unusual eating habits or food preferences

REGRESSION AUTISM DECLARATION

5. This regression began ___04/06/2025___

6. This regression was complete or nearly complete   6 MOS

7. Prior to my child's regression, ___SHE___ was in:

   ◎ Good health     ___ Minor illness     ___ Major illness

8. The immunizations (shots) that my child got before (s)he regressed included:

   ☑ Diphtheria

   ____ Haemophilus influenzae type b

   ☑ Hepatitis B

   ☑ Measles

   ☑ Mumps

   ☑ Pertussis (whooping cough)

   ☑ Poliomyelitis

   ☑ Rubella

   ☑ Tetanus

   ☑ Varicella (chicken pox)

   Other immunizations:

9. When I gave consent for the immunizations (shots) right before my child became autistic, the possibility of autism ___WAS NEVER___ mentioned to me.

10. If I knew at the time I gave consent for the immunizations (shots) right before my child became autistic, I ___WOULD NEVER___ have given that consent.

REGRESSION AUTISM DECLARATION

11. Other Important Facts Or Opinions, Including The Impact On The Family:

SHE WAS FULLY DIAGNOSES ADD BY AGE 3. SHE HAS HAD AN  IEP
ALL THROUGOUT SCHOOL AND IS NOW AN ADULT UNDER
CONSERVATORSHIP.

I declare under penalty of perjury under the laws of the State of CA
that the foregoing is true and correct.

Executed at ___LONG BEACH CA_____, on ___04/06/2025___

*ANN TODD*
(Signature)

Name: ANN TODD

REGRESSION AUTISM DECLARATION

Exhibit 6

1  Richard B. Fox, J.D., M.D.
   State Bar Number 283447
2  1875 S. Bascom Avenue, Ste. 2400
   Campbell, CA 95008
3  Tel: 408-402-2452
   Fax: 669-221-6281
4  drfox@drfoxlawoffice.com
   Attorney for Plaintiffs
5

6

7                    **UNITED STATES DISTRICT COURT**

8                    **EASTERN DISTRICT OF CALIFORNIA**

9

10 Free Now Foundation, And Brave And Free      Case No.: 2:24−CV−03523−DJC−SCR
   Santa Cruz;                                  DECLARATION OF:
11
                  PlaintiffS,                   Janice Fry
12
   vs.                                          REGRESSIVE AUTISM DECLARATION
13
14 Erica Pan In Her Official Capacity As Director
   Of The California Department Of Public Health,
15 And Courtney Johnson, In Her Official Capacity
   As Principal, Foothill Technology High School,
16 Ventura Unified School District, Monica
   Morales, In Her Official Capacity As Director,
17 Santa Cruz County Health Services Agency;
18
                  Defendants
19
20    1. I am ___Janice Fry_____,

21    2. I have personal knowledge of all matters and facts set forth herein and could and
         would competently testify thereto if called upon to do so.
22

23    3. My child was ___5_____ old and developing normally when
         His_____ development and behavior suddenly regressed after getting immunizations.
24

25    4. After getting the immunizations my child regressed in the following ways (rate each
         on a 0 to 3 scale, with 0 being no regression, 1 being mild regression, 2 being
26       moderate regression, and 3 being severe regression):

27

28                         REGRESSION AUTISM DECLARATION

**Social Communication**:

3 ____ Difficulty understanding and using social cues, such as eye contact, facial expressions, and body language

3 ____ Limited eye contact and avoidance of eye contact

3 ____ Lack of interest in social interactions and difficulty sharing experiences

3 ____ Challenges with understanding and responding to emotions in others

**Repetitive Behaviors:**

3 ____ Repetitive movements, such as hand flapping, spinning, or rocking

3 ____ Insistence on routines and resistance to change

3 ____ Highly focused interests or obsessions with specific objects or activities

3 ____ Stereotyped speech patterns, such as repeating words or phrases

**Restricted Interests:**

3 ____ Intense and narrow interests that may consume a significant amount of time and attention

3 ____ Difficulty shifting focus from their interests to other activities

3 ____ Preference for certain objects, textures, or sensory experiences

**Other Characteristics:**

3 ____ Delayed language development or unusual language patterns

3 ____ Difficulty with pretend play and imaginative activities

3 ____ Sensory sensitivities, such as over- or undersensitivity to sounds, textures, or smells

