1   Richard B. Fox, J.D., M.D.
    State Bar Number 283447
2   1875 S. Bascom Avenue, Ste. 2400
    Campbell, CA 95008
3   Tel: 408-402-2452
    Fax: 669-221-6281
4   drfox@drfoxlawoffice.com
    Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Free Now Foundation, Brave And Free Santa Cruz, D.Q., by his Next Friend, Alix Mayer, A.R., by his Next Friend, Alix Mayer, T.E., by his Next Friend, Kathleen Lynch, and N.D., by his Next Friend Kathleen Lynch; <br><br>         Plaintiffs; <br><br> vs. <br><br> Erica Pan, In Her Official Capacity As Director Of The California Department Of Public Health; <br><br>         Defendants | **CASE NO. 2:24-cv-03523-DJC-SCR** <br><br> **Date: July 10, 2025** <br> **Time: 1:30 p.m.** <br> **Courtroom: 7** <br> **Judge: Hon. Daniel J. Calabretta** <br><br> **Action Filed: December 16, 2024** <br><br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** <br><br> **FRCP RULE 65(a)** |

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

U.S. CONSTITUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

FEDERAL CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     FEDERAL STATUTES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     FEDERAL RULES OF CIVIL PROCEDURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     CALIFORNIA CONSTITUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     CALIFORNIA STATUTES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     OTHER AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

1.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

2.      JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

     2.1    Subject Matter Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

     2.2    Personal Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

     2.3    Venue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

3.      PROCEDURAL POSTURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

4.      THE PLAINTIFFS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     4.1    The Minor Child Plaintiffs And Their Next Friends . . . . . . . . . . . . . . . . . . . . . . 12

     4.2    Plaintiff Free Now Foundation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

     4.3    Plaintiff Brave And Free Santa Cruz Has Associational Standing In This Case . . 14

5.   DEFENDANT ERICA PAN, DIRECTOR OF THE CALIFORNIA DEPARTMENT OF
     PUBLIC HEALTH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

6.   STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
     6.1   The National Vaccine Injury Compensation Program (VICP) Is Administered By The
           U.S. Health Resources & Services Administration Within The U.S. Department of
           Health And Human Services. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
     6.2   The VICP Has Awarded Approximately $2.1 Billion In Compensation For Injuries
           And Deaths For Approximately 4,600 Claims In Which The Federal Department Of
           Health And Human Services Has Determined That Childhood Vaccines Were The
           Cause. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
     6.3   The National Rate Of Autism In Children Is Now One In Thirty-One And One In
           Twenty In California. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
     6.4   Hundreds Of California Infants Die Every Year Soon After An Immunization
           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
     6.5   The Tragic Stories Behind The Statistics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
     6.6   The California Department Of Public Health Makes Misleading Claims About Vaccine
           Safety, Through The U.S. Centers For Disease Control, On Its Website . . . . . . . . 19

7.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
     7.1   Legal Standard For A Preliminary Injunction. . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
     7.2.  The Requirements For A Preliminary Injunction Are Met . . . . . . . . . . . . . . . . . . 22
           7.2.1  Plaintiffs Are Likely To Succeed, Under Strict Scrutiny Review, On The Merits
                  Of Their Claims That HSC 120335 Infringes Their Fundamental Substantive
                  Due Process Clause Rights To Refuse Unwanted Medical Injections That Are
                  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
                  7.2.1.1 Infringements Of Fundamental Rights Are Reviewed Under Strict

MP&A ISO MOTION FOR PRELIMINARY INJUNCTION - PAGE 3

Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

7.2.1.2 HSC 120335 Infringes The Child's Fundamental Right, As Exercised By Their Parent Or Guardian, To Refuse Unwanted Vaccine Injections Upon Pain Of Forfeiting Their Fundamental Right To Education . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

7.2.1.3 The Right Of Parents To Decide Their Children's Medical Treatments Is Fundamental And Any Infringements Must Be Reviewed Under Strict Scrutiny . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

7.2.1.4 The Doctrine Of Unconstitutional Conditions Is Infringed By Conditioning The Child's Fundamental *Meyer-Pierce* Right To Attend School On The Waiver Of The Child's Right To Refuse Unwanted And Harmful Vaccine Injections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

7.2.1.5 Neither *Jacobson, Zucht,* Nor *Prince* Are Not Controlling In This Case For Four Reasons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

7.2.1.6 Because The Purpose Of California's Immunization Requirements Is To Protect The Child And Not The Public, They Infringe On The Parent's Fundamental Rights To Care For Their Children And Must Be Reviewed Under Strict Scrutiny . . . . . . . . . . . . . . . . . . . . . . . . . . 26

7.2.1.7 California's School Immunization Requirements Under Health and Safety Code Sections 120325 And 120335 Are Not Narrowly Tailored To Achieve A Compelling Government Interest . . . . . . . . . . . . . . 28

7.2.1.8 The State May Not Require Children To Be Injected With Often Permanently Harmful And Potentially Lethal Drugs For The Purported Benefit Of Others . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

7.2.1.9 Children Must Be Afforded Due Process Before Their Liberties May Be Infringed, Due Process Not Available Under HSC 120335 . . . 30

7.2.3 The Minor Child Plaintiffs Are Likely To Suffer Irreparable Harm In The Absence Of Preliminary Relief Because They Will Or May Be Excluded From

Their Schools. While Many Other California Infants And Children Will Be Forced To Get Often Harmful Or Sometimes Lethal Injections Of Vaccines So As Not To Be Excluded From Their Schools . . . . . . . . . . . . . . . . . . . . . . 30

7.2.4   The Balance Of Equities Tips In Plaintiffs' Favor Because They May Be Harmed Without Injunctive Relief Whereas None Of The Other Students In Their Classes Will Be Harmed Because California Has No Data To Show That Its Mandated Immunizations Prevent Transmission Of Infection . . . . . . . 31

7.2.5   An Injunction Is In The Public Interest Because It Will Reduce The Autism Rate In California, The Highest In The Country, With The Care And Education Of Those Autistic Children Costing The Public Billions Of Dollars Annually . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

7.2.6   The Alternative Requirements For A Preliminary Injunction Are Met . . . 31

7.3   Injunctive Relief Is Appropriate, Not Only For Plaintiffs, But For All Similarly Situated California Children Because Of The State Policy To Infringe Upon The Fundamental Medical And Educational Rights Of All Of Them . . . . . . . . . . . . . . 32

8.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**TABLE OF AUTHORITIES**

**U.S. CONSTITUTION**

Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**FEDERAL CASES**

*Troxel et vir. v Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054 (2000) . . . . . . . . . . . . . . . . . . . . . . . 23

*All for the Wild Rockies v. Pena*, 865 F.3d 1211 (9th Cir. 2017) . . . . . . . . . . . . . . . . . . 21, 22, 31

*Am. Unites for Kids v. Rousseau*, 985 F.3d 1075 (9th Cir. 2021). . . . . . . . . . . . . . . . . . . . . . . . . 14

*Bonner v. Moran* (1941) 75 U.S.App.D.C. 156, 126 F.2d 121. . . . . . . . . . . . . . . . . . . . . . . . . 23

*Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Doe by Gonzales v. Maher*, 793 F.2d 1470 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Dolan v. City of Tigard*, 512 U.S. 374, 114 S. Ct. 2309, 129 L. Ed. 2d. 304 (1994) . . . . . . . . . . 24

*Fields v. Palmdale School Dist.*427 F.3d 1197, 1208 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Health Freedom Def. Fund, Inc. v. Carvalho,* 104 F.4th 715, 725 (9th Cir., 2024) . . . . . . . . 11, 26

*Henning Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643, 3 Ann.Cas. 765 (1905) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11, 22, 25-27

*Meyer v. Nebraska*, 262 U.S. 390, 399, 401, 67 L. Ed. 1042, 43 S. Ct. 625 (1923). . . . . . . . . 23-25

*Mullins v. State of Oregon*, 57 F.3d 789, 793 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Parham v. J. R.*, 442 U.S. 584, 602, 61 L. Ed. 2d 101, 99 S. Ct. 2493 (1979). . . . . . . . . . . . . . . 24

*Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) . . . . . . . . . . . . . . . 25

*Pierce v. Society of Sisters*, 268 U.S. 510, 534-535, 69 L. Ed. 1070, 45 S. Ct. 571 ( 1925) . . 23-25

*Prince v.Massachusetts*, 321 U.S. 158, 88 L. Ed. 645, 64S. Ct. 438 (1944) . . . . . . . . . . . . . 23, 25

*Quilloin v.Walcott*, 434 U.S. 246, 255, 54 L. Ed. 2d 511, 98 S. Ct. 549 (1978) . . . . . . . . . . . . . 24

*Reno v. Flores*, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1, 507 U.S. 292 (1993) . . . . . . . . . . . . . 22, 23

*Santosky v. Kramer*, 455 U.S.745, 753, 71 L. Ed. 2d 599, 102 S. Ct. 1388 (1982) . . . . . . . . . . . 24

*Skinner v. State of Oklahoma Williamson*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942 . . 9, 26

*Union Pac Ry Co v. Botsford*, 141 U.S. 250, 11 S.Ct. 1000, 35 L.Ed. 734 (1891) . . . . . . . . . . . 22

*Washington v. Glucksberg*, 521 U.S.702, 720, 138 L. Ed. 2d 772 (1977) . . . . . . . . . . . . . . . 23, 24

*Washington v. Harper*, 494 U.S. 210, 229 , 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) . . . . . . . . 22

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Wisconsin v. Yoder*, 406 U.S. 205, 232, 32 L. Ed. 2d 15, 92 S. Ct. 1526 (1972) . . . . . . . . . . . 23, 27

*Zucht v. King*, 260 U.S. 174, 67 L.Ed. 194, 43 S.Ct. 24 (1922) . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

**FEDERAL STATUTES**

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

28 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

28 U.S.C. § 1346 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

28 U.S.C. § 1391 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

National Childhood Vaccine Injury Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 21, 25

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed.R.Civ.P., Rule  65(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 32

Fed.R.Civ.P., Rule 4(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**CALIFORNIA CONSTITUTION**

California Constitution, Article IX, Section 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**CALIFORNIA CASES**

*Ballard v. Anderson* (1971) 4 Cal.3d 873, 883, 95 Cal.Rptr. 1, 484 P.2d 1345 . . . . . . . . . . . . . . 23

*Cobbs v. Grant*, 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1 (Cal. 1972) . . . . . . . . . . . . . . . . . 23

*Doyle v. Giuliucci* (1965) 62 Cal.2d 606, 43 Cal.Rptr. 697, 401 P.2d 1 . . . . . . . . . . . . . . . . . . . 23

**CALIFORNIA STATUTES**

Health and Safety Code Section 120325 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 28

Health and Safety Code Section 120335 . . . . . . . . . . . . . . . 9, 10, 12, 14, 16, 21-23, 25, 28, 30, 32

**OTHER AUTHORITIES**

*McFall v. Shimp*, 10 Pa. D. & C. 3d 90 - Pa: Court of Common Pleas (1978) . . . . . . . . . . . 29, 30

## 1.    INTRODUCTION

This Motion For Preliminary Injunction seeks to temporarily enjoin, during the pendency of this litigation, the California Department of Public Health (CDPH) from enforcing, as to the named plaintiffs and all other similarly situated California children, the immunizations mandated under California Health and Safety Code (HSC) Section 120335(b) for children attending schools, both public and private, pre-schools, and day care centers because: (1) plaintiffs are likely to succeed on the merits, (2) plaintiffs and other similarly situated California children face irreparable harm in the absence of preliminary relief, (3) the balance of the equities favor the plaintiffs, and (4) the public interest will be best served by such an injunction.

Plaintiffs are likely to succeed on the merits of their claims that HSC 120335 infringes their fundamental Substantive Due Process Clause rights because the Supreme Court's decision in *Jacobson v. Massachusetts* does not apply in this case: (1) unlike *Jacobson*, the legislative branch, the U.S. Congress, has determined, when it enacted the National Childhood Vaccine Injury Act of 1986, that the vaccines mandated under HSC Section 120335 can cause serious injury and death, (2) unlike *Jacobson*, California has no data to show that the vaccines mandated under HSC Section 120335 serve a public health purpose by preventing transmission of the relevant infections, (3) unlike *Jacobson,* HSC Section 120335 does not allow opting out of its requirements by the payment of a nominal fine, and (4) unlike *Jacobson*, decided under rational basis review in 1905, mandated medical treatments that cause serious, permanent harm and injury have, since *Skinner v. Oklahoma*,[1] been reviewed under strict scrutiny. Plaintiffs are also likely to succeed on their procedural due process claim that their fundamental rights to refuse immunization with often harmful and sometimes lethal vaccines or be forced to forfeit their educations may not be infringed without notice and hearing rights not provided under HSC 120335.

Plaintiffs and other similarly situated California children face irreparable harm in the absence of preliminary relief because plaintiffs and other similarly situated California children will not be allowed to attend their schools, including during the summer months, without the mandated

---

[1] *Skinner v. State of Oklahoma Williamson*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942).

immunizations, missing days of school that cannot be recovered, or risk serious, permanent injury from: (1) vaccines to the U.S. Congress, under the National Childhood Vaccine Injury Act, to cause such injury and (2) vaccines that are currently under investigation by the U.S. Department of Health and Human Services as possible causes of serious, permanent injury due to autism.

The balance of the equities favor the plaintiffs because plaintiffs face the risk of serious, permanent injury from vaccines known to the U.S. Congress, under the National Childhood Vaccine Injury Act, to cause such serious, permanent injury and California has no data to show any public health benefit by prevention of transmission of the relevant infections to the public.

The public interest will be best served by such an injunction because some of the serious, permanent injuries caused by the immunizations mandated under HSC 120335, particularly autism, impose enormous public costs for medical and custodial care and special educational services for these children.

That these mandated vaccines cause serious, permanent harm, is not open to dispute because the U.S. Congress found, when it passed the National Childhood Vaccine Injury Act (NCVIA), that those vaccines often cause permanent injury and death. The U.S. Health Services and Resources Administration (HRSA) now reports that the federal Vaccine Injury Compensation Program (VICP) has, to date, paid out more than $5.3 billion dollars to more than 11,600 claimants for vaccine-related injuries and deaths under the NCVIA.

The two most common serious vaccine injuries are autism and Sudden Unexpected Infant Death (SUID). The U.S. Centers for Disease Control (CDC) reports that autism now strikes one in thirty-one U.S. children, with vaccine-mandating California leading the nation with a rate of one in twenty, 50% higher than the national average. For California boys the rate is one in twelve. Most are regressive autism cases in which a previously normally developing child suddenly becomes autistic within hours or a few days of an immunization. With California having a population of about 8,680,000 children, as many as 400,000 of them may be autistic, with many more autistic adults. With California having about 400,000 births per year, the estimate would be 20,000 new cases per year, about *55 every single day*. The CDC now reports that nearly one fourth, about 22 new cases every single day in California, have IQ's less than 70 and are considered intellectually disabled. They never

have more than a few dozen words, cannot toilet themselves, and need life-long, full-time care, with most of that burden falling on the parents, especially mothers.

Those of school age require expensive special education services. California has about 850,000 students in special education classes. About 170,000 (20%) are autistic. California receives almost $15 billion in federal funds for special education. Twenty percent of that would be $3 billion per year.