3 ____ Challenges with motor coordination or fine motor skills

3 ____ Unusual eating habits or food preferences

REGRESSION AUTISM DECLARATION

5. This regression began ___06/01/2020_____

6. This regression was complete or nearly complete   Days

7. Prior to my child's regression, ___He_____ was in:

   ⊚ Good health     ___ Minor illness     ___ Major illness

8. The immunizations (shots) that my child got before (s)he regressed included:

   ___ Diphtheria

   ☑ Haemophilus influenzae type b

   ☑ Hepatitis B

   ☑ Measles

   ___ Mumps

   ___ Pertussis (whooping cough)

   ___ Poliomyelitis

   ___ Rubella

   ___ Tetanus

   ___ Varicella (chicken pox)

   Other immunizations:   The other regular child vaccines

9. When I gave consent for the immunizations (shots) right before my child became autistic, the possibility of autism ___Was never_____ mentioned to me.

10. If I knew at the time I gave consent for the immunizations (shots) right before my child became autistic, I ___World never_____ have given that consent.

REGRESSION AUTISM DECLARATION

11. Other Important Facts Or Opinions, Including The Impact On The Family:

My child became a completely different person, it was like a light switched off in him. He was social and talkative he was already saying basic words, signing to communicate. And after he became withdrawn would get angry, anti social, didn't even like his brothers out want to interact with any other children like he did prior. And now at 5 I am dealing with being his full time caregiver he hits other people and spits on them. He is non verbal. He hits himself, the list is long.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at ___Whittier_____, on ___04/06/2025_____

_____
(Signature)

Name: ___Janice Fry_____

REGRESSION AUTISM DECLARATION

Exhibit 7

Richard B. Fox, J.D., M.D.
State Bar Number 283447
1875 S. Bascom Avenue, Ste. 2400
Campbell, CA 95008
Tel: 408-402-2452
Fax: 669-221-6281
drfox@drfoxlawoffice.com
Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Free Now Foundation, And Brave And Free Santa Cruz;<br><br>　　　　　Plaintiffs,<br><br>vs.<br><br>Erica Pan In Her Official Capacity As Director Of The California Department Of Public Health, And Courtney Johnson, In Her Official Capacity As Principal, Foothill Technology High School, Ventura Unified School District, Monica Morales, In Her Official Capacity As Director, Santa Cruz County Health Services Agency;<br><br>　　　　　Defendants | Case No.: 2:24−CV−03523−DJC−SCR<br>DECLARATION OF:<br><br>Marie Bacsik<br><br>REGRESSIVE AUTISM DECLARATION |

1. I am ___Marie Bacsik___.

2. I have personal knowledge of all matters and facts set forth herein and could and would competently testify thereto if called upon to do so.

3. My child was ___10___ old and developing normally when ___Her___ development and behavior suddenly regressed after getting immunizations.

4. After getting the immunizations my child regressed in the following ways (rate each on a 0 to 3 scale, with 0 being no regression, 1 being mild regression, 2 being moderate regression, and 3 being severe regression):

REGRESSION AUTISM DECLARATION

**Social Communication**:

3 ____ Difficulty understanding and using social cues, such as eye contact, facial expressions, and body language

3 ____ Limited eye contact and avoidance of eye contact

3 ____ Lack of interest in social interactions and difficulty sharing experiences

3 ____ Challenges with understanding and responding to emotions in others

**Repetitive Behaviors:**

3 ____ Repetitive movements, such as hand flapping, spinning, or rocking

3 ____ Insistence on routines and resistance to change

3 ____ Highly focused interests or obsessions with specific objects or activities

3 ____ Stereotyped speech patterns, such as repeating words or phrases

**Restricted Interests:**

3 ____ Intense and narrow interests that may consume a significant amount of time and attention

3 ____ Difficulty shifting focus from their interests to other activities

3 ____ Preference for certain objects, textures, or sensory experiences

**Other Characteristics:**

3 ____ Delayed language development or unusual language patterns

3 ____ Difficulty with pretend play and imaginative activities

3 ____ Sensory sensitivities, such as over- or undersensitivity to sounds, textures, or smells