The CDC reports that Sudden Unexpected Infant Death (SUID) strikes about 3,700 otherwise healthy U.S. infants per year, about ten every day. About one in ten of those is a California infant, about one every day. A veteran police SUID investigator estimates that about half of SUID occur within 72 hours of an immunization and, overall, about 85% were likely due to immunization. It is unconscionable for California to continue to mandate vaccine-related death, literally lethal injections, for all these innocent children.

Heretofore, the courts have deferred to laws mandating these deadly vaccines under the Supreme Court's 1905 decision in *Jacobson v. Massachusetts* permitting Massachusetts to require smallpox vaccinations for adults under its police powers since those vaccinations were known to the legislature to be: (1) **safe**, and (2) **to prevent the transmission of the infection to the public.**

However, the Ninth Circuit Court of Appeals recently ruled, in *Health Freedom Def. Fund v. Carvalho*, that *Jacobson* would not apply to COVID-19 immunization requirements under *Jacobson's* public health rationale if COVID-19 vaccines did not prevent transmission of COVID-19 infections. Here, California does not have data to show that the vaccines that it requires for schoolchildren do actually prevent transmission of the relevant infections and the VICP data show that California's mandated immunizations are not safe and do often cause injury and death.

**2.     JURISDICTION AND VENUE**

**2.1     Subject Matter Jurisdiction**

This court has jurisdiction in this action under the laws of the United States, 28 U.S.C. §§ 1331, 1343, and 1346, with the claims arising under 42 U.S.C. § 1983 (deprivation of civil rights). This Court has authority to grant the requested injunctive relief under 28 U.S.C. Section 1343.

**2.2     Personal Jurisdiction**

Personal jurisdiction as to defendants Erica Pan, in her official capacity as Director of the

California Department of Public Health ("CDPH"), arise under Fed.R.Civ.P., Rule 4(j).

### 2.3 Venue

Venue is appropriate in this court, under 28 U.S.C. § 1391, because a substantial part of the acts giving rise to this lawsuit occurred in this district, specifically the acts of Tomás Aragón and Erica Pan, the former and current Directors of the California Department of Public Health.

## 3. PROCEDURAL POSTURE

This action was commenced on December 16, 2024 by the filing of a Complaint. ECF #1. Plaintiffs filed a First Amended Complaint on March 24, 2025. ECF #16. Plaintiffs filed a Motion For Temporary Restraining Order and Preliminary Injunction on March 25, 2025, ECF #18. The motion for the TRO was denied by order of the Court on March 26, 2025. ECF #20. On March 6, 2025 Plaintiff's filed a Motion For Leave To File A Second Amended Complaint. ECF # 28. On March 7, 2025 Plaintiffs stipulated to the denial of the Motion for Preliminary Injunction filed March 25, 2025. ECF #30. On March 16, 2025 Plaintiffs filed a Notice Of Request To Seal Documents. ECF # 33. On March 20, 2025 Defendant Erica Pan filed a Statement of Non-Opposition to Plaintiff's Motion For Leave To File A Second Amended Complaint. ECF #35. On May 30, 2025 the Court ordered that Plaintiffs file a Second Amended Complaint. ECF #38. On June 3, 2025 Plaintiffs filed a Second Amended Complaint. ECF #39.

## 4. THE PLAINTIFFS

### 4.1 The Minor Child Plaintiffs And Their Next Friends

Plaintiff D.Q., attended school in the Ventura Unified School District (VUSD) until the school went on vacation break at the end of calendar year 2024. Sealed Exhibit 1. When D.Q. returned to his school on January 7, 2025 to resume his classes he was summoned to the school's administrative offices and informed that he could not return to school until he complied with the school district's immunization policies. *Id.* He remains excluded, now going on five months. Without a preliminary injunction enjoining the enforcement of HSC 120335 by defendant Pan, D.Q. will continue to be excluded when the new school year begins in a few months. The VUSD maintains that it was compelled by exclude D.Q. from school by the CDPH. Exhibit 2. D.Q. is represented in this action by Next Friend Alix Mayer at the request of D.Q.'s parents. Sealed Exhibit 1.

Plaintiff A.R., attends a private church school in Santa Cruz County. Sealed Exhibit 7. Recently the adult brother of A.R. was informed by the secretary of that school that she had been contacted by Lauren Tranchitia, BSN, RN, the Immunization Coordinator for the County of Santa Cruz Department of Public Health, and told by nurse Tranchita that his brother, A.R., must show that he has all the immunizations on the schedule that Ms. Tranchita left with the secretary, and which the secretary forwarded to the adult brother of A.R. in order to remain enrolled at the church school. *Id.* The secretary stated to the adult brother of A.R. that nurse Tranchita had stated that the immunizations should be completed within ten days. *Id.* Monica Morales is the supervisor of nurse Tranchita. Exhibit 9, Declaration of Monica Morales. She states that nurse Tranchita does audit the immunization records of the schools in Santa Cruz County for compliance with California's immunization requirements and does sent those audits to the California Department of Public Health upon their request. *Id.* Minor child A.R. is represented in this action by Next Friend Alix Mayer at the request of his parents. Sealed Exhibit 7.

Plaintiff Minor Child T.E. resides in Santa Cruz County. Sealed Exhibit 8. On January 5, 2022 Minor Child T.E. was excluded from his school in Santa Cruz County due to his immunization status under California's immunization requirements and remains excluded to this date. *Id.* Minor child T.E. is represented in this action by his Next Friend, Kathleen Lynch, at the request of his parents. *Id.*

Plaintiff Minor Child N.D. resides in Santa Cruz County. He attends a private school but is not fully compliant with California's immunization requirements for school attendance. He will likely face a requirement to prove his compliance with those requirements at the beginning of the next school year and fears being excluded from that school that he has attended for many years. Sealed Exhibit 4. Minor Child N.D. is represented in this action by his Next Friend, Kathleen Lynch, at the request of his parents. *Id.*

### 4.2 Plaintiff Free Now Foundation Has Associational Standing In This Case

Plaintiff Free Now Foundation is a non-profit corporation and operates principally in California.[2] It maintains a website at https://freenowfoundation.org/. Alix Mayer, Next Friend of minor

---

[2] Declaration of Alix Mayer, Chair of Free Now Foundation, Exhibit #1.

children plaintiffs D.Q. and A.R., is the chair and CEO of Free Now Foundation. Exhibit 10, Declaration of Alix Mayer. One of the primary stated purposes of Free Now Foundation is to protect civil liberties and health rights for all, especially children. *Id.* Plaintiff Free Now Foundation has associational standing in this case because Alix Mayer is a member of Free Now Foundation. *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1096 (9th Cir. 2021)("An association or organization can sue based on injuries to itself or to its members.")

### 4.3 Plaintiff Brave And Free Santa Cruz Has Associational Standing In This Case

Plaintiff Brave And Free Santa Cruz is an unincorporated freedom advocacy group that was organized on July 4, 2022 with its principal activities in Santa Cruz County, California. Declaration of Kathleen Lynch, exhibit 11. Kathleen Lynch, Next Friend of minor child plaintiffs T.E. and N.D., is co-chair of Brave and Free Santa Cruz. *Id.* It meets regularly in Santa Cruz County and maintains a website at braveandfreesantacruz.org/. *Id.* Because Kathleen Lynch is a member of Brave and Free Santa Cruz, it has associational standing in this proceeding. *Am. Unites for Kids, supra.*

## 5. DEFENDANT ERICA PAN, DIRECTOR OF THE CALIFORNIA DEPARTMENT OF PUBLIC HEALTH

The California Department of Public Health (CDPH) oversees the enforcement of California Health and Safety Code Section 120335 as applied to all California educational and child care facilities. Defendant Erica Pan is the Director of the CDPH and has overall authority for the enforcement of California immunization requirements for all of California public and private schools, pre-schools, and daycare centers. She replaced former defendant Tomás Aragón as CDPH Director as of February 1, 2025.

## 6. STATEMENT OF FACTS

### 6.1 The National Vaccine Injury Compensation Program (VICP) Is Administered By The U.S. Health Resources & Services Administration Within The U.S. Department of Health And Human Services

The National Vaccine Injury Compensation Program (VICP is administered by the U.S. Health Resources & Services Administration (HRSA). RFJN, Exhibit 1, p.2. The HRSA operates within the U.S. Department of Health and Human Services (DHHS). *Id.*

**6.2     The VICP Has Awarded Approximately $2.1 Billion In Compensation For Injuries And Deaths For Approximately 4,600 Claims In Which The Federal Department Of Health And Human Services Has Determined That Childhood Vaccines Were The Cause**

More than 28,292 petitions have been filed with the VICP since 1988. Of these, 24,779 petitions have been adjudicated, with 11,821 of those determined to be compensable, while 12,958 were dismissed. Total compensation paid over the life of the program is approximately $5.3 billion. RFJN, Exhibit 2, p. 1. Thus, the rate of compensable claims is about 48%.

Being awarded compensation for a petition does not necessarily mean that the vaccine caused the alleged injury. Approximately 60 percent of all compensation awarded by the VICP are the result of a negotiated settlement between the parties in which HHS has not concluded, based upon review of the evidence, that the alleged vaccine(s) caused the alleged injury. *Id.* By inference, approximately 40 percent of all compensation has been awarded on the basis that HHS has concluded that the alleged vaccines did cause the alleged injuries. Thus, the VICP has awarded approximately $2.1 billion in compensation for injuries and deaths for approximately 4,600 claims wherein HHS has determined that childhood vaccines were, indeed, the cause. This fact is, therefore, beyond serious dispute.

Since 1988, 1,444 claims have been filed with the VICP for deaths due to vaccines. *Id.,* at p. 5. The most common vaccine alleged as the cause was the DTP (diphtheria/tetanus/pertussis) vaccine with 698 claims filed, roughly half of the total. *Id.* The VICP report does not state the number of these death claims that were compensated.

**6.3     The National Rate Of Autism In Children Is Now One In Thirty-One And One In Twenty In California**

According to CDC data, the prevalence of autism in the United States is now one in every thirty-one 4 year-old children, with autism being 3.8 times more prevalent in boy than in girls. RFJN, Exhibit 3. In vaccine-mandating California, the prevalence is sharply higher at one in twenty four year-old children. *Id.* With 80% of those being boys, the prevalence of autism in California boys can be estimated to be one in every twelve four year-olds. The CDC reports that forty percent had IQ's less than 70 such that they were considered intellectually disabled. *Id.* With California having a birth rate of about 750,000 per year, that implies about 33,000 new autism cases per year, nearly one hundred per day, with about forty percent (forty per day) intellectually disabled and needing full-time care. Of

the autism cases among children age one to three (the most common age of onset) reported to the CDC Vaccine Adverse Event Reporting System (VAERS), the greatest number had their onset within one day after an immunization and more than half within the first two days. RFJN, Exhibit 5 The close temporal association between vaccination and onset leaves no doubt that vaccines were the proximate causes.

**6.4     Hundreds Of California Infants Die Every Year Soon After An Immunization**

According the the CDC, there were about 3,700 sudden unexpected infant deaths (SUID) in the United States in 2022 (RFJN, exhibit 6), that is, about 10 every day. Using the CDC data, the number of SUID in California for 2024 can be estimated at nearly 400, more than one per day. *Id.*

According to the sworn statement of a veteran police SIDS investigator, she estimates that about half of all the 250 or so SUID that her unit investigated during her career as a SUID investigator occurred within 72 hours of an immunization and that, overall, about 85% of all those SUID were likely related to an immunization. Declaration of Jennifer Chubb, Exhibit 12.

**6.5     The Tragic Stories Behind The Statistics**

It has been claimed (although it is disputed), that Stalin once said, "One death is a tragedy, a million is a statistic." Thus, the mind struggles to understand what all these vaccine injuries and deaths claims really mean? A few individual stories help to understand the tragedies behind the statistics.

In a sworn declaration, Darlene Culotta stated that her son was seven weeks old when she had him vaccinated with the DTP shot now required under HSC Section 120335(b).  Declaration of Darlene Culotta, exhibit 13. He was in good health at the time. The next morning she found him dead in his crib. No one told her that this was a possibility when she gave consent for that shot and she never would have given that consent if she had known that. *Id.*

In a sworn declaration, Sally Rubin of Oakland, California states that her son was three years and seven months old when he had the sudden onset of regressive autism shortly after he received immunizations required under HSC Section 120335(b), including diphtheria, tetanus, measles, mumps, and rubella. Declaration of Sally Rubin, exhibit 14. He now suffers, to a severe degree, from all of these characteristics of autism, including: (1) difficulty understanding and using social cues, such as eye contact, facial expressions, and body language, (2) limited eye contact and avoidance of eye

contact, (3) lack of interest in social interactions and difficulty sharing experiences, (4) challenges with understanding and responding to emotions in others, (5) repetitive movements, such as hand flapping, spinning, or rocking, (6) insistence on routines and resistance to change, highly focused interests or obsessions with specific objects or activities, (8) stereotyped speech patterns, such as repeating words or phrases, (9) intense and narrow interests that may consume a significant amount of time and attention, (10) difficulty shifting focus from their interests to other activities, (11) preference for certain objects, textures, or sensory experiences, (12) delayed language development or unusual language patterns, (13) difficulty with pretend play and imaginative activities, (14) sensory sensitivities, such as over- or undersensitivity to sounds, textures, or smells, (15) challenges with motor coordination or fine motor skills, (16) unusual eating habits or food preferences. *Id.* As for the impact on her family, she stated that, "I had my own company at the time and closed it to be able to devote myself full time to helping my son. It has been financially devastating." *Id.* She further states that, "When I gave consent for the immunizations (shots) right before my child became autistic, the possibility of autism was never mentioned to me. If I knew at the time I gave consent for the immunizations right before my child became autistic, I never would have given that consent." *Id.*

Sally Rubin's tragic story is typical. Jennifer Silva's daughter had the sudden onset of regressive autism at age 18 months after immunizations. Declaration of Jennifer Silva, exhibit 15. Her daughter is seriously afflicted with all the same symptoms as the Rubin child. *Id.* No one told her that this was a possibility before she consented to those immunizations and she never would have consented if she had known. *Id.* Her comments are haunting:

> My daughter became very agitated initially, unable to cope with daily life, experiencing several tantrums, which had never occurred before. She then lost her eye contact and ability to answer her name. She wandered around our home as if we weren't there. I felt like I had lost my girl. The regret and sadness that enveloped me as a mother was overpowering. *Id.*

Meena Kurian's previously healthy son was fourteen months old when he was suddenly stricken by regressive autism after immunizations. Declaration of Meena Kurian, exhibit 16. He has all the same symptoms as the children above. That possibility was never mentioned to her before she consented and she never would have consented if she had known. She commented that, "Financial strain, could not work as an RN as my son needed me. Girls felt neglected as we had to focus on son.