3 ____ Challenges with motor coordination or fine motor skills

3 ____ Unusual eating habits or food preferences

REGRESSION AUTISM DECLARATION

5. This regression began _____11/07/2019_____

6. This regression was complete or nearly complete   5 days

7. Prior to my child's regression, _____She_____ was in:

    ___ Good health   ⊙ Minor illness   ___ Major illness

8. The immunizations (shots) that my child got before (s)he regressed included:

    ☑ Diphtheria

    ☑ Haemophilus influenzae type b

    ☑ Hepatitis B

    ☑ Measles

    ☑ Mumps

    ☑ Pertussis (whooping cough)

    ☑ Poliomyelitis

    ☑ Rubella

    ☑ Tetanus

    ☑ Varicella (chicken pox)

    Other immunizations:   Hep A

9. When I gave consent for the immunizations (shots) right before my child became autistic, the possibility of autism _____Was never_____ mentioned to me.

10. If I knew at the time I gave consent for the immunizations (shots) right before my child became autistic, I _____Would never_____ have given that consent.

REGRESSION AUTISM DECLARATION

11. Other Important Facts Or Opinions, Including The Impact On The Family:

She was in the hospital with Infantile Spasms about 24 hours after her vaccines and lost all abilities within a few days. She now has Severe Autism, Severe Autoimmune Encephalitis and is on IVIG (insurance approved because of how severe), severe gut dysbiosis, rashes, and has suffered Infantile Spasms and Syncope. We have all the testing to prove all of this and it all matches up with her hospital admissions. She is still receiving these treatments at age 10.

I declare under penalty of perjury under the laws of the State of California
that the foregoing is true and correct.

Executed at El Cajon, California , on 04/04/2025 .

(Signature)

Name: Marie Bacsik

REGRESSION AUTISM DECLARATION

Exhibit 8

Richard B. Fox, J.D., M.D.
State Bar Number 283447
1875 S. Bascom Avenue, Ste. 2400
Campbell, CA 95008
Tel: 408-402-2452
Fax: 669-221-6281
drfox@drfoxlawoffice.com
Attorney for Plaintiffs

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Free Now Foundation, And Brave And Free Santa Cruz;<br><br>        PlaintiffS,<br><br>vs.<br><br>Erica Pan In Her Official Capacity As Director Of The California Department Of Public Health, And Courtney Johnson, In Her Official Capacity As Principal, Foothill Technology High School, Ventura Unified School District, Monica Morales, In Her Official Capacity As Director, Santa Cruz County Health Services Agency;<br><br>        Defendants | Case No.: 2:24−CV−03523−DJC−SCR<br>DECLARATION OF:<br><br>Kara Morales<br><br>CHRONIC VACCINE-INJURED CHILD DECLARATION |

1. I am _____Kara Morales_____,

2. I have personal knowledge of all matters and facts set forth herein and could and would competently testify thereto if called upon to do so.

3. My child was _____5.5 months_____ old and in good health until the day that ___he___ got immunized.

4. After getting the immunizations my child developed the following chronic condition:

epilepsy

VACCINE-INJURED CHILD DECLARATION

5. This chronic condition began _____04/03/2025_____

6. This chronic condition was complete or nearly complete approximately 2017?

7. Prior to my child's immunizations, ___he_____ was in:

___ Good health  ◎ Minor illness  ___ Major illness

8. The immunizations (shots) that my child got before (s)he developed this chronic condition included:

☑ Diphtheria

☑ Haemophilus influenzae type b

___ Hepatitis B

___ Measles

___ Mumps

☑ Pertussis (whooping cough)

___ Poliomyelitis

___ Rubella

☑ Tetanus

___ Varicella (chicken pox)

Other immunizations:

He received the Hepatitis B vaccine as a newborn, and was in the hospital 2.5 weeks later with a high fever. The two events may be unrelated. However, we did not vaccinate him again until 5.5 months old. He was in generally good health at the time, but had a little dry cough. I asked if we should wait again since he had some kind of mild illness, but the nurse said he had no fever, no juicy cough, and so it was "perfectly safe". Within 24 hours of receiving those vaccines, he began having absence seizures. Within 72 hours of receiving the vaccines he collapsed in my arms, stopped breathing, and was taken by ambulance to Rady Children's Hospital. He had further seizures in the presence of an attending neurologist. He was moved to a room for observation, and at one point crashed and they moved him to the ICU. He spent 4 days total at Rady's. He was put on anti-seizure medication and remained on anti-seizure medication for several years. He continued to see the neurologist for breakthrough seizures. We did vaccinate him one more time when he was little, but did not give him DTaP ever again. I reported his near fatal adverse event to ...

VACCINE-INJURED CHILD DECLARATION

Other Important Facts Or Opinions, Including The Impact On The Family:

The neurologist told us in the ICU that the lack of oxygen to his brain during those serious seizures would most likely have some kind of impact on his learning. He does have an IEP still at age 16.5, but no longer has seizures and has been off anti-seizure medication for several years now. We stopped vaccinating him completely years ago and he is doing well now. There most definitely was a huge impact on our family. It is stressful to have a child with a serious medical condition. We had to give him medication every day, which was a battle. I gave up full time work for several years, which caused serious financial stress on our family. There are other impacts I could describe but will not in order to respect our son's privacy.

I declare under penalty of perjury under the laws of the State of <u>CALIFORNIA</u> that the foregoing is true and correct.

Executed at <u>San Diego, CA</u>, on <u>04/03/2025</u>

*K. Morales*

(Signature)

Name: <u>Kara Morales</u>

VACCINE-INJURED CHILD DECLARATION

Exhibit 9

1   Richard B. Fox, J.D., M.D.
    State Bar Number 283447
2   1875 S. Bascom Avenue, Ste. 2400
    Campbell, CA 95008
3   Tel: 408-402-2452
    Fax: 669-221-6281
4   drfox@drfoxlawoffice.com
    Attorney for Plaintiffs

5

6

7               **UNITED STATES DISTRICT COURT**

8               **EASTERN DISTRICT OF CALIFORNIA**

9

| | |
|---|---|
| 10 Free Now Foundation, And Brave And Free | Case No.: 2:24–CV–03523–DJC–SCR |
| 11 Santa Cruz; | DECLARATION OF: |
|           PlaintiffS, | Wendy Chin |
| 12 | |
| 13 vs. | CHRONIC VACCINE-INJURED CHILD |
| 14 Erica Pan In Her Official Capacity As Director | DECLARATION |
| Of The California Department Of Public Health, | |
| 15 And Courtney Johnson, In Her Official Capacity | |
| As Principal, Foothill Technology High School, | |
| 16 Ventura Unified School District, Monica | |
| Morales, In Her Official Capacity As Director, | |
| 17 Santa Cruz County Health Services Agency; | |
| 18 | |
| 19       Defendants | |

20     1.   I am _____Wendy Chin_____.

21     2.   I have personal knowledge of all matters and facts set forth herein and could and
22        would competently testify thereto if called upon to do so.

23     3.   My child was _____a newborn_____ old and in good health until the day
24        that ___she_____ got immunized.

25     4.   After getting the immunizations my child developed the following chronic condition:

26
      Chronic, severe eczema
27

28                VACCINE-INJURED CHILD DECLARATION

5. This chronic condition began _____04/11/2008_____

6. This chronic condition was complete or nearly complete lifelong

7. Prior to my child's immunizations, ___she___ was in:

   ◎ Good health    ___ Minor illness    ___ Major illness

8. The immunizations (shots) that my child got before (s)he developed this chronic condition included:

   ____ Diphtheria

   ____ Haemophilus influenzae type b

   ☑ Hepatitis B

   ____ Measles

   ____ Mumps

   ____ Pertussis (whooping cough)

   ____ Poliomyelitis

   ____ Rubella

   ____ Tetanus

   ____ Varicella (chicken pox)

   Other immunizations:

   Despite her chronic eczema, her doctor continued to recommend routine vaccination according to AAP guidelines.