Strained marital and family bonds." *Id.*

Salvadore Newton's son developed regressive autism in 2012 after immunizations at age two and one half months. Declaration of Salvado Newton, exhibit 17. He has all the same symptoms as the other children above. That possibility was never mentioned to Salvadore before he consented to the shots and he never would have consented had he known. He commented:

> [Redacted] developed seizures and still has them to this day. The first 7 years of his life [redacted] had trouble sleeping. Little to no trouble before the shots. He would pace back and forth endlessly, sometimes until 1 or 2 in the morning. I had many sleepless nights. To this day he can't sleep without melatonin supplements. [Redacted] was forming words and crawling at an extremely early age. Now at 13 he can't speak and is still in diapers. He needs care for food preparation and personal hygiene. I pray one day he can function on his own and have a good productive life. *Id.*

In a sworn declaration, Ann Todd stated that her twenty month old daughter was developing normally until the child suddenly developed regressive autism after immunizations. Declaration of Ann Todd, exhibit 18. The child has all the same symptoms as the other autistic children above and is severely affected. She was not told of this possibility and never would have consented had she known. The child was in special education throughout school and is now an adult under conservatorship. *Id.*

In a sworn declaration, Janet Fry states that her son was in previously good health when he suddenly became autistic after immunizations. Declaration of Janet Fry, exhibit 19. He has the same symptoms as the other autistic children above and is severely affected in all respects. She was not told of this possibility before giving consent and never would have done so had she known. She further states that:

> My child became a completely different person, it was like a light switched off in him. He was social and talkative he was already saying basic words, signing to communicate. And after he became withdrawn would get angry, anti social, didn't even like his brothers or want to interact with any other children like he did prior. And now at 5 I am dealing with being his full time caregiver he hits other people and spits on them. He is non verbal. He hits himself, the list is long. *Id.*

In a sworn declaration, Emma Bacsik states that her daughter was 10 months old when the daughter suddenly regressed into autism. Declaration of Emma Bacsik, exhibit 20. The child now has all the same symptoms as the other children above and to a severe degree in all respects. She was never told of this possibility and never would have consented had she known of it. She further states that:

> She was in the hospital with Infantile Spasms about 24 hours after her vaccines and lost all abilities within a few days. She now has Severe Autism, Severe Autoimmune Encephalitis and

is on IVIG (insurance approved because of how severe), severe gut dysbiosis, rashes, and has suffered Infantile Spasms and Syncope. We have all the testing to prove all of this and it all matches up with her hospital admissions. She is still receiving these treatments at age 10. *Id.*

Regressive autism is not the only post-vaccine injury seen. Kara Morales' son developed seizures at five and a half months after immunizations. Declaration of Kara Morales, exhibit 21. She commented that:

He received the Hepatitis B vaccine as a newborn, and was in the hospital 2.5 weeks later with a high fever. The two events may be unrelated. However, we did not vaccinate him again until 5.5 months old . He was in generally good health at the time, but had a little dry cough. I asked if we should wait again since he had some kind of mild illness, but the nurse said he had no fever, no juicy cough, and so it was "perfectly safe". Within 24 hours of receiving those vaccines, he began having absence seizures. Within 72 hours of receiving the vaccines he collapsed in my arms, stopped breathing, and was taken by ambulance to Rady Children's Hospital. He had further seizures in the presence of an attending neurologist. He was moved to a room for observation, and at one point crashed and they moved him to the ICU. He spent 4 days total at Rady's. He was put on anti-seizure medication and remained on anti-seizure medication for several years. He continued to see the neurologist for breakthrough seizures. *Id.*

Wendy Chin's daughter developed chronic severe eczema after getting immunizations as a newborn infant but her doctor continued to give those shots. Declaration of Wendy Chin, exhibit 22. She commented that:

My daughter was fully vaccinated at age 5, and by that point she had developed life threatening food allergies and had anaphylactic reactions. In her teen years she was diagnosed with MCAS (mast cell activation syndrome) and suffers from chronic eczema, constipation, insomnia, and brain fog. *Id.*

In a sworn declaration, Grace Shain states that her son was 15 years old and in good health until he received the HPV vaccine recommended by the California Department of Public Health. Declaration of Grace Shain, exhibit 23.Thereafter he developed, "vaccine induced myalgic encephalomyelitis, dysautonomia, POTS (postural orthostatic tachycardia syndrome), gastroparesis, and a host of other neurological symptoms." *Id.*

My son was a straight A student, on 2 swim teams, super social, and shortly after receiving the Gardasil HPV vaccine became very sick, dropped out of all school, exercise, eventually became bed-bound for many years. He has never recovered and this has put an immense financial and emotional toll on the entire family. *Id.*

These stories are just the tip of the massive iceberg of the daily tragedies of post-vaccine injury and death for tens of thousands families just within California.

**6.6      The California Department Of Public Health Makes Misleading Claims About Vaccine Safety, Through The U.S. Centers For Disease Control, On Its Website**

The Immunization Branch of the California Department of Public Health has a webpage entitled "Resources For Parents/Guardians. RFJN, Ex. #7. A link on that webpage, "Common Questions about Vaccines," links to a webpage of the Centers For Disease Control entitled "About Vaccines for your Children." RFJN, Ex. #8. That linked webpage addresses three common questions:

Are vaccines safe?
Yes. Vaccines are very safe. The United States' long-standing vaccine safety system ensures that vaccines are as safe as possible. Currently, the United States has the safest vaccine supply in its history. Millions of children safely receive vaccines each year. The most common side effects are very mild, such as pain or swelling at the injection site.

What are the risks and benefits of vaccines?
Vaccines can prevent infectious diseases that once killed or harmed many infants, children, and adults. Without vaccines, your child is at risk for getting seriously ill and suffering pain, disability, and even death from diseases like measles and whooping cough. The main risks associated with getting vaccines are side effects, which are almost always mild (redness and swelling at the injection site) and go away within a few days. Serious side effects after vaccination, such as a severe allergic reaction, are very rare and doctors and clinic staff are trained to deal with them. The disease-prevention benefits of getting vaccines are much greater than the possible side effects for almost all children. The only exceptions to this are cases in which a child has a serious chronic medical condition like cancer or a disease that weakens the immune system, or has had a severe allergic reaction to a previous vaccine dose.

Is there a link between autism and vaccines?
No. Scientific studies and reviews continue to show no relationship between vaccines and autism. Please see the CDC vaccine safety website for more information on autism and vaccines.

The last line refers to and contains a link to a CDC webpage on its website entitled, "Autism and Vaccines." RFJN, Ex. #9. That webpage states that:

Some people have had concerns that ASD might be linked to the vaccines children receive, but studies have shown that there is no link between receiving vaccines and developing ASD. The National Academy of Medicine, formerly known as Institute of Medicine, reviewed the safety of 8 vaccines to children and adults. The review found that with rare exceptions, these vaccines are very safe.

This statement is following by a footnote referencing a 2012 study by the Institute of Medicine (IOM). The 2012 IOM study made no such claim that, "with rare exceptions, these vaccines are very safe" as claimed by the CDC. In actual fact, the IOM study examined 158 causal relationships between various vaccines and various adverse effects (RFJN, Ex. 10, at p. 24) and was able to find only *five* such relationships where it could confidently state that the vaccine did not cause the adverse effect (*id.,* at p. 23). One of those five confirmed negative relationships was between the measles-mumps-rubella vaccine and childhood autism. *Id.* That conclusion rested upon five older reports, four reported in 2004

or earlier and one in 2010. *Id.,* at pp. 145. None of these studies were from the modern era in which the numbers of immunizations required and the incidence of autism have both increased greatly.

Thus, most of the vaccines required under HSC Section 120335(b) were *not* exonerated by the IOM study. As the IOM study candidly admitted, "...the limitations of the currently available peer-reviewed data meant that, more often not, we did not have sufficient scientific information to conclude whether a particular vaccine caused a specific rare adverse event." *Id.,* at p. xi. Nor has the CDC updated the inconclusive 2012 IOM study, now more than ten years old, as required under the National Childhood Vaccine Injury Act, sections 312 and 313.

The CDC's webpage on vaccines and autism also contains the statement that:

> CDC's study about age at first Measles-Mumps-Rubella (MMR) vaccination and autism, published in Pediatrics in 2004, included boys and girls from different ethnic groups, including black children.

RFJN, Ex. #9.

However, one of the authors of that paper, CDC researcher William Thompson, released a statement through his attorney in 2014 stating:

> I regret that my coauthors and I omitted statistically significant information in our 2004 article published in the journal Pediatrics. The omitted data suggested that African American males who received the MMR vaccine before age 36 months were at increased risk for autism. Decisions were made regarding which findings to report after the data were collected, and I believe that the final study protocol was not followed.[3]

This statement is offered not to show the truth of the facts alleged by Dr. Thompson, but only to show that Dr. Thompson made the allegation. The CDC could have refuted the allegation by simply updating the 2004 study, which is overdue anyway, but it has not.

**7. ARGUMENT**

**7.1 Legal Standard For A Preliminary Injunction**

Plaintiffs move for preliminary injunctive relief under Fed.R.Civ.P., Rule 65(a), To obtain preliminary injunctive relief, a movant must "meet one of two variants of the same standard." *All for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017). Under the first standard, the movant

---

[3] RFJN #11, August 27, 2014 Press Release, "Statement of William W. Thompson, Ph.D., Regarding the 2004 Article Examining the Possibility of a Relationship Between MMR Vaccine and Autism"

must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Under the second standard, the movant must show "that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits," that the "balance of hardships tips sharply in the Plaintiff's favor," and that "the other two Winter factors are satisfied." *Id.* (quotation omitted).

## 7.2.    The Requirements For A Preliminary Injunction Are Met

### 7.2.1    Plaintiffs Are Likely To Succeed, Under Strict Scrutiny Review, On The Merits Of Their Claims That HSC 120335 Infringes Their Fundamental Substantive Due Process Clause Rights To Refuse Unwanted Medical Injections That Are Often Harmful And Sometimes Lethal

#### 7.2.1.1 Infringements Of Fundamental Rights Are Reviewed Under Strict Scrutiny

"Governmental actions that infringe upon a fundamental right receive strict scrutiny." *Fields v. Palmdale School Dist.* 427 F.3d 1197, 1208 (2005), *Mullins v. State of Oregon*, 57 F.3d 789, 793 (1995), citing *Reno v. Flores*, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1, 507 U.S. 292 (1993).

#### 7.2.1.2 HSC 120335 Infringes The Child's Fundamental Right, As Exercised By Their Parent Or Guardian, To Refuse Unwanted Vaccine Injections Upon Pain Of Forfeiting Their Fundamental Right To Education

The Substantive Due Process Clause has long provided a liberty interest in refusing unwanted medical treatments. *Union Pac Ry Co v. Botsford*, 141 U.S. 250, 11 S.Ct. 1000, 35 L.Ed. 734 (1891) (holding that the courts could not compel a woman to submit to a medical examination); *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (holding that Missouri could regulate medical treatment of an incompetent adult while noting that "[t]he principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions," citing *Jacobson, supra*, at 24-30). In *Washington v. Harper* the Court noted that "[t]he forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty"). *Washington v. Harper*, 494 U.S. 210, 229 , 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (holding "that a

State's procedures for administering antipsychotic medication to prisoners were sufficient to satisfy due process concerns...) Where that person is a minor, California confers the right of consent upon the parent or guardian. *Cobbs v. Grant*, 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1 (Cal. 1972) ("...if the patient is a minor or incompetent, the authority to consent (to medical care) is transferred to the patient's legal guardian or closest available relative," citing *Ballard v. Anderson* (1971) 4 Cal.3d 873, 883, 95 Cal.Rptr. 1, 484 P.2d 1345; *Doyle v. Giuliucci* (1965) 62 Cal.2d 606, 43 Cal.Rptr. 697, 401 P.2d 1; *Bonner v. Moran* (1941) 75 U.S.App.D.C. 156, 126 F.2d 121.

HSC 120335 infringes the child's fundamental right, as exercised by their parent or guardian, to refuse unwanted injections of vaccines forced upon the child by the highly coercive means of forfeiting the child's fundamental right to pre-school and grade school educations, the *Meyer-Pierce* right (see next). Such infringements of fundamental rights are reviewed under strict scrutiny.

### 7.2.1.3 The Right Of Parents To Decide Their Children's Medical Treatments Is Fundamental And Any Infringements Must Be Reviewed Under Strict Scrutiny

The Due Process Clause of the Fourteenth Amendment "...also includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.'" *Troxel et vir. v Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054 (2000), citing *Washington v. Glucksberg*, 521 U.S.702, 720, 138 L. Ed. 2d 772 (1977), and *Reno v. Flores, supra,* at 301-302. "The liberty interest at issue in this case -- the interest of parents in the care, custody, and control of their children -- is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel,* at 65, citing *Meyer v. Nebraska*, 262 U.S. 390, 399, 401, 67 L. Ed. 1042, 43 S. Ct. 625 (1923)("... right of parents to 'establish a home and bring up children' and 'to control the education of their own.'"); *Pierce v. Society of Sisters*, 268 U.S. 510, 534-535, 69 L. Ed. 1070, 45 S. Ct. 571( 1925)("the 'liberty of parents and guardians' includes the right 'to direct the upbringing and education of children under their control,'" and "'the child is not the mere creature of the State..,'"); *Prince v.Massachusetts*, 321 U.S. 158, 88 L. Ed. 645, 64S. Ct. 438 (1944)("[i]t is cardinal with us that the custody, care and nurture of the child reside first in the parents..."); *Wisconsin v. Yoder*, 406 U.S. 205, 232, 32 L. Ed. 2d 15, 92 S. Ct. 1526 (1972)('The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of

their children. This primary role of the parents in the upbringing of their children is now established beyond debate..."); *Quilloin v.Walcott*, 434 U.S. 246, 255, 54 L. Ed. 2d 511, 98 S. Ct. 549 (1978)("[w]e have recognized on numerous occasions that the relationship between parent and child is constitutionally protected"); *Parham v. J. R.*, 442 U.S. 584, 602, 61 L. Ed. 2d 101, 99 S. Ct. 2493 (1979)("Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children"); *Santosky v. Kramer*, 455 U.S.745, 753, 71 L. Ed. 2d 599, 102 S. Ct. 1388 (1982)(discussing "the fundamental liberty interest of natural parents in the care, custody, and management of their child"); *Washington v. Glucksberg, supra*, at 720 ("[i]n a long line of cases, we have held that, in addition to the specific freedoms protected by the Bill of Rights, the 'liberty' specially protected by the Due Process Clause includes the right . . . to direct the education and upbringing of one's children" (citing *Meyer* and *Pierce*).) Finally, the case of *Mahmoud v. Taylor* is now before the Supreme Court, docket 24-297, and will be decided by the time this motion is heard on July 10, 2025. Plaintiffs expect that the decision will reaffirm parents' rights in the care and custody of their children as fundamental under the Substantive Due Process Clause.

Under these precedents, parents have a fundamental right in the care of their children. The fundamental right to care for their children has also, traditionally, included medical care. *Cobbs v. Grant, supra.* Any infringements of that fundamental right must reviewed under strict scrutiny.

### 7.2.1.4 The Doctrine Of Unconstitutional Conditions Is Infringed By Conditioning The Child's Fundamental *Meyer-Pierce* Right To Attend School On The Waiver Of The Child's Right To Refuse Unwanted And Harmful Vaccine Injections

The Doctrine of Unconstitutional Conditions forbids the government from conditioning the enjoyment of a government benefit or right upon the infringement of a constitutional right. *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests," where a college professor alleged that his employment was ended because he exercised his first amendment right to criticize the college); *Dolan v. City of Tigard*, 512 U.S. 374, 114 S. Ct. 2309, 129 L. Ed. 2d. 304 (1994) (holding that "... the government may not require a person to give up a constitutional right—here the right to receive just compensation when property is taken for a public use—in exchange for

a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the property.")