VACCINE-INJURED CHILD DECLARATION

Other Important Facts Or Opinions, Including The Impact On The Family:
My daughter was fully vaccinated at at age 5, and by that point she had
developed life threatening food allergies and had anaphylactic reactions. In
her teen years she was diagnosed with MCAS and suffers from chronic
eczema, constipation, insomnia, and brain fog.

I declare under penalty of perjury under the laws of the State of CA _____
that the foregoing is true and correct.

Executed at _____, on _____
San Juan Capistrano, Ca                         04/03/2025

*Wendy Chin*
_____
(Signature)

Name: _____
Wendy  Chin

VACCINE-INJURED CHILD DECLARATION

Exhibit 10

Richard B. Fox, J.D., M.D.
State Bar Number 283447
1875 S. Bascom Avenue, Ste. 2400
Campbell, CA 95008
Tel: 408-402-2452
Fax: 669-221-6281
drfox@drfoxlawoffice.com
Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Free Now Foundation, And Brave And Free Santa Cruz;<br><br>        PlaintiffS,<br><br>vs.<br><br>Erica Pan In Her Official Capacity As Director Of The California Department Of Public Health, And Courtney Johnson, In Her Official Capacity As Principal, Foothill Technology High School, Ventura Unified School District, Monica Morales, In Her Official Capacity As Director, Santa Cruz County Health Services Agency;<br><br>        Defendants | Case No.: 2:24−CV−03523−DJC−SCR<br>DECLARATION OF:<br><br>GRACE SHAIN<br><br>CHRONIC VACCINE-INJURED CHILD DECLARATION |

1. I am __Grace Shain__,

2. I have personal knowledge of all matters and facts set forth herein and could and would competently testify thereto if called upon to do so.

3. My child was __15__ old and in good health until the day that __he__ got immunized.

VACCINE-INJURED CHILD DECLARATION

4.  After getting the immunizations my child developed the following chronic condition: vaccine induced myalgic encephalomyelitis, dysautonomia, POTS, PANDAS, gastroparesis, and a host of other neurological symptoms and others

5.  This chronic condition began _____02/03/2018_____

6.  This chronic condition was complete or nearly complete  11/11/1111

7.  Prior to my child's immunizations, ___he_____ was in:

   ◎ Good health  ____ Minor illness  ____ Major illness

8.  The immunizations (shots) that my child got before (s)he developed this chronic condition included:

   ____Diphtheria

   ____Haemophilus influenzae type b

   ____Hepatitis B

   ☑Measles

   ____Mumps

   ____Pertussis (whooping cough)

   ____Poliomyelitis

   ____Rubella

   ____Tetanus

   ____Varicella (chicken pox)

   Other immunizations:

   Gardasil HPV

VACCINE-INJURED CHILD DECLARATION

9. When I gave consent for the immunizations (shots) right before my child died, the possibility of death ___was never___ mentioned to me.

10. If I knew at the time I gave consent for the immunizations (shots) right before my child died I ___would never___ have given that consent.


Other Important Facts Or Opinions, Including The Impact On The Family:
# 9 & #10 above is not applicable, as my son did not die.

My son was a straight A student, on 2 swim teams, super social, and shortly after receiving the Gardasil HPV vaccine became very sick, dropped out of all school, exercise, eventually became bed-bound for many years. He has never recovered and this has put an immense financial and emotional toll on the entire family.

I declare under penalty of perjury under the laws of the State of ___California___ that the foregoing is true and correct.

Executed at ___Pacific Palisades, California___, on ___04/07/2025___

___Grace Shain___
(Signature)

Name: ___Grace Shain___

VACCINE-INJURED CHILD DECLARATION

**CERTIFICATE OF SERVICE**

**Case Name: Free Now Foundation, et al. v Pan**

No. 2:24-cv-03523-DJC-SCR

I hereby certify that on June 3, 2025, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**Second Amended Complaint**

I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct, and that this declaration was executed on June 3, 2025 at Campbell, California.

Richard B. Fox, J.D., M.D.
Law Office Of Richard B. Fox
1875 S. Bascom Avenue
Suite 2400
Campbell, CA 95008
Tel: 408-402-2452
Fax: 669-221-6281
Email: drfox@drfoxlawoffice.com