A parent's right to educate their child is a fundamental right, often termed the *Meyer-Pierce* right, since it derives from those two decisions. In California, children also have a right to a public school education. California Constitution, Article IX, Section 5. The parent's right to decide the child's medical treatment is also a fundamental right, as also discussed above.

California HSC Section 120335(b) requires a parent who wishes to exercise the latter fundamental right to waive the former fundamental rights. This is a plain violation of the Supreme Court's "unconstitutional conditions" doctrine.

### 7.2.1.5 Neither *Jacobson, Zucht,* Nor *Prince* Are Not Controlling In This Case For Four Reasons

The three Supreme Court cases that are often cited to support mandatory immunization laws are *Jacobson* (1905),[4] *Zucht* (1922),[5] and *Prince* (1944).[6]

Neither *Jacobson*, *Zucht,* nor *Prince* apply in this case for four reasons. First, none addressed government mandates for potentially lethal injections that often cause serious injury and death. The fact that California's required childhood vaccines cause serious injury and death is a fact known beyond genuine dispute, so well known that Congress enacted the National Childhood Vaccine Injury Act (NCVIA) in 1986 to compensate the victims of those vaccines under the National Vaccine Injury Compensation Program (VICP). To this date, the VICP has made 11,671, awards for injuries and deaths under that act, totaling over $5.3 billion. RFJN, Exhibit 2, at p. 1. *Jacobson* explicitly stated that its holding did not address vaccines that "would seriously impair ... health or probably cause death." *Jacobson, supra,* at 39 ("we are not inclined to hold that the statute establishes the absolute rule that an adult must be vaccinated if it be apparent or can be shown with reasonable certainty that he is not at the time a fit subject of vaccination, or that vaccination, by reason of his then condition, would seriously impair his health, or probably cause his death.")

---

[4] *Henning Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643, 3 Ann.Cas. 765 (1905)

[5] *Zucht v. King*, 260 U.S. 174, 67 L.Ed. 194, 43 S.Ct. 24 (1922).

[6] *Prince v. Commonwealth of Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944).

Second, all three decisions based the authority for mandatory vaccination on the state's police power, *i.e.,* the power of the state to mandate vaccination to protect the public from serious or life-threatening infections transmitted by others, as opposed to the *parens parentis* power to protect children from their own infections. (See section 6.5 next) Where, as here, the state does not have compelling evidence that its mandated immunizations prevent the transmission of serious infections to others, neither *Jacobson, Zucht,* nor *Prince* apply. *Health Freedom Def. Fund, Inc. v. Carvalho,* 104 F.4th 715, 725 (9th Cir., 2024) (holding that, "the district court misapplied the Supreme Court's decision in Jacobson..., stretching it beyond its public health rationale". Thus, the Ninth Circuit held that COVID-19 immunizations could not be required under *Jacobson* where it was alleged that they did not serve a public health purpose by preventing transmission of COVID-19. *Id.*

Third, the Massachusetts statute upheld under *Jacobson* involved a very minor restriction for those objecting to the mandated vaccination, a modest $5 fine, not the forfeiture of the child's entire education, protected as a fundamental right under the *Meyer* and *Pierce* decisions. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 71, 208 L.Ed.2d 206 (2020) (J. Gorsuch concurring) (the Massachusetts statute, under which "individuals could accept the vaccine, pay the [$5] fine, or identify a basis for exemption...easily survived rational basis review, and might even have survived strict scrutiny, *given the opt-outs available...*") (emphasis added.)

Fourth, both *Jacobson* (1905) and *Zucht* (1922) were decided under rational basis review before the Supreme Court adopted the strict scrutiny standard of review for infringements of fundamental rights. *Skinner, supra*. Here, parents' right to decide their children's medical treatments is fundamental (see above).

### 7.2.1.6 Because The Purpose Of California's Immunization Requirements Is To Protect The Child And Not The Public, They Infringe On The Parent's Fundamental Rights To Care For Their Children And Must Be Reviewed Under Strict Scrutiny

California Health and Safety Code Section 120325 states the purpose for California's immunization requirements:

In enacting this chapter ... it is the intent of the Legislature to provide: (a) A means for the eventual achievement of total immunization of appropriate age groups against the following childhood diseases: (1) Diphtheria, (2) Hepatitis B, (3) Haemophilus influenzae type b, (4) Measles, (5) Mumps, (6) Pertussis (whooping cough), (7) Poliomyelitis, (8) Rubella, (9) Tetanus, (10) Varicella (chickenpox). (11) Any other disease deemed appropriate by the

department, taking into consideration the recommendations of the Advisory Committee on Immunization Practices of the United States Department of Health and Human Services, the American Academy of Pediatrics, and the American Academy of Family Physicians.

This statement of intent provides no insight into the question of whether the purpose of these requirements is a public health purpose, *i.e.,* to prevent the transmission and spread of contagious diseases from infected individuals to and among the public, or for the private purpose of protecting individual children from acquiring those infections or to lessen their illnesses.

The CDPH has a webpage captioned as "Required Immunizations For School Entry." RFJN, Ex. # 12. That webpage contains the statement that:

When you visit your health care provider for back-to-school immunizations, make sure to also ask about other **vaccines that help keep your child healthy**, including hepatitis A, COVID-19, and the annual flu vaccine. Preteens and teens should also get the human papillomavirus (HPV) vaccine to protect against certain cancers and meningococcal vaccines.

Thus, the stated purpose for California's immunization requirements is to "help keep your child healthy," not to prevent that child from transmitting that child's infections to other children.

The distinction is very important because the prevention of transmission of infectious diseases from infected individuals to the public, such as by quarantine, has been held to be a police power. *Jacobson, supra,* at p. 25 ("the police power of a state must be held to embrace, at least, such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety.)

On the other hand, any state authority to protect the child from the child's *own* infections arises, not from its police powers, but from its **limited** *parens patriae* powers to safeguard the child's own health and welfare. *Wisconsin v. Yoder, supra*, at 232, holding that the state's parens patriae powers "to 'save' a child from himself or his Amish parents" did not extend to requiring an additional two years of formal high school education. Since "the interest of parents in the care, custody, and control of their children ... is perhaps the oldest of the fundamental liberty interests recognized by this Court"[7] any infringement upon that fundamental interest by the state by mandated medical treatments,

---

[7] *Troxel, supra,* at p. 65.

such as under a claim of *parens patriae*, must be reviewed under strict scrutiny.[8]

Here, where the vaccines mandated by California for children have been found by the federal government to cause serious injury and death such that they are entitled to compensation under the Vaccine Injury Compensation Program, California cannot show that those requirements are narrowly tailored to achieve a compelling government interest sufficient to infringe the parents' fundamental right to protect their children from such injury and death. Thus, they fail strict scrutiny.

### 7.2.1.7 California's School Immunization Requirements Under Health and Safety Code Sections 120325 And 120335 Are Not Narrowly Tailored To Achieve A Compelling Government Interest

There is nothing in Health and Safety Code Sections 120325 or 120335 that shows narrow tailoring for any of the mandated immunization so as to achieve an important government interest, especially in view of their serious and deadly side effects.

California Health and Safety Code Section 120325 (emphasis added) provides that:

In enacting this chapter ... it is the intent of the Legislature to provide: (a) A means for the eventual achievement of **total immunization** (emphasis added) of appropriate age groups against the following childhood diseases: (1) Diphtheria, (2) Hepatitis B, (3) Haemophilus influenzae type b, (4) Measles, (5) Mumps, (6) Pertussis (whooping cough), (7) Poliomyelitis, (8) Rubella, (9) Tetanus, (10) Varicella (chickenpox). (11) Any other disease deemed appropriate by the department, taking into consideration the recommendations of the Advisory Committee on Immunization Practices of the United States Department of Health and Human Services, the American Academy of Pediatrics, and the American Academy of Family Physicians.

California Health and Safety Code Section 120335(b) provides that:

(b) The governing authority shall not unconditionally admit any person as a pupil of any private or public elementary or secondary school, child care center, day nursery, nursery school, family day care home, or development center, unless, prior to his or her first admission to that institution, he or she has been fully immunized. The following are the diseases for which immunizations shall be documented: (1) Diphtheria, (2) Haemophilus influenzae type b, (3) Measles, (4) Mumps, (5) Pertussis (whooping cough), (6) Poliomyelitis, (7) Rubella, (8) Tetanus, (9) Hepatitis B, (10) Varicella (chickenpox), (11) Any other disease deemed appropriate by the [California Department of Public Health], taking into consideration the recommendations of the Advisory Committee on Immunization Practices of the United States Department of Health and Human Services, the American Academy of Pediatrics, and the American Academy of Family Physicians.

Thus, the goal of these statutes is the "total immunization" of all children with vaccines known to cause serious injury and death, the *exact opposite* of any narrow tailoring of these requirements,

---

[8] *Fields v. Palmdale School Dist.* 427 F.3d 1197, 1208 (2005), citing *Mullins v. State of Oregon*, 57 F.3d 789, 793 (1995), citing *Reno v. Flores*, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1, 507 U.S. 292 (1993).

such as by considering genetic susceptibility or previous vaccine injury, to achieve a compelling interest. Neither do these statutes set forth any stated compelling **public** health interest(s) by which a court could determine the legislative intent so as to apply strict scrutiny.

### 7.2.1.8 The State May Not Require Children To Be Injected With Often Permanently Harmful And Potentially Lethal Drugs For The Purported Benefit Of Others

Under Anglo-Saxon common law, the state may not impose harm on some for the benefit of others. This principle was cogently illustrated in *McFall v. Shimp*.[9] In that case McFall suffered from a rare bone marrow disease with a very dim prognosis for survival unless he received a bone marrow transplant from a compatible donor. A cousin, Shimp, was the only compatible donor but refused to donate the necessary bone marrow. McFall then sought an order from the court to require Shimp to donate the necessary bone marrow. But the court refused to issue such an order:

> The common law has consistently held to a rule which provides that one human being is under no legal compulsion to give aid or to take action to save another human being or to rescue. A great deal has been written regarding this rule which, on the surface, appears to be revolting in a moral sense. Introspection, however, will demonstrate that the rule is founded upon the very essence of our free society. It is noteworthy that counsel for plaintiff has cited authority which has developed in other societies in support of plaintiff's request in this instance. Our society, contrary to many others, has as its first principle, the respect for the individual, and that society and government exist to protect the individual from being invaded and hurt by another. Many societies adopt a contrary view which has the individual existing to serve the society as a whole. In preserving such a society as we have, it is bound to happen that great moral conflicts will arise and will appear harsh in a given instance. In this case, the chancellor is being asked to force one member of society to undergo a medical procedure which would provide that part of that individual's body would be removed from him and given to another so that the other could live. Morally, this decision rests with defendant, and, in the view of the court, the refusal of defendant is morally indefensible. **For our law to compel defendant to submit to an intrusion of his body would change every concept and principle upon which our society is founded. To do so would defeat the sanctity of the individual, and would impose a rule which would know no limits, and one could not imagine where the line would be drawn.**[10]

In this case, Shimp was not asked to submit to anything known to the Congress to cause severe injury and death, such as childhood vaccines, but only to donate some of his bone marrow which would have caused him little harm in the short term and none in the long term.

*McFall v. Shimp* is an unusual case, but not because the need to procure organs is uncommon, the need is very common. What was uncommon about the *McFall* case is that McFall thought that he

---

[9] *McFall v. Shimp*, 10 Pa. D. & C. 3d 90 - Pa: Court of Common Pleas (1978)

[10] *Id.,* at 91 (emphasis added.)

could get a court to **order** it, that's the unusual part. Everyone knows that, in this country, the government and the courts do **not order** people to give up their organs for the benefit of others, even if the donation would not harm the donor. Indeed, reports of forced organ donation in China are universally condemned in this country.

The Congress has already found that the risk of harm from the immunizations mandated by California is so constant and foreseeable as to require legislation to provide remediation for it. This clearly violates *McFall's* "first principle, the respect for the individual, and that society and government exist to protect the individual from being invaded and hurt by another," especially being intentionally hurt, or even killed, by the government itself.

### 7.2.1.9 Children Must Be Afforded Due Process Before Their Liberties May Be Infringed, Due Process Not Available Under HSC 120335

Children must be afforded appropriate due process before their liberty interests may be infringed. *Parham v. J.R.*, 442 U.S. 584, 599-600, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1977) (holding that Georgia's medical factfinding processes for the commitment of children to state mental hospitals were consistent with constitutional guarantees, based upon three factors, "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail," citing *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

Here, the child's private interest is enormous, the avoidance of the risk of serious, permanent injury (1 in 12 for autism in boys) or sudden infant death. The risk of erroneous deprivation under the procedures used is high because there are no due process procedures provided under HSC 120335. While the cost to the government of providing adequate due process procedures could be substantial, the savings to the public and the families from the avoidance of high-cost autism cases would likely be even greater.

### 7.2.3 The Minor Child Plaintiffs Are Likely To Suffer Irreparable Harm In The Absence Of Preliminary Relief Because They Will Or May Be Excluded From Their Schools. While Many Other California Infants And Children Will Be Forced To Get Often Harmful Or Sometimes Lethal Injections Of Vaccines So As Not To Be Excluded From Their Schools

The minor child plaintiffs are likely to suffer irreparable harm in the absence of preliminary relief because they will, in the case of D.Q., or may be, in the cases of A.R., T.E., and N.D., excluded from their schools, losing school days that cannot be restored to them. In particular, D.Q. needs summer school to make up for the days that he has already been improperly excluded from school. Furthermore, many other California infants and children will be forced to get potentially harmful or lethal injections of vaccines so as not to be excluded from their schools. Those harms, such as autism and sudden infant death, are irreparable.

### 7.2.4 The Balance Of Equities Tips In Plaintiffs' Favor Because They May Be Harmed Without Injunctive Relief Whereas None Of The Other Students In Their Classes Will Be Harmed Because California Has No Data To Show That Its Mandated Immunizations Prevent Transmission Of Infection

The balance of equities tips in plaintiffs' favor because, in the absence of injunctive relief, they may or will be harmed whereas none of the other students in their classes will be harmed because California has no data to show that its mandated immunizations prevent transmission of infection and they are, purportedly, protected by their own immunizations.

### 7.2.5 An Injunction Is In The Public Interest Because It Will Reduce The Autism Rate In California, The Highest In The Country, With The Care And Education Of Those Autistic Children Costing The Public Billions Of Dollars Annually

An injunction is in the public interest because it will reduce the incidence of autism in California, the highest in the country, where the care and education for those autistic children costs the public billions of dollars annually.

### 7.2.6 The Alternative Requirements For A Preliminary Injunction Are Met

Under the alternative standard, the movant must show "that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits," that the "balance of hardships tips sharply in the Plaintiff's favor," and that "the other two Winter factors are satisfied." *All for the Wild Rockies v. Pena, supra*, at 1217 (quotation omitted).

As for the first requirement, the plaintiffs are likely to succeed on the merits because the defendants cannot show that: (a) their requirements that innocent infants and children must be injected with potentially lethal vaccines known to the Congress and the VICP to cause serious injury and death in order to exercise their fundamental rights to attend school can pass strict scrutiny review as narrowly

tailored to achieve a compelling government interest, and (b) the mandated immunizations serve a public, rather than a private, health purpose by preventing the transmission of serious infectious diseases.

As for the second alternative requirement, the "balance of hardships" tips sharply in the Plaintiff's favor in the absence of preliminary relief because they will or may be excluded from their schools and many other California infants and children will be forced to get potentially harmful or lethal injections of vaccines so as not to be excluded from their schools. On the other hand, the public will not suffer because California has no data to show that its mandated immunizations prevent transmission of infection..

### 7.3 Injunctive Relief Is Appropriate, Not Only For Plaintiffs, But For All Similarly Situated California Children Because Of The State Policy To Infringe Upon The Fundamental Medical And Educational Rights Of All Of Them

Injunctive relief from the enforcement of HSC Section 120335 is appropriate, not only as to the named plaintiffs, but also as to all other similarly situated partially and wholly unvaccinated California children because of the harm to the fundamental rights of the plaintiffs and all those similarly situated children resulting from a statewide policy to exclude all those similarly situated children from their schools based upon their immunization status. *Doe by Gonzales v. Maher*, 793 F.2d 1470 (9th Cir. 1986)(affirming a permanent statewide injunction enjoining the state defendants to ensure that all local educational agencies provided appropriate services to their special education students where the state defendants had failed to adopt such a statewide policy.)

## 8. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for Preliminary Injunction under Rule 65(a), enjoining defendant Erica Pan, in her official capacity as Director of the California Department of Public Health, from enforcing the requirements of California Health and Safety Code Section 120335 as to the plaintiff minor children and all other similarly situated California school children.

Dated: June 4, 2025                    Respectfully submitted,

*Richard B. Fox*

Richard B. Fox, Counsel for Plaintiffs

**EXHIBITS**

Exhibit 9

Docusign Envelope ID: 59CBAE58-6A3C-4677-A9E4-2B0394F528A7

JASON M. HEATH, State Bar No. 180501
County Counsel
MELISSA C. SHAW, State Bar No. 232275
Lead Assistant County Counsel
Office of the Santa Cruz County Counsel
701 Ocean Street, Room 505
Santa Cruz, California 95060
Telephone: (831) 454-2040
Fax: (831) 454-2115
Email: melissa.shaw@santacruzcountyca.gov

Attorneys for Defendants
MONICA MORALES, Director,
SANTA CRUZ COUNTY HEALTH SERVICES AGENCY

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FREE NOW FOUNDATION, and BRAVE AND FREE SANTA CRUZ, MINOR CHILD #1, MOTHER AND FATHER OF MINOR CHILD #1; MINOR CHILD #, MOTHER OF MINOR CHILD #2, MINOR CHILD #3, MOTHER, FATHER, AND ADULT BROTHER OF MINOR CHILD #3, MINOR CHILD #4, MOTHER AND FATHER OF MINOR CHILD #4,<br><br>Plaintiffs,<br><br>v.<br><br>TOMÁS ARAGÓN In His Official Capacity As Director Of The California Department Of Public Health, and COURTNEY JOHNSON, In Her Official Capacity As Principal, FOOTHILL TECHNOLOGY HIGH SCHOOL, VENTURA UNIFIED SCHOOL DISTRICT; MONICA MORALES, Director, SANTA CRUZ COUNTY HEALTH SERVICES AGENCY,<br><br>Defendants. | Case No. 2:24-cv-03523-DJC-SCR<br><br><br>**DECLARATION OF MONICA MORALES** |

I, MONICA MORALES, declare as follows:

1. The matters set forth in this Declaration are of my own personal knowledge, and if called upon to testify, I could and would competently testify as follows:

*Free Now Foundation, et al. v. Aragón, Tomás, et al.*
Case No.: 5:24-cv-02796-SVK

-1-

Docusign Envelope ID: 59CBAE58-6A3C-4677-A9E4-2B0394F528A7

1  2.  I am currently employed, and at all times relevant to this litigation have been

2 employed as the Director of the Health Services Agency of the County of Santa Cruz since January

3 2022.

4  3.  I am currently a defendant in this action and make this declaration in support of a

5 stipulation for dismissal.

6  4.  The California Health and Safety Code sets forth regulations regarding various

7 diseases that children should be immunized for and sets the time frames for those immunizations.

8 (See Health and Safety Code, §§ 120325-120380; 17 Cal. Code Regs., § 6000 et. seq.)

9  5.  The California Health and Safety Code outlines the school immunization

10 requirements, schools are required to enforce them, and the California Department of Public Health

11 provides guidance and resources to local health jurisdictions and schools regarding immunizations

12 schedules. If there are students that are not in compliance, the State of California requests that the

13 school sends the student a 10 day notice regarding those vaccinations.

14  6.  Lauren Tranchitia, a nurse for the County of Santa Cruz Department of Public Health,

15 recently completed an audit of school immunization records pursuant to California State Law. Once

16 her audit was complete she sent the documented findings to schools with students out of compliance.

17 Additionally, her findings recommend that the school send a 10 day notice to out of compliance

18 students. This recommendation is in accordance with the requirements of the California School

19 Immunization Law, Health and Safety Code sections 120325-120375.

20  7.  Neither myself, nor anyone at the County of Santa Cruz makes any decisions as to

21 whether or not a child shall be excluded from school based on meeting school immunization

22 requirements. It is my understanding that the school district is the governing body of those decisions.

23  I declare under penalty of perjury under the laws of the State of California that the

24 foregoing is true and correct.

25  Executed this ¹___ day of May, 2025 in Santa Cruz, California.

26

27 By: _____

28     Monica Morales

*Free Now Foundation, et al. v. Aragón, Tomás, et al.*
Case No.: 5:24-cv-02796-SVK

-2-

## CERTIFICATE OF SERVICE

I, the undersigned, state that I am a citizen of the United States and employed in the County of Santa Cruz, State of California. I am over the age of 18 years and not a party to the within action. My business address is 701 Ocean Street, Room 505, Santa Cruz, California 95060. On the date set out below, I served a true copy of the following on the person(s)/entity(ies) listed below:

**DECLARATION OF MONICA MORALES**

☐ by **service by mail** by placing said copy enclosed in a sealed envelope and depositing the sealed envelope with the United States Postal Service with the postage fully prepaid.

☒ by **service by mail** by placing said copy enclosed in a sealed envelope and placing the envelope for collection and mailing on the date and at the place shown below following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service with postage fully prepaid.

☐ by **personal service** at a.m./p.m. at __

☐ by **email** by transmitting said copy electronically to the email address(es) listed below from my email account administered by the County of Santa Cruz. The electronic transmission was successful with no reported rejections.

☐ by **express or overnight mail** by depositing a copy in a post office, mailbox, sub-post office, substation, mail chute, or other like facility regularly maintained by the United States Postal Service for receipt of express mail or a mailbox, mail chute, or other like facility regularly maintained by an overnight mail company, in a sealed envelope, with express mail postage paid addressed to the below listed person(s).

☐ by **express or overnight mail** by arranging for pick-up by an employee of an express/overnight mail company on:

☐ by **facsimile service** at the number listed below and have confirmation that it was received by:

Richard B. Fox, Esq.
1875 S. Bascom Avenue, Ste. 2400
Campbell, CA 95008
Email: drfox@drfoxlawoffice.com
*Attorneys for Plaintiffs*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on _____, 2025 at Santa Cruz, California.

_____
SARA SANTISTEVAN

*Free Now Foundation, et al. v. Aragón, Tomás, et al.*
Case No.: 5:24-cv-02796-SVK

-3-

Exhibit 10

1  Richard B. Fox, J.D., M.D.
   State Bar Number 283447
2  1875 S. Bascom Avenue, Ste. 2400
   Campbell, CA 95008
3  Tel: 408-402-2452
   Fax: 669-221-6281
4  drfox@drfoxlawoffice.com
   Attorney for Plaintiffs
5

6
                    **UNITED STATES DISTRICT COURT**
7
                    **EASTERN DISTRICT OF CALIFORNIA**
8

9  Free Now Foundation, Brave And Free        CASE NO.  **2:24-cv-03523-DJC-SCR**
   Santa Cruz, D.Q., by his Next Friend, Alix
10 Mayer, A.R., by his Next Friend, Alix       Date:
   Mayer, T.E., by his Next Friend, Kathleen   Time:
11 Lynch, and N.D., by his Next Friend,        Courtroom: 7
   Kathleen Lynch;                             Judge: Hon. Daniel J. Calabretta
12
                                               DECLARATION OF ALIX MAYER
13            Plaintiffs
   vs.
14
   Erica Pan In Her Official Capacity As
15 Director Of The California Department Of
   Public Health;
16
              Defendant
17

18
   I, Alix Mayer, declare:
19
          1.      I am the Co-Founder and Chair of Free Now Foundation, one of the leading medical
20
   freedom law non-profits in California, and a current Plaintiff in the above entitled matter. I have
21
   personal knowledge of all matters and facts set forth herein and could and would competently testify
22
   thereto if called upon to do so.
23
          2,      Free Now Foundation was incorporated as a non-profit on April 7, 2023 and operates
24
   principally in California. It maintains a website at https://freenowfoundation.org/.
25
          3.      From its inception, one of the Foundation's central missions has been the protection
26
   of medical freedom, as shown by the Foundation's first website homepage (crawled on April 25, 2023)
27
   which lists "Protecting Medical Freedom" as one of its three missions. (Attachment #1, Free Now
28

Foundation homepage (https://freenowfoundation.org), as crawled April 25, 2023.)

4. One of the primary stated purposes of Free Now Foundation is to protect civil liberties and health rights for all, especially children.

5. Article II of Free Now Foundation's Amended and Restated Articles of Incorporation include the statement that:

The purposes for which the Free Now Foundation is organized are exclusively educational and charitable within the meaning of Section 501(c)(3) of the United States Internal Revenue Code, as amended, and in this connection, to protect and preserve civil and human rights, including rights to bodily autonomy, for the vulnerable and the voiceless, hy educating, advocating, and litigating for freedom of choice in health care for individuals and families;

6. A web page from the Foundation's website (as crawled June 6, 2023) captioned as "Legal Director Updates" states, in relevant part, that:

Free Now Foundation, which originally operated as the California Chapter of Children's Health Defense but is now a fully independent 501c3 non-profit, has been informing families about their fundamental legal rights, providing self-help legal resources to oppose unlawful school and employment jab and mask requirements, and engaging in strategic lawsuits to challenge the illegal mandates in California, which has been among the most restrictive in the country, since early 2020.

Thus, public education of parents to know their medical freedom rights and remedies has always been a core mission of the Foundation.

7. Children's Health Defense is a nationally known medical freedom advocacy group, founded by Robert F. Kennedy, Jr., that has challenged mandated childhood immunizations for many years. Free Now Foundation shares this mission, with particular emphasis on those mandates applying to California children.

8. To date, Free Now Foundation has approximately 30,000 members, with social media followings in the tens of thousands.

9. A substantial number of Free Now Foundation's membership includes individuals who question the constitutionality of CA Health & Safety Code Section 120335, and what right any governmental or legislative body has to mandate that an individual forego one fundamental right for

another.

10.     Moreover, the general membership of Free Now Foundation is comprised, in part, of individuals who are California citizens who have school aged children or grandchildren that are not fully vaccinated in accord with the requirements of Section 120335, and who wish their children and grandchildren to have the right to attend public or private schools, pre-schools, and daycare centers without regard to immunization status.

11.     Those parents and grandparents of un-immunized children are at risk of bearing the personal and financial costs of: (1) caring for any of those children who become injured as a result of any immunizations mandated for those children under California law, and/or (2) bearing the personal and financial burdens of home schooling the children excluded from public and private schools under Health and Safety Code 120335.

12.     Those individual members of Free Now Foundation who, as parents and grandparents of un-immunized children are at risk of bearing the burdens of either: (1) caring for children injured by immunizations mandated under Section 120335, or (2) providing home schooling for those children excluded from their usual schools, as a result of the ongoing enforcement of Section 120335 would otherwise have the right and ability to sue the Defendants in their own right in this matter should they have been named as an individual Plaintiff.

13.     I am also, in my individual capacity, serving as the Next Friend of minor child plaintiffs D.Q. and A.R. at the request of their parents and will withdraw upon the request of either parent..

14.     Because a significant number of members of Free Now Foundation, including myself, have the right and ability to sue in their own capacities, they have elected to have their interests be represented by plaintiff Free Now Foundation in this Matter on behalf of all such members.

15.     The primary purpose of this lawsuit, to stop any and all further enforcement of Section 120335 by the State of California as applied to all California children, is specifically in line with the mission of the Free Now Foundation and germane to its existence.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DECLARATION OF ALIX MAYER - PAGE 3

Executed at Redwood City, California, on May 7, 2025.

Alix Mayer, Chairman, Free Now Foundation

Exhibit 11

Richard B. Fox, J.D., M.D.
State Bar Number 283447
1875 S. Bascom Avenue, Ste. 2400
Campbell, CA 95008
Tel: 408-402-2452
Fax: 669-221-6281
drfox@drfoxlawoffice.com
Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Free Now Foundation, Brave And Free Santa Cruz, D.Q., by his Next Friend, Alix Mayer, A.R., by his Next Friend, Alix Mayer, T.E., by his Next Friend, Kathleen Lynch, and N.D., by his Next Friend, Kathleen Lynch;<br><br>                Plaintiffs<br><br>vs.<br><br>Erica Pan In Her Official Capacity As Director Of The California Department Of Public Health;<br><br>                Defendant | CASE NO. 2:24-cv-03523-DJC-SCR<br><br>Date:<br>Time:<br>Courtroom: 7<br>Judge: Hon. Daniel J. Calabretta<br><br>Declaration of Kathleen Lynch |

I, Kathleen Lynch, declare as follows:

1. Plaintiff Brave And Free Santa Cruz is an unincorporated freedom advocacy group that was organized on July 4, 2022 with its principal activities in Santa Cruz County, California. It meets regularly in Santa Cruz County. It maintains a website at braveandfreesantacruz.org/. I am the Co-Coordinator for the group.

2. As part of its mission, Brave and Free Santa Cruz has been opposed to mandatory childhood vaccines since its founding.

3. For example, our website's home page first went up about March 29, 2023, containing this mission statement:

> Our mission is to build a large people's movement in Santa Cruz County to fight the World Economic Forum's Great Reset. Our movement will reach a critical mass strong enough to

DECLARATION OF KATHLEEN LYNCH - PAGE 1

maintain our freedoms, our health choices, and our economic well-being. We are active locally to stop the damaging and unconstitutional mandates occurring under the pretext of the COVID-19 pandemic, part of the Globalist's "Great Reset" plan for totalitarian control and population reduction. We will resist and not cooperate with coercion and censorship. **We will not be subject to any form of dangerous injections and medical tyranny.** We employ powerful nonviolent strategies and educate ourselves to defeat the diabolical "Great Reset." We strive to create a community that is based on loving cooperation and service to each other, so that we may all thrive in a world that we are proud to pass on to future generations.

(Attachment 1.)

4.     That original home page also contains links to: (1) the home page of Children's Health Defense, then led by Robert F. Kennedy, Jr., a well known opponent of mandatory childhood vaccination, and (2) a web page captioned as, "Stop Mandatory Vaccinations." (*Ibid.*)

5.     One of the primary stated purposes of Brave and Free Santa Cruz is to promote medical freedom and choice, and to educate and protect the rights of individuals and ensure that the general public has knowledge of and a choice in what medications are put into the bodies of their children and themselves.

6.     The group meets monthly with attendance that varies between 20 and 100, depending on the speaker. It has 400 people on its email list. The group has a steering committee comprised of eight members that meets once a month. The group does a weekly outreach literature table at the Santa Cruz Farmer's Market.

7.     The group's members include the family of minor child T.E. in this matter.

8.     The group's members include current and/or potential parents and grandparents of unvaccinated children who wish their children and grandchildren to have the right to attend public or private schools, pre-schools, and daycare centers without regard to immunization status. Those actual and potential parents and grandparents of unvaccinated children are also at risk of bearing the personal and financial costs of: (1) caring for any of those children who become injured as a result of any immunizations mandated for those children under California law, and/or (2) bearing the personal and financial burdens of home schooling the children excluded from the public and private schools under Health and Safety Code Section 120335. The group also includes some members and/or attendees with family members who attend school under Individualized Education Programs.

9.     I am also, in my individual capacity, serving as the Next Friend of minor child plaintiffs

1   T.E and N.D. at the request of their parents and will withdraw upon the request of either parent..

2       10.     Because a significant number of members of Free Now Foundation, including myself,
3 have the right and ability to sue in our own capacities, we have elected to have our interests
4 represented by plaintiff Brave and Free Santa Cruz in this Matter on behalf of all such members.

5       11.     The primary purpose of this lawsuit, to stop any and all further mandatory
6 immunization of IEP students by the State of California is specifically in line with and germane to the
7 purpose for Brave and Free Santa Cruz's existence.

8       12.     I have personal knowledge of all matters and facts set forth herein and could and would
9 competently testify thereto if called upon to do so.

10

11       I declare under penalty of perjury under the laws of the State of California that the foregoing
12 is true and correct.

13

14 Executed at Aptos, California, on May 6, 2025

15

16

17                     Kathleen Lynch

18

19

20

21

22

23

24

25

26

27

28

Exhibit 12

Richard B. Fox, J.D., M.D.
State Bar Number 283447
1875 S. Bascom Avenue, Ste. 2400
Campbell, CA 95008
Tel: 408-402-2452
Fax: 669-221-6281
drfox@drfoxlawoffice.com
Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Free Now Foundation, And Brave And Free Santa Cruz;<br><br>    PlaintiffS,<br><br>vs.<br><br>Tomás Aragón In His Official Capacity As Director Of The California Department Of Public Health, And Courtney Johnson, In Her Official Capacity As Principal, Foothill Technology High School, Ventura Unified School District, Monica Morales, In Her Official Capacity As Director, Santa Cruz County Health Services Agency;<br><br>    Defendants | Case No.: 2:24−CV−03523−DJC−SCR<br>DECLARATION OF:<br><br>JENNIFER CHUBB |

1. I am Jennifer Chubb.

2. I have personal knowledge of all matters and facts set forth herein and could and would competently testify thereto if called upon to do so.

3. I am a former police officer in a city of about 300,000 population.

4. During the time I served as a police officer in that city I was assigned to the Child Victim and Sexual Assault Unit (CVSA) which  investigates cases of Sudden Infant

DECLARATION OF:JENNIFER CHUBB - 1

Death Syndrome, which we defined as the death of an infant of age less than one month to one year with no other identifiable cause of death.

5. I estimate that CVSA investigated about 250 such cases over a seven-year period.

6. As part of those investigations, it was detective protocol to ask the parents about any vaccinations that might have occurred in the days and weeks before the infant died.

7. Based upon that experience, I estimate that about 50% of the infant deaths that were investigated occurred within 48 hours after that infant received a vaccination.

8. I would also estimate that about 70% of those infant deaths occurred within one week after that infant received a vaccination.

9. Overall, in my professional opinion as a police investigator trained to look for non-accidental causes of infant death, I would estimate that 85% of those infant deaths were most likely caused by vaccinations.

10. Nonetheless, in my experience, vaccination was never listed as a cause of death on the official death certificate.

11. On September 26, 2023 I did an interview on the above topic with Steve Kirsch on his Vaccine Safety Research Foundation podcast. It can be viewed at this link:
https://rumble.com/v3l4f9k-former-police-detective-reveals-50-of-sids-cases-happened-within-48-hours-p.html?utm_source=substack&utm_medium=email

12. A machine-transcribed transcript of that interview is appended to this Declaration. All of my statements in that interview, as transcribed in the attachment, are hereby incorporated by reference into this Declaration.

I declare under penalty of perjury under the laws of the State of Nebraska

that the foregoing is true and correct.

Executed at Omaha, NE _____, on 4/5/25

_____
(Signature)

Name: Jennifer Chubb

DECLARATION OF:JENNIFER CHUBB - 3

Exhibit 13

Richard B. Fox, J.D., M.D.
State Bar Number 283447
1875 S. Bascom Avenue, Ste. 2400
Campbell, CA 95008
Tel: 408-402-2452
Fax: 669-221-6281
drfox@drfoxlawoffice.com
Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Free Now Foundation, And Brave And Free Santa Cruz;<br><br>        PlaintiffS,<br><br>vs.<br><br>Erica Pan In Her Official Capacity As Director Of The California Department Of Public Health, And Courtney Johnson, In Her Official Capacity As Principal, Foothill Technology High School, Ventura Unified School District, Monica Morales, In Her Official Capacity As Director, Santa Cruz County Health Services Agency;<br><br>        Defendants | Case No.: 2:24−CV−03523−DJC−SCR<br>DECLARATION OF:<br><br>DARLENE  CULOTTA<br><br>SUDDEN CHILD DEATH CASE |

1. I am  __DARLENE CULOTTA__ ,

2. I have personal knowledge of all matters and facts set forth herein and could and would competently testify thereto if called upon to do so.

3. My child was __7 Weeks__ old when __He__ died.

4. My child died __Day after__ day(s) after __He__ got immunizations (shots).

5. Before my child died __He__ got __One DPT shot__ separate injections (shots)

6. Prior to my child's sudden death, __He__ was in:

    ◎ Good health  ___ Minor illness  ___ Major illness

7. The immunizations (shots) that my child got before (s)he died included:

☑ Diphtheria

____ Haemophilus influenzae type b

____ Hepatitis B

____ Measles

____ Mumps

☑ Pertussis (whooping cough)

____ Poliomyelitis

____ Rubella

☑ Tetanus

____ Varicella (chicken pox)

____ None

8. When I gave consent for the immunizations (shots) right before my child died, the possibility of death Was Never _____ mentioned to me.

9. If I knew at the time I gave consent for the immunizations (shots) right before my child died, I Would never _____ have given that consent.

10. Other Important Facts Or Opinions, Including The Impact On The Family:

I took him to his WELL BABY check up back in May of 1969 and found him dead in his crib the next morning.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Palmdale , on 04/06/2025

*Darlene Culotta*

(Signature)

Name: DARLENE CULOTTA

Exhibit 14

Richard B. Fox, J.D., M.D.
State Bar Number 283447
1875 S. Bascom Avenue, Ste. 2400
Campbell, CA 95008
Tel: 408-402-2452
Fax: 669-221-6281
drfox@drfoxlawoffice.com
Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Free Now Foundation, And Brave And Free Santa Cruz;<br><br>PlaintiffS,<br><br>vs.<br><br>Erica Pan In Her Official Capacity As Director Of The California Department Of Public Health, And Courtney Johnson, In Her Official Capacity As Principal, Foothill Technology High School, Ventura Unified School District, Monica Morales, In Her Official Capacity As Director, Santa Cruz County Health Services Agency;<br><br>Defendants | Case No.: 2:24−CV−03523−DJC−SCR<br>DECLARATION OF:<br><br>SALLY RUBIN<br><br>REGRESSIVE AUTISM DECLARATION |

1. I am _____SALLY RUBIN_____,

2. I have personal knowledge of all matters and facts set forth herein and could and would competently testify thereto if called upon to do so.

3. My child was ____3 YEARS 7 MONTHS____ old and developing normally when HIS_____ development and behavior suddenly regressed after getting immunizations.

4. After getting the immunizations my child regressed in the following ways (rate each on a 0 to 3 scale, with 0 being no regression, 1 being mild regression, 2 being moderate regression, and 3 being severe regression):

REGRESSION AUTISM DECLARATION

**Social Communication**:

3 \_\_\_\_ Difficulty understanding and using social cues, such as eye contact, facial expressions, and body language

3 \_\_\_\_ Limited eye contact and avoidance of eye contact

2 \_\_\_\_ Lack of interest in social interactions and difficulty sharing experiences

3 \_\_\_\_ Challenges with understanding and responding to emotions in others

**Repetitive Behaviors:**

1 \_\_\_\_ Repetitive movements, such as hand flapping, spinning, or rocking

3 \_\_\_\_ Insistence on routines and resistance to change

3 \_\_\_\_ Highly focused interests or obsessions with specific objects or activities

3 \_\_\_\_ Stereotyped speech patterns, such as repeating words or phrases

**Restricted Interests:**

3 \_\_\_\_ Intense and narrow interests that may consume a significant amount of time and attention

3 \_\_\_\_ Difficulty shifting focus from their interests to other activities

3 \_\_\_\_ Preference for certain objects, textures, or sensory experiences

**Other Characteristics:**

3 \_\_\_\_ Delayed language development or unusual language patterns

3 \_\_\_\_ Difficulty with pretend play and imaginative activities

3 \_\_\_\_ Sensory sensitivities, such as over- or undersensitivity to sounds, textures, or smells

2 \_\_\_\_ Challenges with motor coordination or fine motor skills

3 \_\_\_\_ Unusual eating habits or food preferences

REGRESSION AUTISM DECLARATION

5. This regression began ___01/20/1997___

6. This regression was complete or nearly complete   DAYS

7. Prior to my child's regression, ___HE___ was in:

   ___ Good health   ◎ Minor illness   ___ Major illness

8. The immunizations (shots) that my child got before (s)he regressed included:

   ☑ Diphtheria

   ___ Haemophilus influenzae type b

   ___ Hepatitis B

   ☑ Measles

   ☑ Mumps

   ___ Pertussis (whooping cough)

   ___ Poliomyelitis

   ☑ Rubella

   ☑ Tetanus

   ___ Varicella (chicken pox)

   Other immunizations: NONE

9. When I gave consent for the immunizations (shots) right before my child became autistic, the possibility of autism ___WAS NEVER___ mentioned to me.

10. If I knew at the time I gave consent for the immunizations (shots) right before my child became autistic, I ___WOULD NEVER___ have given that consent.

REGRESSION AUTISM DECLARATION

11. Other Important Facts Or Opinions, Including The Impact On The Family:

I HAD MY OWN COMPANY AT THE TIME AND CLOSED IT TO BE ABLE
TO DEVOTE MYSELF FULL TIME TO HELPING MY SON. IT HAS BEEN
FINANCIALLY DEVASTATING.

I declare under penalty of perjury under the laws of the State of CALIFORNIA
that the foregoing is true and correct.

Executed at _____OAKLAND, CA_____, on ____04/03/2025_____

_____
(Signature)

Name: ____SALLY RUBIN_____

REGRESSION AUTISM DECLARATION

Exhibit 15

Richard B. Fox, J.D., M.D.
State Bar Number 283447
1875 S. Bascom Avenue, Ste. 2400
Campbell, CA 95008
Tel: 408-402-2452
Fax: 669-221-6281
drfox@drfoxlawoffice.com
Attorney for Plaintiffs

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Free Now Foundation, And Brave And Free Santa Cruz;<br><br>            PlaintiffS,<br><br>vs.<br><br>Erica Pan In Her Official Capacity As Director Of The California Department Of Public Health, And Courtney Johnson, In Her Official Capacity As Principal, Foothill Technology High School, Ventura Unified School District, Monica Morales, In Her Official Capacity As Director, Santa Cruz County Health Services Agency;<br><br>            Defendants | Case No.: 2:24−CV−03523−DJC−SCR<br>DECLARATION OF:<br><br>JENNIFER SILVA<br><br>REGRESSIVE AUTISM DECLARATION |

1. I am  _JENNIFER SILVA_____,

2. I have personal knowledge of all matters and facts set forth herein and could and would competently testify thereto if called upon to do so.

3. My child was  _18 MONTHS_____  old and developing normally when  _HER_____  development and behavior suddenly regressed after getting immunizations.

4. After getting the immunizations my child regressed in the following ways (rate each on a 0 to 3 scale, with 0 being no regression, 1 being mild regression, 2 being moderate regression, and 3 being severe regression):

REGRESSION AUTISM DECLARATION

**Social Communication**:

3 ___ Difficulty understanding and using social cues, such as eye contact, facial expressions, and body language

3 ___ Limited eye contact and avoidance of eye contact

3 ___ Lack of interest in social interactions and difficulty sharing experiences

2 ___ Challenges with understanding and responding to emotions in others

**Repetitive Behaviors:**

2 ___ Repetitive movements, such as hand flapping, spinning, or rocking

3 ___ Insistence on routines and resistance to change

3 ___ Highly focused interests or obsessions with specific objects or activities

3 ___ Stereotyped speech patterns, such as repeating words or phrases

**Restricted Interests:**

2 ___ Intense and narrow interests that may consume a significant amount of time and attention

2 ___ Difficulty shifting focus from their interests to other activities

2 ___ Preference for certain objects, textures, or sensory experiences

**Other Characteristics:**

3 ___ Delayed language development or unusual language patterns

3 ___ Difficulty with pretend play and imaginative activities

2 ___ Sensory sensitivities, such as over- or undersensitivity to sounds, textures, or smells

1 ___ Challenges with motor coordination or fine motor skills

3 ___ Unusual eating habits or food preferences

REGRESSION AUTISM DECLARATION

5. This regression began _____09/04/2018_____

6. This regression was complete or nearly complete   11 MONTHS

7. Prior to my child's regression, _____SHE_____ was in:

   ⊚ Good health     ___ Minor illness     ___ Major illness

8. The immunizations (shots) that my child got before (s)he regressed included:

   ☑ Diphtheria

   ___ Haemophilus influenzae type b

   ___ Hepatitis B

   ___ Measles

   ___ Mumps

   ☑ Pertussis (whooping cough)

   ___ Poliomyelitis

   ___ Rubella

   ☑ Tetanus

   ___ Varicella (chicken pox)

   Other immunizations:

9. When I gave consent for the immunizations (shots) right before my child became autistic, the possibility of autism _____NEVER_____ mentioned to me.

10. If I knew at the time I gave consent for the immunizations (shots) right before my child became autistic, I __WOULD NEVER__ have given that consent.

REGRESSION AUTISM DECLARATION

11. Other Important Facts Or Opinions, Including The Impact On The Family:

MY DAUGHTER BECAME VERY AGITATED INITIALLY, UNABLE TO COPE WITH DAILY LIFE,
EXPERIENCING SEVERAL TANTRUMS, WHICH HAD NEVER OCCURRED BEFORE. SHE THEN LOST
HER EYE CONTACT AND ABILITY TO ANSWER TO HER NAME. SHE WANDERED AROUND OUR
HOME AS IF WE WERN'T THERE. I FELT LIKE I HAD LOST MY GIRL. THE REGRET AND SADNESS
THAT ENVELOPED ME AS A MOTHER WAS OVERPOWERING.

I declare under penalty of perjury under the laws of the State of CALIFORNIA
that the foregoing is true and correct.

Executed at _____HUNTINGTON BEACH, CA_____, on ____04/04/2025____

_____
(Signature)

Name: ___JENNIFER SILVA_____

REGRESSION AUTISM DECLARATION

Exhibit 16

Richard B. Fox, J.D., M.D.
State Bar Number 283447
1875 S. Bascom Avenue, Ste. 2400
Campbell, CA 95008
Tel: 408-402-2452
Fax: 669-221-6281
drfox@drfoxlawoffice.com
Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Free Now Foundation, And Brave And Free Santa Cruz; <br><br>         PlaintiffS, <br><br> vs. <br><br> Erica Pan In Her Official Capacity As Director Of The California Department Of Public Health, And Courtney Johnson, In Her Official Capacity As Principal, Foothill Technology High School, Ventura Unified School District, Monica Morales, In Her Official Capacity As Director, Santa Cruz County Health Services Agency; <br><br>         Defendants | Case No.: 2:24−CV−03523−DJC−SCR DECLARATION OF: <br><br>     MEENA KURIAN <br><br> REGRESSIVE AUTISM DECLARATION |

1. I am ___Meena Kurian___,

2. I have personal knowledge of all matters and facts set forth herein and could and would competently testify thereto if called upon to do so.

3. My child was ___14 months___ old and developing normally when his _____ development and behavior suddenly regressed after getting immunizations.

4. After getting the immunizations my child regressed in the following ways (rate each on a 0 to 3 scale, with 0 being no regression, 1 being mild regression, 2 being moderate regression, and 3 being severe regression):

REGRESSION AUTISM DECLARATION

**Social Communication**:

- ☑ Difficulty understanding and using social cues, such as eye contact, facial expressions, and body language

- ☑ Limited eye contact and avoidance of eye contact

- ☑ Lack of interest in social interactions and difficulty sharing experiences

- ☑ Challenges with understanding and responding to emotions in others

**Repetitive Behaviors:**

- ☑ Repetitive movements, such as hand flapping, spinning, or rocking

- ☑ Insistence on routines and resistance to change

- ☑ Highly focused interests or obsessions with specific objects or activities

- ☑ Stereotyped speech patterns, such as repeating words or phrases

**Restricted Interests:**

- ☑ Intense and narrow interests that may consume a significant amount of time and attention

- ☑ Difficulty shifting focus from their interests to other activities

- ☑ Preference for certain objects, textures, or sensory experiences

**Other Characteristics:**

- ☑ Delayed language development or unusual language patterns

- ☑ Difficulty with pretend play and imaginative activities

- ☑ Sensory sensitivities, such as over- or undersensitivity to sounds, textures, or smells

- ☑ Challenges with motor coordination or fine motor skills

- ☑ Unusual eating habits or food preferences

REGRESSION AUTISM DECLARATION

5. This regression began ___11/12/2008_____

6. This regression was complete or nearly complete

7. Prior to my child's regression, _he_____ was in:

   ◎ Good health     ___ Minor illness     ___ Major illness

8. The immunizations (shots) that my child got before (s)he regressed included:

   ☑ Diphtheria

   ☑ Haemophilus influenzae type b

   ☑ Hepatitis B

   ☑ Measles

   ☑ Mumps

   ☑ Pertussis (whooping cough)

   ☑ Poliomyelitis

   ☑ Rubella

   ☑ Tetanus

   ___ Varicella (chicken pox)

   Other immunizations:   Flu

9. When I gave consent for the immunizations (shots) right before my child became autistic, the possibility of autism ___was never_____ mentioned to me.

10. If I knew at the time I gave consent for the immunizations (shots) right before my child became autistic, I ___would never_____ have given that consent.

REGRESSION AUTISM DECLARATION

11. Other Important Facts Or Opinions, Including The Impact On The Family:

Financial strain, could not work as an RN as my
son needed me. Girls felt neglected as we had
to focus on son. Strained marital and family
bonds.

I declare under penalty of perjury under the laws of the State of Virginia
that the foregoing is true and correct.

Executed at _____Wise_____, on ____04/03/2025_____

*MeenaGK*

(Signature)

Name: ____Meena Kurian_____

REGRESSION AUTISM DECLARATION

Exhibit 17

1    Richard B. Fox, J.D., M.D.
     State Bar Number 283447
2    1875 S. Bascom Avenue, Ste. 2400
     Campbell, CA 95008
3    Tel: 408-402-2452
     Fax: 669-221-6281
4    drfox@drfoxlawoffice.com
     Attorney for Plaintiffs
5

6

7                        UNITED STATES DISTRICT COURT

8                        EASTERN DISTRICT OF CALIFORNIA

9

10   Free Now Foundation, And Brave And Free        Case No.: 2:24-CV-03523-DJC-SCR
                                                     DECLARATION OF:
11   Santa Cruz;
                    PlaintiffS,                      SALVADORE NEWTON
12
13   vs.                                             REGRESSIVE AUTISM DECLARATION

14   Erica Pan In Her Official Capacity As Director
     Of The California Department Of Public Health,
15   And Courtney Johnson, In Her Official Capacity
     As Principal, Foothill Technology High School,
16   Ventura Unified School District, Monica
     Morales, In Her Official Capacity As Director,
17   Santa Cruz County Health Services Agency;

18
                    Defendants
19

20      1. I am ___Salvadore Newton___.

21      2. I have personal knowledge of all matters and facts set forth herein and could and
22         would competently testify thereto if called upon to do so.

23      3. My child was ___2.5 months___ old and developing normally when
24         His ___ development and behavior suddenly regressed after getting immunizations.

25      4. After getting the immunizations my child regressed in the following ways (rate each
           on a 0 to 3 scale, with 0 being no regression, 1 being mild regression, 2 being
26         moderate regression, and 3 being severe regression):

27

28                          REGRESSION AUTISM DECLARATION

**Social Communication**:

2 ___ Difficulty understanding and using social cues, such as eye contact, facial expressions, and body language

3 ___ Limited eye contact and avoidance of eye contact

2 ___ Lack of interest in social interactions and difficulty sharing experiences

2 ___ Challenges with understanding and responding to emotions in others

**Repetitive Behaviors:**

3 ___ Repetitive movements, such as hand flapping, spinning, or rocking

2 ___ Insistence on routines and resistance to change

3 ___ Highly focused interests or obsessions with specific objects or activities

1 ___ Stereotyped speech patterns, such as repeating words or phrases

**Restricted Interests:**

3 ___ Intense and narrow interests that may consume a significant amount of time and attention

3 ___ Difficulty shifting focus from their interests to other activities

3 ___ Preference for certain objects, textures, or sensory experiences

**Other Characteristics:**

3 ___ Delayed language development or unusual language patterns

2 ___ Difficulty with pretend play and imaginative activities

3 ___ Sensory sensitivities, such as over- or undersensitivity to sounds, textures, or smells

3 ___ Challenges with motor coordination or fine motor skills

3 ___ Unusual eating habits or food preferences

REGRESSION AUTISM DECLARATION

5. This regression began ___04/25/2012___

6. This regression was complete or nearly complete   Unknown

7. Prior to my child's regression, ___He___ was in:

   🔘 Good health   ___ Minor illness   ___ Major illness

8. The immunizations (shots) that my child got before (s)he regressed included:

   ___ Diphtheria

   ___ Haemophilus influenzae type b

   ___ Hepatitis B

   ___ Measles

   ___ Mumps

   ___ Pertussis (whooping cough)

   ☑ Poliomyelitis

   ___ Rubella

   ___ Tetanus

   ___ Varicella (chicken pox)

   Other immunizations:   Polio; HIB; Pneumococcal; Rota Rix

9. When I gave consent for the immunizations (shots) right before my child became autistic, the possibility of autism ___Was never___ mentioned to me.

10. If I knew at the time I gave consent for the immunizations (shots) right before my child became autistic, I ___Would never___ have given that consent.

REGRESSION AUTISM DECLARATION

1

## 11. Other Important Facts Or Opinions, Including The Impact On The Family:

Hunter developed seizures and still has them to this day. The first 7 years of his life Hunter had trouble sleeping. Little to no trouble before the shots. He would pace back and forth endlessly, sometimes until 1 or 2 in the morning, I had many sleepless nights. To this day he can't sleep without melatonin supplements. Hunter was forming words and crawling at an extremely early age. Now at 13 he can't speak and is still in diapers. He needs care for food preparation and personal hygiene. I pray one day he can function on his own and have a good productive life.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at ___Novato CA_____, on ___04/04/2025___



(Signature)

Name: __Salvadore  Newton___

REGRESSION AUTISM DECLARATION

Exhibit 18

Richard B. Fox, J.D., M.D.
State Bar Number 283447
1875 S. Bascom Avenue, Ste. 2400
Campbell, CA 95008
Tel: 408-402-2452
Fax: 669-221-6281
drfox@drfoxlawoffice.com
Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Free Now Foundation, And Brave And Free Santa Cruz;<br><br>        PlaintiffS,<br><br>vs.<br><br>Erica Pan In Her Official Capacity As Director Of The California Department Of Public Health, And Courtney Johnson, In Her Official Capacity As Principal, Foothill Technology High School, Ventura Unified School District, Monica Morales, In Her Official Capacity As Director, Santa Cruz County Health Services Agency;<br><br>        Defendants | Case No.: 2:24−CV−03523−DJC−SCR<br>DECLARATION OF:<br><br>ANN TODD<br><br>REGRESSIVE AUTISM DECLARATION |

1. I am ANN TODD _____,

2. I have personal knowledge of all matters and facts set forth herein and could and would competently testify thereto if called upon to do so.

3. My child was 20 MOS _____ old and developing normally when HER_____ development and behavior suddenly regressed after getting immunizations.

4. After getting the immunizations my child regressed in the following ways (rate each on a 0 to 3 scale, with 0 being no regression, 1 being mild regression, 2 being moderate regression, and 3 being severe regression):

REGRESSION AUTISM DECLARATION

**Social Communication**:

2 ____ Difficulty understanding and using social cues, such as eye contact, facial expressions, and body language

3 ____ Limited eye contact and avoidance of eye contact

3 ____ Lack of interest in social interactions and difficulty sharing experiences

3 ____ Challenges with understanding and responding to emotions in others

**Repetitive Behaviors:**

3 ____ Repetitive movements, such as hand flapping, spinning, or rocking

3 ____ Insistence on routines and resistance to change

3 ____ Highly focused interests or obsessions with specific objects or activities

3 ____ Stereotyped speech patterns, such as repeating words or phrases

**Restricted Interests:**

3 ____ Intense and narrow interests that may consume a significant amount of time and attention

2 ____ Difficulty shifting focus from their interests to other activities

2 ____ Preference for certain objects, textures, or sensory experiences

**Other Characteristics:**

3 ____ Delayed language development or unusual language patterns

3 ____ Difficulty with pretend play and imaginative activities

2 ____ Sensory sensitivities, such as over- or undersensitivity to sounds, textures, or smells

1 ____ Challenges with motor coordination or fine motor skills

2 ____ Unusual eating habits or food preferences

REGRESSION AUTISM DECLARATION

5. This regression began _____04/06/2025_____

6. This regression was complete or nearly complete   6 MOS

7. Prior to my child's regression, ____SHE_____ was in:

  ◎ Good health     ___ Minor illness     ___ Major illness

8. The immunizations (shots) that my child got before (s)he regressed included:

  ☑ Diphtheria

  ____Haemophilus influenzae type b

  ☑ Hepatitis B

  ☑ Measles

  ☑ Mumps

  ☑ Pertussis (whooping cough)

  ☑ Poliomyelitis

  ☑ Rubella

  ☑ Tetanus

  ☑ Varicella (chicken pox)

  Other immunizations:

9. When I gave consent for the immunizations (shots) right before my child became autistic, the possibility of autism ____WAS NEVER_____ mentioned to me.

10. If I knew at the time I gave consent for the immunizations (shots) right before my child became autistic, I ___WOULD NEVER_____ have given that consent.

REGRESSION AUTISM DECLARATION

11. Other Important Facts Or Opinions, Including The Impact On The Family:

SHE WAS FULLY DIAGNOSES ADD BY AGE 3. SHE HAS HAD AN IEP
ALL THROUGOUT SCHOOL AND IS NOW AN ADULT UNDER
CONSERVATORSHIP.

I declare under penalty of perjury under the laws of the State of CA
that the foregoing is true and correct.

Executed at _____LONG BEACH CA_____, on _____04/06/2025_____

*ANN TODD*
_____
(Signature)

Name:____ANN TODD_____

REGRESSION AUTISM DECLARATION

Exhibit 19

Richard B. Fox, J.D., M.D.
State Bar Number 283447
1875 S. Bascom Avenue, Ste. 2400
Campbell, CA 95008
Tel: 408-402-2452
Fax: 669-221-6281
drfox@drfoxlawoffice.com
Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Free Now Foundation, And Brave And Free Santa Cruz;<br><br>    PlaintiffS,<br><br>vs.<br><br>Erica Pan In Her Official Capacity As Director Of The California Department Of Public Health, And Courtney Johnson, In Her Official Capacity As Principal, Foothill Technology High School, Ventura Unified School District, Monica Morales, In Her Official Capacity As Director, Santa Cruz County Health Services Agency;<br><br>    Defendants | Case No.: 2:24−CV−03523−DJC−SCR<br>DECLARATION OF:<br><br>Janice Fry<br><br>REGRESSIVE AUTISM DECLARATION |

1. I am ___Janice Fry___.

2. I have personal knowledge of all matters and facts set forth herein and could and would competently testify thereto if called upon to do so.

3. My child was ___5___ old and developing normally when His___ development and behavior suddenly regressed after getting immunizations.

4. After getting the immunizations my child regressed in the following ways (rate each on a 0 to 3 scale, with 0 being no regression, 1 being mild regression, 2 being moderate regression, and 3 being severe regression):

REGRESSION AUTISM DECLARATION

**Social Communication**:

3 ____ Difficulty understanding and using social cues, such as eye contact, facial expressions, and body language

3 ____ Limited eye contact and avoidance of eye contact

3 ____ Lack of interest in social interactions and difficulty sharing experiences

3 ____ Challenges with understanding and responding to emotions in others

**Repetitive Behaviors:**

3 ____ Repetitive movements, such as hand flapping, spinning, or rocking

3 ____ Insistence on routines and resistance to change

3 ____ Highly focused interests or obsessions with specific objects or activities

3 ____ Stereotyped speech patterns, such as repeating words or phrases

**Restricted Interests:**

3 ____ Intense and narrow interests that may consume a significant amount of time and attention

3 ____ Difficulty shifting focus from their interests to other activities

3 ____ Preference for certain objects, textures, or sensory experiences

**Other Characteristics:**

3 ____ Delayed language development or unusual language patterns

3 ____ Difficulty with pretend play and imaginative activities

3 ____ Sensory sensitivities, such as over- or undersensitivity to sounds, textures, or smells

3 ____ Challenges with motor coordination or fine motor skills

3 ____ Unusual eating habits or food preferences

REGRESSION AUTISM DECLARATION

5. This regression began _06/01/2020_____

6. This regression was complete or nearly complete   Days

7. Prior to my child's regression, _He_____ was in:

   ◎ Good health    ___ Minor illness    ___ Major illness

8. The immunizations (shots) that my child got before (s)he regressed included:

   ___ Diphtheria

   ☑ Haemophilus influenzae type b

   ☑ Hepatitis B

   ☑ Measles

   ___ Mumps

   ___ Pertussis (whooping cough)

   ___ Poliomyelitis

   ___ Rubella

   ___ Tetanus

   ___ Varicella (chicken pox)

   Other immunizations:   The other regular child vaccines

9. When I gave consent for the immunizations (shots) right before my child became autistic, the possibility of autism _Was never_____ mentioned to me.

10. If I knew at the time I gave consent for the immunizations (shots) right before my child became autistic, I _World never_____ have given that consent.

REGRESSION AUTISM DECLARATION

11. Other Important Facts Or Opinions, Including The Impact On The Family:

My child became a completely different person, it was like a light switched off in him. He was social and talkative he was already saying basic words, signing to communicate. And after he became withdrawn would get angry, anti social, didn't even like his brothers out want to interact with any other children like he did prior. And now at 5 I am dealing with being his full time caregiver he hits other people and spits on them. He is non verbal. He hits himself, the list is long.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at ___Whittier_____, on ___04/06/2025_____

_____
(Signature)

Name: ___Janice Fry_____

REGRESSION AUTISM DECLARATION

Exhibit 20

Richard B. Fox, J.D., M.D.
State Bar Number 283447
1875 S. Bascom Avenue, Ste. 2400
Campbell, CA 95008
Tel: 408-402-2452
Fax: 669-221-6281
drfox@drfoxlawoffice.com
Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| Free Now Foundation, And Brave And Free Santa Cruz;<br><br>　　　　　Plaintiffs,<br><br>vs.<br><br>Erica Pan In Her Official Capacity As Director Of The California Department Of Public Health, And Courtney Johnson, In Her Official Capacity As Principal, Foothill Technology High School, Ventura Unified School District, Monica Morales, In Her Official Capacity As Director, Santa Cruz County Health Services Agency;<br><br>　　　　　Defendants | Case No.: 2:24−CV−03523−DJC−SCR<br>DECLARATION OF:<br><br>Marie Bacsik<br><br>REGRESSIVE AUTISM DECLARATION |

1. I am __Marie Bacsik_____.

2. I have personal knowledge of all matters and facts set forth herein and could and would competently testify thereto if called upon to do so.

3. My child was ____10_____ old and developing normally when __Her_____ development and behavior suddenly regressed after getting immunizations.

4. After getting the immunizations my child regressed in the following ways (rate each on a 0 to 3 scale, with 0 being no regression, 1 being mild regression, 2 being moderate regression, and 3 being severe regression):

REGRESSION AUTISM DECLARATION

**Social Communication**:

3 \_\_\_\_ Difficulty understanding and using social cues, such as eye contact, facial expressions, and body language

3 \_\_\_\_ Limited eye contact and avoidance of eye contact

3 \_\_\_\_ Lack of interest in social interactions and difficulty sharing experiences

3 \_\_\_\_ Challenges with understanding and responding to emotions in others

**Repetitive Behaviors:**

3 \_\_\_\_ Repetitive movements, such as hand flapping, spinning, or rocking

3 \_\_\_\_ Insistence on routines and resistance to change

3 \_\_\_\_ Highly focused interests or obsessions with specific objects or activities

3 \_\_\_\_ Stereotyped speech patterns, such as repeating words or phrases

**Restricted Interests:**

3 \_\_\_\_ Intense and narrow interests that may consume a significant amount of time and attention

3 \_\_\_\_ Difficulty shifting focus from their interests to other activities

3 \_\_\_\_ Preference for certain objects, textures, or sensory experiences

**Other Characteristics:**

3 \_\_\_\_ Delayed language development or unusual language patterns

3 \_\_\_\_ Difficulty with pretend play and imaginative activities

3 \_\_\_\_ Sensory sensitivities, such as over- or undersensitivity to sounds, textures, or smells

3 \_\_\_\_ Challenges with motor coordination or fine motor skills

3 \_\_\_\_ Unusual eating habits or food preferences

REGRESSION AUTISM DECLARATION

5. This regression began _____11/07/2019_____

6. This regression was complete or nearly complete   5 days

7. Prior to my child's regression, ____She____ was in:

   ___ Good health   Ⓞ Minor illness   ___ Major illness

8. The immunizations (shots) that my child got before (s)he regressed included:

   ☑ Diphtheria

   ☑ Haemophilus influenzae type b

   ☑ Hepatitis B

   ☑ Measles

   ☑ Mumps

   ☑ Pertussis (whooping cough)

   ☑ Poliomyelitis

   ☑ Rubella

   ☑ Tetanus

   ☑ Varicella (chicken pox)

   Other immunizations:   Hep A

9. When I gave consent for the immunizations (shots) right before my child became autistic, the possibility of autism ____Was never____ mentioned to me.

10. If I knew at the time I gave consent for the immunizations (shots) right before my child became autistic, I ____Would never____ have given that consent.

REGRESSION AUTISM DECLARATION

## 11. Other Important Facts Or Opinions, Including The Impact On The Family:

She was in the hospital with Infantile Spasms about 24 hours after her vaccines and lost all abilities within a few days. She now has Severe Autism, Severe Autoimmune Encephalitis and is on IVIG (insurance approved because of how severe), severe gut dysbiosis, rashes, and has suffered Infantile Spasms and Syncope. We have all the testing to prove all of this and it all matches up with her hospital admissions. She is still receiving these treatments at age 10.

I declare under penalty of perjury under the laws of the State of California
that the foregoing is true and correct.

Executed at _____El Cajon, California_____, on ____04/04/2025_____.

_____
(Signature)

Name:____Marie Bacsik_____

REGRESSION AUTISM DECLARATION

Exhibit 21

Richard B. Fox, J.D., M.D.
State Bar Number 283447
1875 S. Bascom Avenue, Ste. 2400
Campbell, CA 95008
Tel: 408-402-2452
Fax: 669-221-6281
drfox@drfoxlawoffice.com
Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| Free Now Foundation, And Brave And Free Santa Cruz;<br><br>        PlaintiffS,<br><br>vs.<br><br>Erica Pan In Her Official Capacity As Director Of The California Department Of Public Health, And Courtney Johnson, In Her Official Capacity As Principal, Foothill Technology High School, Ventura Unified School District, Monica Morales, In Her Official Capacity As Director, Santa Cruz County Health Services Agency;<br><br>        Defendants | Case No.: 2:24−CV−03523−DJC−SCR<br>DECLARATION OF:<br><br>Kara Morales<br><br>CHRONIC VACCINE-INJURED CHILD DECLARATION |

1. I am _____Kara Morales_____,

2. I have personal knowledge of all matters and facts set forth herein and could and would competently testify thereto if called upon to do so.

3. My child was _____5.5 months_____ old and in good health until the day that ___he___ got immunized.

4. After getting the immunizations my child developed the following chronic condition:

epilepsy

VACCINE-INJURED CHILD DECLARATION

5. This chronic condition began _____04/03/2025_____

6. This chronic condition was complete or nearly complete approximately 2017?

7. Prior to my child's immunizations, __he_____ was in:

___ Good health    ◎ Minor illness    ___ Major illness

8. The immunizations (shots) that my child got before (s)he developed this chronic condition included:

☑ Diphtheria

☑ Haemophilus influenzae type b

___ Hepatitis B

___ Measles

___ Mumps

☑ Pertussis (whooping cough)

___ Poliomyelitis

___ Rubella

☑ Tetanus

___ Varicella (chicken pox)

Other immunizations:

He received the Hepatitis B vaccine as a newborn, and was in the hospital 2.5 weeks later with a high fever. The two events may be unrelated. However, we did not vaccinate him again until 5.5 months old. He was in generally good health at the time, but had a little dry cough. I asked if we should wait again since he had some kind of mild illness, but the nurse said he had no fever, no juicy cough, and so it was "perfectly safe". Within 24 hours of receiving those vaccines, he began having absence seizures. Within 72 hours of receiving the vaccines he collapsed in my arms, stopped breathing, and was taken by ambulance to Rady Children's Hospital. He had further seizures in the presence of an attending neurologist. He was moved to a room for observation, and at one point crashed and they moved him to the ICU. He spent 4 days total at Rady's. He was put on anti-seizure medication and remained on anti-seizure medication for several years. He continued to see the neurologist for breakthrough seizures. We did vaccinate him one more time when he was little, but did not give him DTaP ever again. I reported his near fatal adverse event to ...

VACCINE-INJURED CHILD DECLARATION

Other Important Facts Or Opinions, Including The Impact On The Family:

The neurologist told us in the ICU that the lack of oxygen to his brain during those serious seizures would most likely have some kind of impact on his learning. He does have an IEP still at age 16.5, but no longer has seizures and has been off anti-seizure medication for several years now. We stopped vaccinating him completely years ago and he is doing well now. There most definitely was a huge impact on our family. It is stressful to have a child with a serious medical condition. We had to give him medication every day, which was a battle. I gave up full time work for several years, which caused serious financial stress on our family. There are other impacts I could describe but will not in order to respect our son's privacy.

I declare under penalty of perjury under the laws of the State of <u>CALIFORNIA</u> that the foregoing is true and correct.

Executed at <u>San Diego, CA</u>, on <u>04/03/2025</u>

*K. Morales*
(Signature)

Name: <u>Kara Morales</u>

VACCINE-INJURED CHILD DECLARATION

Exhibit 22

1 | Richard B. Fox, J.D., M.D.
State Bar Number 283447
2 | 1875 S. Bascom Avenue, Ste. 2400
Campbell, CA 95008
3 | Tel: 408-402-2452
Fax: 669-221-6281
4 | drfox@drfoxlawoffice.com
Attorney for Plaintiffs
5 |

6 |

7 |                    **UNITED STATES DISTRICT COURT**

8 |                    **EASTERN DISTRICT OF CALIFORNIA**

9 |

10 | Free Now Foundation, And Brave And Free | Case No.: 2:24–CV–03523–DJC–SCR
Santa Cruz;                                | DECLARATION OF:
11 |            PlaintiffS,                   | Wendy Chin
12 |
13 | vs.                                      | CHRONIC VACCINE-INJURED CHILD
                                             | DECLARATION
14 | Erica Pan In Her Official Capacity As Director
Of The California Department Of Public Health,
15 | And Courtney Johnson, In Her Official Capacity
As Principal, Foothill Technology High School,
16 | Ventura Unified School District, Monica
Morales, In Her Official Capacity As Director,
17 | Santa Cruz County Health Services Agency;
18 |
19 |            Defendants
20 | 1.  I am _____Wendy Chin_____.

21 | 2.  I have personal knowledge of all matters and facts set forth herein and could and
22 |     would competently testify thereto if called upon to do so.

23 | 3.  My child was _____a newborn_____ old and in good health until the day
24 |     that ___she___ got immunized.

25 | 4.  After getting the immunizations my child developed the following chronic condition:

26 |
      Chronic, severe eczema
27 |
28 |                    VACCINE-INJURED CHILD DECLARATION

5. This chronic condition began ___04/11/2008___

6. This chronic condition was complete or nearly complete lifelong

7. Prior to my child's immunizations, ___she___ was in:

◎ Good health      ___ Minor illness      ___ Major illness

8. The immunizations (shots) that my child got before (s)he developed this chronic condition included:

___ Diphtheria

___ Haemophilus influenzae type b

☑ Hepatitis B

___ Measles

___ Mumps

___ Pertussis (whooping cough)

___ Poliomyelitis

___ Rubella

___ Tetanus

___ Varicella (chicken pox)

Other immunizations:

Despite her chronic eczema, her doctor continued to recommend routine vaccination according to AAP guidelines.

VACCINE-INJURED CHILD DECLARATION

Other Important Facts Or Opinions, Including The Impact On The Family:
My daughter was fully vaccinated at at age 5, and by that point she had developed life threatening food allergies and had anaphylactic reactions. In her teen years she was diagnosed with MCAS and suffers from chronic eczema, constipation, insomnia, and brain fog.

I declare under penalty of perjury under the laws of the State of CA that the foregoing is true and correct.

Executed at San Juan Capistrano, Ca, on 04/03/2025

*Wendy Chin*

(Signature)

Name: Wendy Chin

VACCINE-INJURED CHILD DECLARATION

Exhibit 23

Richard B. Fox, J.D., M.D.
State Bar Number 283447
1875 S. Bascom Avenue, Ste. 2400
Campbell, CA 95008
Tel: 408-402-2452
Fax: 669-221-6281
drfox@drfoxlawoffice.com
Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Free Now Foundation, And Brave And Free Santa Cruz;<br><br>        PlaintiffS,<br><br>vs.<br><br>Erica Pan In Her Official Capacity As Director Of The California Department Of Public Health, And Courtney Johnson, In Her Official Capacity As Principal, Foothill Technology High School, Ventura Unified School District, Monica Morales, In Her Official Capacity As Director, Santa Cruz County Health Services Agency;<br><br>        Defendants | Case No.: 2:24−CV−03523−DJC−SCR<br>DECLARATION OF:<br><br>GRACE SHAIN<br><br>CHRONIC VACCINE-INJURED CHILD DECLARATION |

1. I am _____Grace Shain_____,

2. I have personal knowledge of all matters and facts set forth herein and could and would competently testify thereto if called upon to do so.

3. My child was _____15_____ old and in good health until the day that _____he_____ got immunized.

VACCINE-INJURED CHILD DECLARATION

4.  After getting the immunizations my child developed the following chronic condition: vaccine induced myalgic encephalomyelitis, dysautonomia, POTS, PANDAS, gastroparesis, and a host of other neurological symptoms and others

5.  This chronic condition began _____ 02/03/2018 _____

6.  This chronic condition was complete or nearly complete  11/11/1111

7.  Prior to my child's immunizations, __ he _____ was in:

   ◎ Good health    ___ Minor illness    ___ Major illness

8.  The immunizations (shots) that my child got before (s)he developed this chronic condition included:

   ____ Diphtheria

   ____ Haemophilus influenzae type b

   ____ Hepatitis B

   ☑ Measles

   ____ Mumps

   ____ Pertussis (whooping cough)

   ____ Poliomyelitis

   ____ Rubella

   ____ Tetanus

   ____ Varicella (chicken pox)

   Other immunizations:

   Gardasil HPV

VACCINE-INJURED CHILD DECLARATION

9. When I gave consent for the immunizations (shots) right before my child died, the possibility of death __was never__ mentioned to me.

10. If I knew at the time I gave consent for the immunizations (shots) right before my child died I __would never__ have given that consent.

Other Important Facts Or Opinions, Including The Impact On The Family:
# 9 & #10 above is not applicable, as my son did not die.

My son was a straight A student, on 2 swim teams, super social, and shortly after receiving the Gardasil HPV vaccine became very sick, dropped out of all school, exercise, eventually became bed-bound for many years. He has never recovered and this has put an immense financial and emotional toll on the entire family.

I declare under penalty of perjury under the laws of the State of __California__ that the foregoing is true and correct.

Executed at __Pacific Palisades, California__, on __04/07/2025__

__(Signature)__

Name: __Grace Shain__

VACCINE-INJURED CHILD DECLARATION